IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMES BROWN and
CRAIG OWENS,

    Plaintiffs,

    v.

JOHN R. HOUSER, in his individual
capacity, and COBB COUNTY,
GEORGIA,

    Defendants.

CIVIL ACTION FILE

NO. 1:13-CV-1807-WSD-WEJ

## FINAL  REPORT  AND  RECOMMENDATION

"[A] touch with a sword on the [shoulder].  You're knighted."  (Lloyd Dep. [69] 38.)  This is how one former Cobb County official described a lieutenant's promotion to captain in the Cobb County Police Department (the "CCPD" or "Department").  When the sword passed over plaintiffs, James Brown and Craig Owens, they filed suit against defendants, Chief John R. Houser in his individual capacity, and Cobb County, Georgia.  They allege that defendants discriminated against them because of their race in violation of 42 U.S.C. § 1981 and the Equal Protection Clause, and retaliated against them for opposing racially discriminatory employment practices, in violation of Section 1981.  (First Am. Compl. [4] ¶¶ 54-76

(Counts I-III).[1])   Additionally, plaintiff Owens alleges that Cobb County discriminated against him because of his military service in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301, *et seq.*, and retaliated against him for exercising rights provided by USERRA.  (First Am. Compl. ¶¶ 77-92 (Counts IV-V).)

This case comes before the Court on defendants' First Motion for Partial Summary Judgment [59] and their Second Motion for Partial Summary Judgment [61].  Defendants' First Motion seeks summary judgment on plaintiffs' Section 1981 and Equal Protection Clause claims, and defendants' Second Motion seeks summary judgment on plaintiff Owens's USERRA claims.  The Court is aided in resolution of these Motions by defendants' supporting Briefs [59-1 ("Defs.' 1st Br."), 61-1 ("Def.'s 2d Br.")], plaintiffs' Response Briefs [72-1 ("Pls.' 1st Resp."), 73-1 ("Pl.'s 2d Resp.")], and defendants' Reply Briefs [80, 81 ("Def.'s 2d Reply")].  For the reasons discussed below, the undersigned **RECOMMENDS** that defendants' First Motion for Partial Summary Judgment [59] be **GRANTED** and that defendants'

---

[1] The First Amended Complaint supersedes plaintiffs' original Complaint as the operative pleading.  See Pintando v. Miami-Dade Hous. Agency, 501 F.3d 1241, 1243 (11th Cir. 2007) (per curiam).

2

Second Motion for Partial Summary Judgment [61] be **GRANTED IN PART** and **DENIED IN PART**.

## I.   STATEMENT OF FACTS

The Court draws the facts largely from the parties' submissions. Defendants filed Statements of Material Facts on Counts I-III [76] ("DSMF1") and Counts IV-V [75] ("DSMF2"). See N.D. Ga. R. 56.1B.(1). As required by Local Rule 56.1B.(2)a, plaintiffs filed Responses to DSMF1 [79] ("R-DSMF1") and DSMF2 [78] ("R-DSMF2"). Plaintiffs also filed Statements of Additional Facts Presenting Genuine Issues for Trial as to Counts I-III [79-1] ("PSAF1") and Counts IV-V [78-1] ("PSAF2"). See N.D. Ga. R. 56.1B.(2)b. In accord with Local Rule 56.1B.(3), defendants responded to plaintiffs' Statements of Additional Facts. (Defs.' Resp. to PSAF1 [82] ("R-PSAF1") & PSAF2 [83] ("R-PSAF2").)

The Court uses the parties' proposed facts and responses as follows. Where one side does not dispute the other's proposed fact, the Court accepts it for purposes of these Motions and cites to both the proposed fact and corresponding response. Where one side admits a proposed fact in part, the Court includes the undisputed part. Where one side denies the other's proposed fact in whole or in part, the Court reviews the record and determines whether a fact dispute exists. If the denial is

3

without merit, and the record citation supports the fact, the Court deems it admitted. The Court modifies one party's proposed fact per the other's response when the latter better reflects the record cited. The Court excludes proposed facts that are supported by inadmissible evidence, immaterial, and duplicative of other proposed facts.[2] Finally, the Court includes facts drawn from its own review of the record. See Fed. R. Civ. P. 56(c)(3).

Given that the parties assert numerous objections based on materiality of proposed facts, the Court addresses them at the outset.[3] Plaintiffs object to DSMF1

_____

[2] The Court excludes proposed facts in PSAF1 and PSAF2 that duplicate proposed facts in DSMF1 and DSMF2, because the Local Rules limit a nonmovant's statement to "additional" facts, N.D. Ga. R. 56.1B.(2)b, and each additional fact must "present a genuine issue for trial," id. On this basis, the Court excludes PSAF1 ¶¶ 11 (in part), 20 (in part), 76, 77 (in part), 93, 95-97, 99, 101, 103-04, 106-08, and PSAF2 ¶¶ 3, 5, 22, 41. The parties also duplicate proposed facts within their own statements. The Court will address and exclude those redundant facts within the course of the Statement of Facts.

[3] The parties propose more than 410 facts; if the Court did not make cuts where possible the seventy-page (thereabouts) Statement of Facts would be a good deal longer. Thus, the Court is stringent in weeding out the immaterial facts, even acting *sua sponte* to exclude some. Nonetheless, not all proposed facts the Court declines to exclude on materiality grounds are "material" as that term is generally employed in the summary judgment context. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (identifying material facts as those that "might affect the outcome of the suit under the governing law"). Some are included for background purposes or to generate context for analysis. Instead of sustaining materiality

4

¶¶ 7-9, 12, 16, 18-20, 26, 29, 33, 37-45, 47-52, 54, 56-62, 65, 67-74, 76-77, 81-84, 86, 88, 90-91, 94, 97-98, 102, 106-08, 110, 112-19, 122-24, 130, 136; and DSMF2 ¶¶ 8-10, 12-23, 28, 31, 50-51, 54-55, 59.  (R-DSMF1 & R-DSMF2 passim.)  Ruling on plaintiffs' objections, the Court excludes DSMF1 ¶¶ 8, 9 (in part), 12, 16 (in part), 18, 19-20 (in part), 29 (in part), 94 (in part), 97 (in part), 98, 130, 136; and DSMF2 ¶¶ 8-10, 19-23.  In addition, the Court excludes *sua sponte* DSMF1 ¶¶ 10, 21 (in part), 22, 24, 53 (in part), 64 (in part), 66 (in part), 75 (in part), 79, 80 (in part), 92 (in part), 95 (in part), 96, 126-29, 131-32; and DSMF2 ¶¶ 11, 24 (in part), 47, 49 (in part), 57-58.[4]

Defendants dispute the materiality of PSAF1 ¶¶ 15-17, 40-42, 54, 59, 62, 67, 71, 74, 114, 120, 129, 135, 140, 145; and PSAF2 ¶¶ 2, 12, 15-16, 46, 52, 58, 63, 66.  (R-PSAF1 & R-PSAF2 passim.)  Ruling on defendants' objections, the Court excludes PSAF1 ¶¶ 15-17, 40-42, 54, 71, 74, 114, 120, 135, 140, 145; and PSAF2 ¶¶ 2, 15-16, 46, 52, 58, 63, 66.  In addition, the Court excludes *sua sponte* PSAF1

---

objections to facts that do not fit the Anderson definition of materiality, the Court overrules all materiality objections to facts it chooses to include.  Which facts ultimately prove material should be apparent from the analysis.

[4] The Court will not consider DSMF2 ¶¶ 25-27, 30, 37-38, and 56, for the simple reason that DSMF2 omits these paragraphs.

5

¶¶ 1-2, 5, 8-10, 20 (in part), 22 (in part), 24-29, 34 (in part), 37 (in part), 39 (in part), 49, 51-53, 55, 56 (in part), 57-58, 60, 63-64, 72-73, 77 (in part), 78, 80-84, 87-92, 100, 110-12, 115-17, 119, 121-22, 125-27, 130-31, 133-34, 136-39, 141-42, 144, 146-47; and PSAF2 ¶¶ 14, 17-21, 23, 40 (in part), 45, 50-51, 53-54, 56-57, 59-62, 64-65, 68-72.

A final note before proceeding to the facts. Both parties are guilty of unnecessarily complicating the Statement of Facts. They proposed an excessive number of facts[5] and then filed responses that made resolving factual disputes burdensome and tedious. Plaintiffs relentlessly make lengthy, argumentative objections to DSMF1 and DSMF2 in violation of the Local Rules. See N.D. Ga. R. 56.1B.(2)a.(1) (a response to a movant's statement of facts "shall contain individually numbered, *concise, nonargumentative responses* corresponding to each

_____

[5] Originally, the parties proposed upwards of 600 facts. (See [59-2, 61-2, 72-2, 73-2].) The Court ordered that their statements of proposed facts be stricken for failure to comply with the Local Rules, which require, *inter alia*, that such statements be "concise." (Order of Jan. 2, 2015 [74].) On January 16, 2015, plaintiffs submitted Objections to the Magistrate Judge's Order Striking Their Statements of Material Facts [77]. Without awaiting a ruling from the District Court, plaintiffs complied with the undersigned's Order. On April 1, 2015, the District Court overruled plaintiffs' Objections, chiding them for filing their Objections "without a sound legal basis." (Order of Apr. 1, 2015 [84], at 11 n.5, 12.) The revised statements are vast improvements in terms of length, but still contain superfluous (and, in plaintiffs' case, obviously inadmissible) information.

of the movant's numbered undisputed material facts" (emphasis added)).  Plaintiffs will hear this for the third time now, but a response to a statement of material facts "is not an opportunity to write another brief.  If the fact stated is true, admit it.  If the fact is legitimately disputed, then say why, cite the evidence that supports the denial, and stop."  Walker v. United States, IRS, No. 4:07-CV-102-HLM, 2009 WL 1241929, at *3-4 (N.D. Ga. Feb. 26, 2009) (quoting Darnell v. Ga. Power Co., No. 4:04-CV-166-HLM, slip op. at 8 (N.D. Ga. Dec. 21, 2005) (footnote omitted)).

Defendants' responses suffer from an opposite flaw:  perfunctory objections. Typical of their responses is R-PSAF1 ¶ 40, which reads, "Objection, Local Rule 56.1(B)(3)(a),(c).  Best evidence rule.  Inadmissible hearsay, argumentative, lacking foundation, incompetent, and opinion.  Immaterial and irrelevant."  To make a proper objection to admissibility at the summary judgment stage, "the objecting party must plead the objection with *specificity*."  Guijosa-Silva v. Wendell Roberson Farms, Inc., No. 7:10-CV-17 (HL), 2012 WL 860394, at *5 (M.D. Ga. Mar. 13, 2012) (emphasis added).  All objections in R-PSAF1 and R-PSAF2 asserted in the same

7

manner as R-PSAF1 ¶ 40 are hereby overruled.[6]  (See R-PSAF 1 & R-PSAF2 passim.)

## A.    The Plaintiffs

This case arises from defendants' failure to promote Craig Owens and James Brown to the rank of police captain.  Mr. Owens began his employment with the CCPD in 1989 and became a lieutenant on May 23, 2004.  (DSMF1 ¶ 2; R-DSMF1 ¶ 2.)  Mr. Brown began his employment with the CCPD in 1988 and became a lieutenant on December 31, 2000.[7]  (DSMF1 ¶ 1; R-DSMF1 ¶ 1.)  Plaintiffs are

---

[6] Under Local Rule 56.1, if the movant or respondent does not validly deny or object to the other's proposed fact, the Court will deem the proposed fact as admitted.  N.D. Ga. R. 56.1B.(2)a.(2), (3); see also Reese v. Herbert, 527 F.3d 1253, 1267 (11th Cir. 2008).  However, "after deeming the movant's statement of undisputed facts to be admitted pursuant to Local Rule 56.1, the district court must then review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact."  Reese, 527 F.3d at 1267-69 (internal quotation marks omitted).  Where defendants fail to plead an objection with specificity, the Court will review plaintiffs' proposed fact per Reese, judging for itself whether it is supported by admissible evidence and has a proper place in the Statement of Facts.  See id. at 1268-69 ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").  Where the Court sustains one of defendants' objections, it will say so.  Where defendants fail to make a valid objection to one of plaintiffs' factual assertions, but the Court's own review determines that the fact is unsupported, the Court merely states that it is excluding the fact.

[7] PSAF1 ¶ 20 proposes, in part, that Mr. Brown became a lieutenant in 2006.  (See Brown Dep. [65] 128, cited in PSAF1 ¶ 20.)  DSMF1 ¶ 1, which proposes that plaintiff Brown became a lieutenant on December 31, 2000, is corroborated by a table showing the promotion dates of ranking officers.  (See Defs.' Mot. Summ J.

8

African Americans.   (Brown Decl. [79-3] ¶ 7.)   The Court summarizes their qualifications, which are relevant to one of their arguments opposing summary judgment.

### 1.   Lt. Owens

Lt. Owens has been a SWAT team first responder, a traffic death investigator, supervisor in the special operations division, an adjutant to the chief of police, a critical incident commander of the Metro Atlanta Critical Incident Response Team, and a supervisor in the Criminal Investigations Unit.   (PSAF1 ¶¶ 11, 13; R-PSAF1 ¶¶ 11, 13; PSAF2 ¶¶ 10-11; R-PSAF2 ¶¶ 10-11.[8])   The chief selected Lt. Owens to

---

Ex. LL [60-15].)   As detailed infra, time in rank as a lieutenant was one factor in promotions, and if Mr. Brown had been promoted to lieutenant in 2006 rather than in 2000, he would have been less qualified for a promotion.   Because the Court must construe the facts in the light most favorable to the non-moving party (in this case, plaintiffs), the Court accepts the promotion date in DSMF1 ¶ 1 and excludes the contrary portion of PSAF1 ¶ 20.   See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1241 (11th Cir. 2007).

[8] The Court excludes PSAF2 ¶ 9 and the portion of PSAF1 ¶ 13 proposing that the chief's adjutant position is "a stepping[-]stone to the rank of captain, as everyone who holds this position also usually gets promoted to captain."   To oppose a motion for summary judgment under Rule 56(e), "testimony must be sworn, competent and on personal knowledge, and set out facts that would be admissible in evidence at trial."   Vondriska v. Cugno, 368 F. App'x 7, 8-9 (11th Cir. 2010); see also Blake v. Univ. of Notre Dame Du Lac, No. 3:08-CV-70-WCL, 2009 WL 1951805, at *1 (N.D. Ind. July 6, 2009) ("A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by

train at the FBI Academy.  (DSMF1 ¶ 125; R-DSMF1 ¶ 125; PSAF1 ¶ 12; R-PSAF1 ¶ 12.[9])  The CCPD has bestowed on Lt. Owens the Bureau Commendation Award, the Physical Fitness Award, the Police Driving Award, the State of Georgia Grant

---

specific concrete facts reflected in the record, cannot preclude summary judgment."). The deposition testimony cited in support of PSAF2 ¶ 9 and PSAF1 ¶ 13 (see Owens Dep. [71] 172) provides no foundation for Lt. Owens's knowledge of the career trajectories of all former adjutants.  See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); see also Green v. Pittsburgh Plate & Glass Co., 224 F. Supp. 2d 1348, 1359 (N.D. Ala. 2002) (striking plaintiff's deposition testimony that "'nobody else had to go through th[e] same process' to obtain his salary continuation" and "'other employees' . . . were receiving salary continuation with less of a basis than he was," because the statements lacked foundation).  Furthermore, the statement that "everyone" who holds the adjutant position is "usually" promoted is an oxymoron and conclusory.  See Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1093 (1991) (describing terms like "high" and "fair" as conclusory).  Accordingly, the Court excludes these proposed facts. Likewise, the Court excludes PSAF1 ¶ 38, which proposes that "[t]he only two lieutenants to serve as adjutant and not be appointed to captain or major are Campbell and Lt. Owens, and both are African American."  The Court excludes PSAF2 ¶¶ 4 and 8 as duplicative of the admissible portions of PSAF1 ¶¶ 11 and 13.

[9] The Court excludes PSAF2 ¶ 7 and the portion of PSAF1 ¶ 12 proposing that everyone who attends the FBI Academy is "normally promoted to captain or major." Plaintiffs fail to lay a foundation for these assertions, and  the statement that FBI-trained officers are "normally" promoted is conclusory.  (See supra note 8.)  The Court excludes PSAF2 ¶ 6 as duplicative of the admissible portion of PSAF1 ¶ 12.

Writing Award, and other honors.  (PSAF2 ¶ 13; R-PSAF2 ¶ 13.)  He received "good performance" ratings annually from 2006 to 2012.[10]  (PSAF1 ¶ 19; R-PSAF1 ¶ 19.)

Lt. Owens has a master's degree in public administration, a bachelor's of science in criminal justice, a graduate certificate in pre-command from the Command General Staff of the United States Army Command College, five certifications from the Georgia Peace Officer Standards and Training Council ("P.O.S.T."), and twenty other trainings and certifications in law enforcement, command, and management. (PSAF1 ¶ 14; R-PSAF1 ¶ 14.[11])  Lt. Owens is also a Command Sergeant Major in the United States Army Reserves and has served multiple tours of duty in Iraq and Afghanistan.  (PSAF2 ¶ 1; R-PSAF2 ¶ 1.)

### 2.   Lt. Brown

Lt. Brown holds a bachelor's degree in criminal justice and four P.O.S.T. certifications; he has taken dozens of training courses, including the County's managerial training program.  (PSAF1 ¶ 21; R-PSAF1 ¶ 21.)  Lt. Brown managed

---

[10] From 2006 through 2012, the two performance ratings an officer could receive were "good performance" and "unsatisfactory performance."  (PSAF1 ¶ 18; R-PSAF1 ¶ 18.  The Court excludes PSAF2 ¶ 67 as duplicative of PSAF1 ¶¶ 18 and 19.

[11] The Court excludes PSAF2 ¶ 12 as duplicative of PSAF1 ¶ 14.

AO 72A
(Rev.8/82)

the robbery and homicide unit.  (PSAF1 ¶ 22; R-PSAF1 ¶ 22.)  He received "good performance" ratings annually from 2006 to 2012.  (PSAF1 ¶ 23; R-PSAF1 ¶ 23.)  Like Lt. Owens, Lt. Brown has been a member of the SWAT team.  (PSAF1 ¶ 39; R-PSAF1 ¶ 39.)[12]

---

[12] The Court excludes as immaterial the portion of PSAF1 ¶ 39 stating that plaintiffs were the first black officers in the Department's history to serve on the SWAT team.  As explained infra Part III.A.3.e, for such evidence to be probative of defendants' discriminatory intent, plaintiffs would have to lend this fact analytic value, by showing, among other things, when the SWAT team was created, when they were invited to join, the number of black officers who were qualified to be on that elite squad from its inception until they joined, the number of black officers who applied for a SWAT position, and the number of black officers who have served on the SWAT team since plaintiffs.  Immaterial as well is PSAF1 ¶ 40, which proposes that after Lts. Brown and Owens were assigned to the SWAT team, Lt. Stephen Merrifield resigned from the SWAT team.  (R-PSAF1 ¶ 40.)  Plaintiffs ask the Court to infer that Lt. Merrifield resigned either in protest over black officers' assignments to an elite unit, or because he preferred not to work side-by-side with African Americans.  There is no evidence to support such an inference.  (See Brown Dep. [65] 48, cited in PSAF1 ¶ 40 (asked "do you have any facts to indicate that Merrifield's resignation had anything to do with you or Craig Owens?", plaintiff Brown responded, "No facts, ma'am").)  The suspicion, it seems, resides in plaintiff Brown's gut, and courts do not credit intuition as a sufficient basis to find bias against a protected class.  See Garmon v. Vilsack, 820 F. Supp. 2d 1357, 1365 (S.D. Fla. 2011) (in the Title VII context, "[i]nferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions or rumors" (quotation marks omitted)).  Even if Lt. Merrifield did harbor repugnant racist views, the presence of one racist in a six-hundred officer police department does not open up the CCPD to claims of entrenched racial bias in its promotional process.  Lt. Merrifield was not the decisionmaker for the challenged employment actions, and "[t]he biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case."  Holifield v.

12

### B.     Organization of Cobb County Government

Cobb County government is organized into a number of departments; the Department of Public Safety ("DPS") is an umbrella for a number of subsidiary departments and agencies.  (DSMF2 ¶ 1; R-DSMF2 ¶ 1.)  DPS has administrative responsibility for the CCPD, and direct authority over certain police-related units: Internal Affairs, 911 Emergency Center, Training Center, and Animal Control Unit ("ACU").  (DSMF2 ¶ 3; R-DSMF2 ¶ 3.)  DPS does not manage the CCPD's day-to-day operations and affairs, but represents the Department before the County Manager and Board of Commissioners on matters of budget and funding.  (Hatfield Decl. [61-4] ¶ 5.)

_____

Reno, 115 F.3d 1555, 1563-64 (11th Cir. 1997) (per curiam) (quotation marks omitted).  The Court recognizes that Lt. Merrifield, as a member of the command staff, was among a dozen or so officers who, although not decisionmakers, together influenced the decision.  However, Lt. Merrifield awarded plaintiffs scores well above their average command staff score, which strongly suggests that he was not biased against African Americans.  (See Defs.' Mot. Summ. J. Ex. Y [59-33].)

13

From 2003 to 2010, Gary Lloyd served as director of DPS.[13]  (DSMF2 ¶ 2; R-DSMF2 ¶ 2.)  Director Lloyd reported to the County Manager, David Hankerson.  (DSMF2 ¶ 6; R-DSMF2 ¶ 6.)   Mr. Hankerson answers to the Board of Commissioners.  (DSMF2 ¶ 7; R-DSMF2 ¶ 7.)  The DPS director is authorized to select and appoint police officers for assignments to certain DPS subsidiary departments, such as the ACU.  (DSMF2 ¶ 12; R-DSMF2 ¶ 12.)   Officers so

---

[13] The Court excludes as immaterial PSAF2 ¶¶ 16-20.  These proposed facts recount the events that led to Director Lloyd's resignation from Cobb County in 2010.  Lloyd resigned in the face of accusations that he misrepresented his service in the U.S. military.  (Lloyd Dep. [69] 19-22.)  Specifically, Director Lloyd's DD Form 214 (a document the Department of Defense issues a service member when he or she retires or separates from active duty) listed citations he had not received, including the Silver Star, Bronze Star, and Presidential Unit Citation.  (Id. at 21.)  Plaintiff Owens, who alleges that Director Lloyd discriminated against him because of his military service, contends that Director Lloyd's own "shameful history of fabricating his military record" evinces jealousy and "clear animus toward *true* veterans."  (Pl.'s 2d Resp. 10, 15; see also id. at 16 ("This evidence of a phony veteran, Lloyd, targeting the real thing, Lt. Owens, is compelling evidence that Lt. Owens' military service was a motivating factor in Lloyd's decision to deny him a captain position.").)  Director Lloyd was not, as plaintiff Owens puts it, a "phony" veteran.  He served in the Navy and was the recipient of two Battle Stars, a National Defense Medal, and a Vietnam Service Medal.  (Lloyd Dep. [69] 12-13, 21.)  Plaintiff has not shown by a preponderance of the evidence that Director Lloyd indeed forged his DD-214 (Director Lloyd denies the accusation).  See Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.").  Moreover, plaintiff's supposition that Director Lloyd's alleged embellishments of his military record demonstrate animus toward military personnel generally is not compelling evidence of discriminatory intent.

appointed report to the DPS director, not the chief of police. (DSMF2 ¶ 13; R-DSMF2 ¶ 13; <u>see also</u> DSMF2 ¶ 42 (the captain of the ACU was under the direct supervision of Director Lloyd and outside of the police chief's chain of command).[14])

## C. Director Lloyd Allegedly Denies Lt. Owens a Promotion Because of His Military Service

One of the promotions Lt. Owens alleges he was denied for discriminatory reasons was captain of the Animal Control Unit. The ACU, under DPS Director Lloyd's jurisdiction, was responsible for enforcing animal-related ordinances, dealing with vicious animals, managing the shelter and its adoption services, interfacing with animal rights organizations, managing a volunteer force, and representing the County in connection with public interest groups and the media. (DSMF2 ¶ 16; R-DSMF2 ¶ 16.) From 2006 to 2008, civilians managed the ACU.

---

[14] Plaintiffs dispute DSMF2 ¶ 42 by arguing that Director Lloyd and Chief Hatfield made statements that Lt. Owens could not be appointed a captain because he was on military leave, and that Chief Hatfield told Director Lloyd to consider him for the ACU position. (R-DSMF2 ¶ 42.) Because these responses violate the Local Rules, <u>see</u> N.D. Ga. R. 56.1B.(2)a.(1) (a response "shall contain individually numbered, concise, nonargumentative responses corresponding to each of the movant's numbered undisputed material facts"), the Court overrules them. The Court deems the above portion of DSMF2 ¶ 42, which is supported by the record citation provided, admitted.

15

(DSMF2 ¶ 17.[15])  In 2007 the ACU became "a source of increasing concern" for the Board of Commissioners and its chairman directed Mr. Lloyd to find a solution to the ACU's problems.[16]  (DSMF2 ¶ 18; R-DSMF2 ¶ 18.)  To make a long story short (see DSMF2 ¶¶ 19-23, excluded as immaterial), in response to the Board's concerns, Director Lloyd replaced the ACU's civilian management with a sworn command. (Id. ¶ 24.[17])

In June 2007, the United States Army placed Lt. Owens on active duty. (DSMF2 ¶ 39, as modified by R-DSMF2 ¶ 39.)  He took leave from the CCPD to serve in Afghanistan. (Owens Decl. [79-2] ¶ 3; Owens Dep. [71] 12.)  While abroad, the chief of police, George Hatfield, notified Lt. Owens by e-mail that he had been

---

[15] The Court has modified DSMF2 ¶ 17 to exclude the portions of the proposed fact not supported by the record citation provided.  (R-DSMF2 ¶ 17.)

[16] Director Lloyd provided this succinct, and vague, description of the ACU's troubles:  "[P]ersonnel problems and political problems, and things like that." (Lloyd Dep. [69] 34.)

[17] Plaintiffs dispute DSMF2 ¶ 24 with the same objection addressed and overruled supra note 14.  (R-DSMF2 ¶ 24.)  They further dispute the proposed fact by arguing that the memorandum announcing Lt. Patellis's promotion did not mention that he was appointed captain of the ACU.  (Id.)  This response fails to refute the proposed fact.  The Court overrules plaintiffs' invalid objections to DSMF2 ¶ 24 and deems the above part of the proposed fact, which is supported by the record citations provided, admitted.

16

selected as captain of the ACU.[18]  (Owens Dep. [71] 11, 13, 31; see also DSMF2 ¶

41.)  Chief Hatfield later recanted, stating that Director Lloyd would not allow Lt.

Owens to be promoted while on military leave because if he were, Mr. Hankerson

would eliminate the position.  (PSAF2 ¶ 35, citing, *inter alia*, Owens Dep. [71] 11-

12; see also Defs.' Mot. Summ. J. Ex. H [61-10].[19])

---

[18] Defendants argue that plaintiff Owens has no evidence that the decision to replace the ACU's civilian management with a sworn command was made as early as February 2008.  (Defs.' 2d Br. 10.)  While the ACU captain position was not officially created and filled until June 2008, Director Lloyd may have contemplated replacing the unit's civilian command with a sworn command at an earlier date, and Chief Hatfield may have learned that Director Lloyd was going to create a new captain position.  Defendants do not point to any evidence barring that possibility.  However, it is also possible that plaintiff Owens misremembered the particular captain opening for which Chief Hatfield had selected him.  Other captain positions came open while plaintiff was overseas; two openings were filled in December 2007 and another in April 2008.  (See DSMF1 ¶ 17.)  Indeed, Lt. Owens's March 6, 2008 letter to Chief Hatfield states that at their meeting they discussed "the latest round of promotions" (which would indicate those made in December 2007), and it uses the past tense to refer to the promotion he allegedly was denied because of his military leave status.  (Defs.' Mot. Summ. J. Ex. H [61-10].)  However, under USERRA, plaintiff only challenges Director Lloyd's failure to appoint him captain of the ACU.  (See generally Pl.'s 2d Resp.)

[19] Defendants object to PSAF2 ¶ 35 by arguing that Chief Hatfield's statements constitute hearsay.  (R-PSAF2 ¶ 35; Defs.' 2d Br. 6-8.)  The Court will not consider hearsay when ruling on a motion for summary judgment unless the out-of-court statement is reducible to admissible form at trial.  Macuba v. DeBoer, 193 F.3d 1316, 1322-23 (11th Cir. 1999); see also Fed. R. Evid. 802 (hearsay is generally inadmissible).  An out-of-court statement may be reduced to admissible form, among other ways, when it is not hearsay.  Macuba, 193 F.3d at 1323-24.  Excepted from

17

In February 2008, when Lt. Owens returned to the United States on rest and recuperation leave (Owens Decl. [79-2] ¶ 4), he met with Chief Hatfield and Deputy Chief Mull (Owens Dep. [71] 12).  The chief repeated what he had conveyed over

the definition of hearsay is a statement "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D).  Chief Hatfield's statements are not hearsay because he was speaking on a matter within the scope of his employment relationship.  He was the decisionmaker with regard to promotions within the CCPD's chain of command. (See infra note 37.)  Although defendants contend that Chief Hatfield was referring to a promotion within Director Lloyd's chain of command (Defs.' 2d Br. 7), the statements reflect that Chief Hatfield, not Director Lloyd, was unable to promote Lt. Owens because of his military service (see Owens Dep. [71] 11-12 ("I was first notified by Chief Hatfield that he had selected me for a promotion, and then he told me he couldn't do it now because the director [Lloyd] said he wouldn't allow it to occur because I was on military leave.")).  In any event, the alleged statement (that Chief Hatfield had selected Lt. Owens for a promotion) implies that Chief Hatfield was playing some role in having Lt. Owens promoted, even if the decision was ultimately Director Lloyd's.  See Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005) (noting that courts have admitted statements of managers under Rule 801(d)(2)(D) "where there is some evidence that the statements reflected some kind of participation in the employment decision or policy of the employer").  Accordingly, the Court overrules defendants' hearsay objection and deems PSAF2 ¶ 35 admitted.  The Court excludes PSAF2 ¶ 75 as duplicative of PSAF2 ¶ 35.  The Court also excludes PSAF2 ¶ 55, which proposes that at a staff meeting Lt. Owens "was discussed as the recommended appointment to captain, and Hatfield said he could not be appointed because he was on military leave," because the fact contains inadmissible hearsay.  See Macuba, 193 F.3d at 1322-23.  The Court sustains plaintiff's objection to DSMF2 ¶ 43, which states plaintiff's allegation that in early 2008 Chief Hatfield told Lt. Owens that Director Lloyd had not considered him for the ACU appointment due to his military service, because the record citation does not establish that the promotion allegedly denied Lt. Owens was command of the ACU.  (R-DSMF2 ¶ 43.)

18

e-mail—that he had selected (or recommended)[20] Lt. Owens for a promotion, but Director Lloyd would not allow him to promote Lt. Owens. (Id. at 11-12.) Chief Hatfield divulged that this directive was coming from the top—Mr. Hankerson. (Id. at 22.)

During plaintiff Owens's rest and recuperation leave, Chief Hatfield also informed him that "there was a captain position coming open." (PSAF2 ¶ 29.[21]) Lt. Owens expressed to Chief Hatfield his interest in being appointed a captain. (Id. ¶

---

[20] During his deposition, plaintiff Owens waffled on whether Chief Hatfield had selected him for a promotion himself or whether Chief Hatfield had only recommended that Director Lloyd promote him. (Compare Owens Dep. [71] 11 ("I was first notified by Chief Hatfield that he had selected me for a promotion . . . .") and id. at 26 (during a meeting with Director Lloyd, plaintiff told him that "the chief wants to promote me"), with id. at 21 ("And [Chief Hatfield] explained to me . . . that he recommended me for promotion to captain.").

[21] Defendants object to PSAF2 ¶ 29 by arguing that Chief Hatfield's statement to plaintiff Owens is hearsay and does not fall within the Rule 801(d)(2)(D) exception. (R-PSAF2 ¶ 29.) The statement is supported by the declarant's own deposition testimony. (See Hatfield Dep. [67] 44.) The Court may consider Chief Hatfield's testimony because the out-of-court statement can be reduced to admissible form at trial. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1294 (11th Cir. 2012) ("The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial."). Because Chief Hatfield presumably would testify to the same at trial, the Court overrules the objection and deems PSAF2 ¶ 29 admitted.

19

30; R-PSAF2 ¶ 30.)  He also contacted Director Lloyd about receiving a captain appointment.  (PSAF2 ¶ 31; R-PSAF2 ¶ 31.)

At some point, Chief Hatfield and Director Lloyd discussed Lt. Owens's military leave and his interest in being appointed a captain.  (PSAF2 ¶ 32; R-PSAF2 ¶ 32.)   Director Lloyd testified that Chief Hatfield "had concerns about the perception of the rank and file of promoting someone to [captain], or appointing them to a high rank, when that person was gone more than they were there."  (Lloyd Dep. [69] 61; see also PSAF2 ¶ 33, as modified by R-PSAF2 ¶ 33.)  Chief Hatfield believed promoting someone who "was not present a lot" would have "repercussions through the ranks."  (PSAF2 ¶ 34, as modified by R-PSAF2 ¶ 34; Lloyd Dep. [69] 59.)

Concerned that his military leave made him ineligible for promotion, Lt. Owens met with Mr. Hankerson to ask about his eligibility for a promotion while on leave.  (PSAF2 ¶ 36; R-PSAF2 ¶ 36; DSMF2 ¶ 44.[22])  Mr. Hankerson assured the

_____

[22] Plaintiffs object to DSMF2 ¶ 44

on the grounds and to the extent that the asserted fact purports to limit the purpose and scope of the communications during the meeting.  Lt. Owens also asked about Lloyd's statement to Hatfield, and Hankerson told Lt. Owens he had not advised Hatfield and Lloyd that Lt. Owens could not be appointed to captain while on military leave, and in fact,

20

reservist that he could compete for a promotion on the same footing as other candidates and "lost no rights" by virtue of his military obligations.  (DSMF2 ¶ 45; R-DSMF2 ¶ 45; PSAF2 ¶ 37; R-PSAF2 ¶ 37.)  Mr. Hankerson testified that he had told Director Lloyd as much.  (PSAF2 ¶ 37; R-PSAF2 ¶ 37.)

Lt. Owens went straight from Mr. Hankerson's office to Director Lloyd's office.  (PSAF2 ¶ 38; R-PSAF2 ¶ 38 (admitted testimony); Owens Dep. [71] 25.) Consistent with Chief Hatfield's account, Director Lloyd told Lt. Owens that he was ineligible for a promotion because of his military leave.  (PSAF2 ¶ 38; R-PSAF2 ¶ 38 (admitted testimony).)  Director Lloyd added that Mr. Hankerson had advised him of this.  (PSAF2 ¶ 39; R-PSAF2 ¶ 39 (admitted testimony).)  When Lt. Owens countered that Mr. Hankerson had relayed the opposite to him, Director Lloyd claimed to have "misunderstood" the County Manager.  (PSAF2 ¶ 40; DSMF2 ¶

---

had no problem with Lt. Owens being appointed while on military leave.

(R-DSMF2 ¶ 44.)  This response does not refute DSMF2 ¶ 44's assertion that plaintiff Owens's meeting with Mr. Hankerson concerned his eligibility for promotion while on military leave.  DSMF2 ¶ 44 does not misrepresent the "purpose and scope" of the meeting, because, as plaintiffs' response demonstrates, Lt. Owens went to Mr. Hankerson to discuss his eligibility for a promotion while on leave. Accordingly, the Court overrules plaintiffs' response and deems DSMF2 ¶ 44 admitted.

21

46.[23]) Lt. Owens asked Director Lloyd if he could "fix the problem," to which Lloyd replied, "Let me just get my stuff squared away." (PSAF2 ¶ 42.[24])

In March 2008, Lt. Owens returned to active duty with the military in Iraq. (PSAF2 ¶ 43; R-PSAF2 ¶ 43.) On March 6, he sent a letter to Chief Hatfield reflecting the above-described conversations between him, Director Lloyd, and Mr. Hankerson. (PSAF2 ¶ 44, citing, *inter alia*, Hatfield Dep. Ex. 108 [67-1].[25])

─────────────────

[23] Plaintiffs dispute DSMF2 ¶ 46 by providing additional details of the encounter between Lt. Owens and Director Lloyd. (R-DSMF2 ¶ 46.) In doing so, however, they appear to admit the proposed fact. (See id. (plaintiff Owens states that after he told Director Lloyd what Mr. Hankerson had said, Director Lloyd claimed to have "misunderstood" Mr. Hankerson).) Indeed, plaintiffs have proposed a fact similar enough that the Court has excluded it as duplicative of DSMF2 ¶ 46. (See PSAF2 ¶ 41.) Accordingly, the Court overrules plaintiffs' objection and deems DSMF2 ¶ 46, which is supported by the record citation provided, admitted.

[24] Defendants object that the citation to Lt. Owens's deposition does not reference "fixing the problem." (R-PSAF2 ¶ 42.) Plaintiffs' citation to the record is off by two lines. (See Owens Dep. [71] 26.) The Court overrules this unnecessary objection to a typographical error. However, the Court sustains defendants' objection to the portion of PSAF2 ¶ 42 proposing that Chief Hatfield had recommended him for appointment to captain (R-PSAF2 ¶ 42), because the record citation does not refer to Chief Hatfield's recommendation. (See Owens Dep. [71] 26-27.)

[25] For the reasons stated supra notes 19 and 21, the Court overrules defendants' hearsay objection to PSAF2 ¶ 44. (R-PSAF2 ¶ 44.) The Court sustains plaintiffs' objection to DSMF2 ¶ 40, which proposes that the March 6, 2008 letter alleges that Lt. Owens was denied a promotion to ACU captain in February 2008, because the proposed fact is not supported by the record citation provided. (R-DSMF2 ¶ 40.) Likewise, the Court sustains plaintiffs' objection DSMF2 ¶ 41, which

AO 72A
(Rev.8/82)

To lead the ACU, Director Lloyd wanted a no-nonsense manager with the personality, demeanor, tact, and people skills suited to the "delicate" task of overhauling the unit's operations, interfacing with animal rights activists, and managing civilian employees. (DSMF2 ¶ 28; R-DSMF2 ¶ 28 (admitted that Director Lloyd so testified)[26]; see also Prince Decl. [61-3] ¶ 11.)  As a result of Jeffrey Patellis's assignment to the Training Center, Director Lloyd and Major Ronald Prince, the DPS Executive Officer, were acquainted with his management style and work ethic.  (DSMF2 ¶¶ 14-15, 31; R-DSMF2 ¶¶ 14-15.)  Director Lloyd contends that, with input from Major Prince, he decided that Lt. Patellis was the "no-nonsense" manager "best suited to command the ACU in light of the operational issues at hand" because "his personality combined strong leadership skills with flexibility needed to lead the [ACU] through transition and deal with the pressure

_____

proposes that in January or February 2008 Chief Hatfield told Lt. Owens about the ACU captain post, because the proposed fact is not supported by the record citation provided.  (R-DSMF2 ¶ 41.)

[26] Plaintiffs dispute DSMF2 ¶ 28 with the same responses that the Court addressed and overruled supra notes 14 and 17.  (R-DSMF2 ¶ 28.)  The Court disregards these responses and accepts plaintiffs' admission.  (See id.)

and scrutiny of animal rights groups." (DSMF2 ¶¶ 29, 32-33[27]; see also Prince Decl. [61-3] ¶ 15.)

Director Lloyd was aware that other lieutenants, including Lt. Owens, were eager to be appointed captains. (DSMF2 ¶ 34; R-DSMF2 ¶ 34.) At his deposition, Director Lloyd provided this explanation for not giving Lt. Owens the ACU job:

> [He d]idn't have the personality to deal with that position. A lot of public affairs, a lot of dealing with the public and animal control rights-type people, and being able to communicate, talk to people. Lieutenant Owens is more of a black and white person, no gray area with him. Animal control is a very delicate position.

(Lloyd Dep. [69] 78, quoted in DSMF2 ¶ 35.[28]) Director Lloyd felt that Lt. Owens was generally qualified for the rank of captain, but was not qualified to be captain of the ACU. (PSAF2 ¶ 48, as modified by R-PSAF2 ¶ 48.) Chief Hatfield agreed that Lt. Owens's "leadership and command styles" were "firm, direct and unbending." (Hatfield Decl. [61-4] ¶ 27.) Lt. Owens's inflexible approach, Chief

---

[27] The Court modifies the proposed facts to reflect that they state Director Lloyd's deposition testimony, but otherwise overrules plaintiffs' objections to DSMF2 ¶¶ 29, 32-33, which the Court addressed supra notes 14 and 17. (R-DSMF2 ¶¶ 29, 32-33.)

[28] The Court modifies the proposed fact to reflect that it states Director Lloyd's deposition testimony, but otherwise overrules plaintiffs' objections to DSMF2 ¶ 35, which the Court addressed supra notes 14 and 17. (R-DSMF2 ¶ 35.)

24

Hatfield declared, "could be viewed as rigid and lacking patience," and "could create collateral problems with [c]ommand [s]taff, [p]olice peers and subordinates, and civilian employees and members of the public who did not respond well to Lt. Owens' style of leadership." (Id.)[29] However, he also felt that Lt. Owens was "very mission oriented and could do the job." (PSAF2 ¶ 47; R-PSAF2 ¶ 47.) Accordingly, he told Director Lloyd he "need[ed] to look at" Lt. Owens as a candidate for the ACU position and that Lt. Owens "would be a good choice." (PSAF2 ¶ 47; R-

---

[29] In his declaration, Chief Hatfield explains that Lt. Owens's managerial approach to the adjutant position "created needless clashes" between his office, the command staff, the DPS, and other police officers. (Hatfield Decl. [61-4] ¶ 28.) According to Chief Hatfield, Lt. Owens sometimes interfered with, rather than advanced, his agenda. (Id. ¶ 29.) He claims these defects in Lt. Owens's leadership style "significantly influenced [his] decision not to appoint" Lt. Owens a captain. (Id. ¶ 30.) He clarifies that if he did recommend Lt. Owens as a possible candidate for the ACU post, he "did so without personal knowledge of the leadership style and approach [that] was needed for that post at that time. [He] did not know if the firm and strict leadership style that [he] had observed in Lt. Owens was the goal of the Director." (Id. ¶ 53.)

25

PSAF2 ¶ 47; Hatfield Dep. [67-1] 42.[30])  He recommended several other candidates

for the position as well.  (DSMF2 ¶ 49.[31])

---

[30] Defendants object to the portion of PSAF2 ¶ 47 proposing that Chief Hatfield "recommended" Lt. Owens to Director Lloyd as a candidate for the ACU post.  During his deposition, Chief Hatfield rejected the term "recommended" in favor of "need[ed] to look at" Lt. Owens for the position.  (R-PSAF2 ¶ 47.)  In his declaration, however, Chief Hatfield states he "may have recommended Lt. Owens to Director Lloyd, along with other candidates."  (Hatfield Decl. [61-4] ¶ 52; see also DSMF2 ¶ 49 ("Chief Hatfield recalls recommending Lt. Owens along with several other candidates . . . .").)  Chief Hatfield's equivocation does not hinder the Court in resolving this dispute.  Telling a superior that he "*needs* to look at" a candidate because he would be a "good choice" is to recommend that candidate.  The Court overrules the objection, but, for precision's sake, directly quotes Chief Hatfield's deposition testimony.  The Court sustains plaintiffs' objection to the portion of DSMF2 ¶ 42 stating that Chief Hatfield "had no first-hand knowledge of, or participation in Director Lloyd's 2008 decision to install a [c]aptain to command the ACU."  (R-DSMF2 ¶ 42.)  Chief Hatfield so declared (see Hatfield Decl. [61-4] ¶ 8), but his declaration of absolute ignorance is a sham, because Chief Hatfield clearly testified that he discussed the ACU opening with Director Lloyd and told him to look at Lt. Owens for the position (Hatfield Dep. [67] 39-40).  Therefore, DSMF2 ¶ 42 is excluded.  See Santhuff v. Seitz, 385 F. App'x 939, 944 (11th Cir. 2010) (per curiam).

[31] Plaintiffs dispute DSMF2 ¶ 49 by arguing that Chief Hatfield told Director Lloyd to consider him for the ACU appointment.  (R-DSMF2 ¶ 49.)  This does not rule out that Chief Hatfield recommended other candidates as well.  Therefore, the Court overrules the objection and deems DSMF2 ¶ 49, which is supported by the record citations provided, admitted.

The DPS created the ACU captain position in June 2008.  (DSMF2 ¶ 48.[32]) On June 16, 2008, Director Lloyd appointed Lt. Patellis captain of the ACU effective June 29, 2008.  (DSMF2 ¶ 36; R-DSMF2 ¶ 36[33]; Lloyd Decl. [61-7] ¶ 38.)  A memorandum states that among the reasons Director Lloyd promoted Lt. Patellis were his (1) "good" performance ratings in 2005 and 2006; (2) his Distinguished Performance Award and various other awards, (3) a lack of "recent, relevant disciplinary history," and (4) his experience working for the DUI task force, STEP, the SWAT team, Internal Affairs, and the Training Center.  (Defs.' Mot. Summ. J. Ex. S,12 [59-27], at 50-51.[34])

---

[32] Plaintiffs dispute DSMF2 ¶ 48 by noting that Chief Hatfield told Lt. Owens in February 2008 that a captain slot was coming open.  (R-DSMF2 ¶ 48.)  They further note that Chief Hatfield recommended Lt. Owens for the position of ACU captain.  (Id.)  These responses fail to refute the proposed fact.  Accordingly, the Court overrules the objection and deems the above portion of DSMF2 ¶ 48, which is supported by the record citations provided, admitted.

[33] The Court excludes part of DSMF2 ¶ 48 as duplicative of DSMF2 ¶ 36 and excludes DSMF1 ¶ 135 as duplicative of DSMF2 ¶ 36 and other facts in DSMF2.

[34] The Court excludes PSAF2 ¶ 49 and restates the proposed fact to reflect the record citation accurately.

27

By July 2008, Lt. Owens's active military duty had ended, and on July 28, 2008, he returned to full-time duty as a police lieutenant.  (DSMF2 ¶ 39; R-DSMF2 ¶ 39.)[35]

### D.   Chief Hatfield's Captain Appointments:  2005-2010

From 2005 to 2010, George Hatfield served as chief of police, in which capacity he reported to Director Lloyd.  (DSMF1 ¶ 3; R-DSMF1 ¶ 3; DSMF2 ¶ 5; R-DSMF2 ¶ 5.[36])  During his tenure, Chief Hatfield promoted seven lieutenants to the rank of captain.  (DSMF1 ¶ 13; see also DSMF2 ¶ 50.[37])  Director Lloyd's role

_____

[35] PSAF1 ¶ 76 proposes that around 2012, Gary Lloyd, then the former director of DPS, confessed to Lt. Owens that the reason he was not appointed a captain was because of his military leave.  The Court sustains defendants' objection to the proposed fact on hearsay grounds.  (R-PSAF1 ¶ 76.)  Rule 801(d)(2)(D) exempts from the definition of hearsay statements made by a party's agent or employee "on a matter within the scope of that relationship *and while it existed*."  Fed. R. Evid. 801(d)(2)(D) (emphasis added).  Mr. Lloyd was not an employee of Cobb County in 2012 (he had resigned in 2010).  (See DSMF2 ¶ 2; R-DSMF2 ¶ 2.)  PSAF1 ¶ 76 is not, therefore, admissible under the opposing party's statement exception.  See Bigge v. Dist. Sch. Bd. of Citrus Cnty., Fla., No. 5:13-cv-49-Oc-10PRL, 2015 WL 1138472, at *12 (M.D. Fla. Mar. 13, 2015).

[36] The Court excludes DSMF2 ¶ 4 as duplicative of DSMF1 ¶ 3.

[37] Plaintiffs dispute DSMF1 ¶ 13 and DSMF2 ¶ 50, arguing that Director Lloyd was the decisionmaker who appointed seven police captains from 2005 to 2010.  (R-DSMF1 ¶ 13; R-DSMF2 ¶ 50.)  The record does not support plaintiffs' denial.  Mr. Hatfield declared that during his tenure he "was the decision-maker responsible for filling . . . [seven c]aptain positions."  (Hatfield Decl. [59-3] ¶ 20; see also id. ¶ 23 ("I, as Chief, was responsible to make the final decision.").)  Likewise,

28

in the decisional process, at least in 2009, was signing off on and approving funding

_____

Director Lloyd attributed to Chief Hatfield "ultimate decision-making authority for selecting individuals to become captain." (Lloyd Dep. [69] 39.) Policy 2.05 (effective 2006), which Chief Hatfield testified was an accurate statement of policy and practice, stated that "[a]ppointment to a rank above lieutenant shall be made by the chief of police who will be the appointing authority." (Hatfield Dep. [67] 20-21; see also DSMF1 ¶ 9.) Director Lloyd appointed one captain, Jeff Patellis. (Lloyd Dep. [69] 33.) Plaintiffs counter that Chief Hatfield let his chain of command know who he was considering for an appointment. (R-DSMF1 ¶ 13, citing Hatfield Dep. [67] 22-23; R-DSMF2 ¶ 50.) Indeed, as described in PSAF2, Chief Hatfield let Director Lloyd know he was considering Lt. Batterton for captain, and Director Lloyd told Chief Hatfield he did not think Lt. Batterton was qualified to be a captain. (PSAF2 ¶¶ 71-72; R-PSAF 2 ¶¶ 71-72.) Chief Hatfield appointed Lt. Batterton anyway. (See Hatfield Decl. [59-3] ¶ 24; Lloyd Dep. [69] 72-73.) Plaintiffs also contend that Director Lloyd was the individual who proposed adding the rank of captain to police chain of command (the position had been eliminated for a time), "got the positions approved, and decided how many there would be and where they would be." (R-DSMF1 ¶ 13.) This may be, but it does not mean he subsequently appointed all captains. Therefore, the Court overrules plaintiffs' response and deems DSMF1 ¶ 13 and DSMF2 ¶ 50 admitted. For the reasons noted above, the Court sustains defendants' objections to PSAF1 ¶ 3 and PSAF2 ¶ 24, which propose that "[i]t was up to Lloyd who made captain." (R-PSAF1 ¶ 3; R-PSAF2 ¶ 24.) PSAF2 ¶ 25, which proposes that Chief Hatfield could not appoint a captain without Director Lloyd's approval, is not supported by the record citation and is thus excluded. Chief Hatfield testified that he "probably" could not have appointed a captain without Director Lloyd's approval. (Hatfield Dep. [67] 24-25.) While this suggests that Director Lloyd might have had power to veto Chief Hatfield's selections, it does not support plaintiffs' assertion that Director Lloyd handpicked the CCPD captains himself. One last matter for this footnote, the Court excludes part of DSMF1 ¶ 16 as duplicative of DSMF1 ¶ 13.

29

for the appointments.  (DSMF2 ¶ 53.[38])  Under Chief Hatfield's protocol, when a captain position came open, every lieutenant was deemed a candidate.  (DSMF1 ¶ 14.)  Chief Hatfield, along with the command staff—all police captains, majors, and deputy chiefs—evaluated each lieutenant.  (Id.[39])  The appointment process was not well-defined,[40] but Chief Hatfield's selection criteria accounted for a candidate's education, training, assignments, and disciplinary and complaint history.  (PSAF1 ¶¶ 6-7, R-PSAF1 ¶¶ 6 (admitted as partial statement of criteria), 7.[41])

---

[38] Plaintiffs dispute DSMF2 ¶ 53 with the same response the Court addressed and overruled supra note 37.  (R-DSMF2 ¶ 53.)

[39] Plaintiffs dispute DSMF1 ¶ 14 with the same response the Court addressed and overruled supra note 37.  (R-DSMF1 ¶ 14.)  Plaintiffs further dispute DSMF1 ¶ 14 by arguing that none of the appointment memoranda issued before the second of two memoranda announcing Lt. Jeff Adcock's appointment to captain reflect that the command staff made recommendations or gave input to Chief Hatfield.  (R-DSMF1 ¶ 14.)  The memoranda's failure to reflect that the command staff gave input does not refute the proposed fact.  The Court overrules plaintiffs' responses and deems DSMF1 ¶ 14, which is supported by the record citation provided, admitted.  The Court excludes DSMF2 ¶ 51 as duplicative of DSMF1 ¶ 14.

[40] Before February 2012, the CCPD did not publish the factors or selection criteria the chief relied upon to select candidates for captain.  (DSMF1 ¶ 11; R-DSMF1 ¶ 11.)

[41] The Court excludes PSAF2 ¶ 26 as duplicative of PSAF1 ¶ 6 and PSAF2 ¶ 27 as duplicative of PSAF1 ¶ 7.

AO 72A
(Rev.8/82)

With one exception (the appointment of Lt. Batterton), the captain selection process was as follows:

(a)     Chief Hatfield called a meeting of the command staff;

(b)     The command staff discussed each lieutenant's strengths, weaknesses, experience, history, training, discipline, education, assignments, and communication skills;

(c)     Chief Hatfield did not view any particular assignment or training as superior in terms of appointment readiness;

(d)     Direct supervisors and other command staff members provided firsthand information about each lieutenant;

(e)     To avoid biasing the group, Chief Hatfield offered no opinions or comments;

(f)     Each member of the command staff provided Chief Hatfield with rankings of the top five candidates he or she deemed most qualified;

(g)     Chief Hatfield considered all information and made his assessment based on the factors listed in subparagraphs (b), (d), and (f).

31

(DSMF1 ¶ 15.[42])   Chief Hatfield appointed the following captains:   T. Arnold (9/24/06), C. Cox (12/16/07), J. Quan (12/16/07), David Gallmon (4/17/08), Stephen Merrifield (1/11/09), Dale Bolenbaugh (6/28/09), and Brian Batterton (12/13/09). (Id. ¶ 17; R-PSAF1 ¶ 17 (admitted that the individuals were appointed to captain on the specified dates).[43])   David Gallmon is African American.   (Hatfield Decl. [59-3]

-----

[42] Plaintiffs dispute DSMF1 ¶ 15 with the same responses the Court addressed and overruled supra notes 37 and 39.  (R-DSMF1 ¶ 15.)  Plaintiffs further dispute DSMF1 ¶ 15 by arguing that during Chief Hatfield's tenure "there were no defined qualifications that were required for appointment to captain, and no defined process" therefor.  (R-DSMF1 ¶ 15.)  As used in this case, "defined process" refers to the formal, written procedures that Chief Hatfield's successor employed to select captains.  Chief Hatfield did not follow those later-instituted procedures.  However, the record citation supports DSMF1 ¶ 15's assertion that Chief Hatfield followed steps (a) through (g) when selecting a captain (see Hatfield Decl. [59-3] ¶ 22), and plaintiffs' responses do not refute it.  Accordingly, the Court deems DSMF1 ¶ 15 admitted.  The Court also sustains defendants' objection to the portion of PSAF1 ¶ 78 proposing that Chief Hatfield gave no weight to the command staff's recommendations.  That portion of the proposed fact is not supported by the record citation provided (see Houser Dep. [68] 176-77) and is contradicted by a fact deemed admitted (see DSMF1 ¶ 15, subparagraphs (f)-(g)).

[43] Plaintiffs dispute DSMF1 ¶ 17 with the same response the Court addressed and overruled supra note 37.  (R-DSMF1 ¶ 17.)  Although DSMF1 ¶ 17 is not supported with a citation to evidence, the above portion of the proposed fact is supported by Chief Hatfield's declaration.  (See Hatfield Decl. [59-3] ¶ 24.)  The Court excludes the information in DSMF1 ¶ 17 regarding the appointees' race and gender, because that data is not provided in that record citation.  Further, the Court excludes the portions of DSMF1 ¶¶ 19-21 that duplicate DSMF1 ¶ 17.

32

¶ 24.)  Chief Hatfield also promoted Robert Sampson, an African American, to the rank of major.  (Lloyd Dep. [69] 51-52.)

Lts. Merrifield, Bolenbaugh, and Batterton were appointed during Gary Lloyd's tenure as DPS director.[44]  (See PSAF2 ¶ 28; R-PSAF2 ¶ 28.)  However, Chief Hatfield made his decision to promote these three officers without any input from Director Lloyd.  (DSMF2 ¶ 52.[45])  Chief Hatfield declared that, based on his observation of Lt. Owens's managerial style as adjutant, he did not believe that Lt. Owens was the most highly qualified candidate for the appointment opportunities in 2009.  (Id. ¶ 59.[46])

---

[44] Without sustaining plaintiffs' lengthy, argumentative objection (see R-DSMF2 ¶ 54), the Court excludes DSMF2 ¶ 54, which proposes that Chief Hatfield's appointments of Lts. Merrifield, Bolenbaugh, and Batterton were not influenced by plaintiff Owens's USERRA complaints, because the proposed fact states a legal conclusion in violation of the Local Rules.  See N.D. Ga. R. 56.1B.(1)(c).

[45] Plaintiffs dispute DSMF2 ¶ 52 with the same response addressed and overruled supra note 37.  (R-DSMF2 ¶ 52.)

[46] Plaintiffs dispute DSMF2 ¶ 59 with the same response the Court addressed and overruled supra note 37.  (R-DSMF2 ¶ 59.)  They further dispute the proposed fact by arguing that Lt. Owens was better qualified than the three chosen candidates, that Director Lloyd informed Lt. Owens that he could not be promoted while on military leave, and that "other facts and circumstances prove he was not considered with the other candidates and was in fact discriminated against because of his military service and/or retaliated against." (Id.)  This response is argumentative and violates the Local Rules.  See N.D. Ga. R. 56.1B.(2)a.(1).  Although it overrules

33

Plaintiff Owens alleges that when he asked Chief Hatfield and Deputy Chief Mull why he was not appointed a captain in 2009, they told him "it was not up to them," but to Director Lloyd.  (PSAF2 ¶¶ 73-74; R-PSAF2 ¶ 73 (admitted as to plaintiff Owens's testimony).[47])  While Chief Hatfield does not recall making such a remark, he states that when questioned by a lieutenant why he or she was not selected for a position, he would "typically refer[] the disappointed candidate to the fact that DPS 'signed off' on the appointment" "[i]n order to avoid detailed discussion regarding comparative merit of candidates." (Hatfield Decl. [59-3] ¶¶ 35-36.)

### E.    Allegations of Race Discrimination Within the CCPD

The Statement of Facts now shifts focus from alleged discrimination on the basis of military service to alleged discrimination on the basis of race.  Under a heading in PSAF1 styled "Race Discrimination in the Cobb County Police

_____

plaintiffs' objection, the Court modifies the proposed fact to reflect that it states Chief Hatfield's declaration.

[47] The Court addresses defendants' objection to PSAF2 ¶ 74—that the cited testimony is incomplete under Federal Rule of Evidence 106—by including the sentence following this note.  (R-PSAF2 ¶ 74.)  The Court overrules defendants' objection that the cited testimony does not support the asserted statement (id.), because the proposed fact is supported by the record citation provided (see Owens Dep. [71] 45).

Department," plaintiffs propose facts that set the challenged denials of promotion and special unit assignments against a backdrop of racial hostility at the CCPD. A significant number of these proposed facts is either unsupported by the record or immaterial. The Court pauses to explain why.

The Court is compelled to exclude proposed facts that do not meet the personal knowledge requirement of Federal Rule of Evidence 602. <u>Citizens Concerned About Our Children v. Sch. Bd. of Broward Cnty., Fla.</u>, 193 F.3d 1285, 1295 n.11 (11th Cir. 1999) (per curiam) ("Even on summary judgment, a court is not obligated to take as true testimony that is not based upon personal knowledge."). Because plaintiffs have not established personal knowledge of the following assertions, supported only by their testimony, the Court excludes PSAF1 ¶ 30 ("Every time a black officer is promoted or transferred to a good position in the [CCPD], comments are made by officers and supervisors that she or he is only promoted because they are black."); <u>id.</u> ¶ 31 ("The [CCPD] undertook a practice of assigning white lieutenants to special units and assignments that gave those lieutenants a chance to show their abilities and be seen, and which were positions from which officers were normally elevated to the next higher level."); <u>id.</u> ¶¶ 32-33 (special unit positions were never posted and the chief "simply assigned white

35

officers [with less experience]" to those "career-building assignments"); id. ¶ 36

("The National Association for the Advancement of Colored People . . . and a state

representative also met with Hankerson to complain about the lack of promotions for

black officers in the [CCPD]."); id. ¶ 44 ("This was a pattern in the [CCPD]: when

an African American got a prestigious position or was considered for a prestigious

position, then a selection process was implemented, where before there had been

none."); id. ¶ 59 (white officers charged with a DUI were not terminated or asked to

resign). Further, several of the preceding assertions "[have] no probative value with

respect to whether summary judgment should be granted because they [are]

conclusory and lack[] specific supporting facts." Hetherington v. Wal-Mart, Inc.,

511 F. App'x 909, 911 (11th Cir. 2013) (per curiam); see also Leigh v. Warner Bros.,

Inc., 212 F.3d 1210, 1217 (11th Cir. 2000) (the Eleventh Circuit "'has consistently

held that conclusory allegations without specific supporting facts have no probative

value'" (quoting Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985)).

The Court sustains defendants' objections to the following proposed facts

because they are not supported by the record citations provided:  PSAF1 ¶ 43

(plaintiffs "were the first and last SWAT team members required to go outside the

36

department to get certified"); id. ¶ 50 (Lt. Brown was denied the opportunity to attend the FBI Academy).[48]  (See R-PSAF1 ¶¶ 43, 50.)

Finally, the following proposed facts, although supported by admissible evidence, are excluded because they are plainly immaterial:

(1)  PSAF1 ¶ 41:  "After Lt. Brown and Lt. Owens got on the SWAT team, there was a selection process implemented for selecting SWAT team members, whereas before there had been no process but simply appointments."

Lt. Brown clarified that he did not mean to imply that the process "was implemented to deter African-Americans."  (Brown Dep. [65] 49.)  When asked pointedly whether he thought the process was designed to deter African Americans from joining SWAT, Lt. Brown gave an unequivocal answer: "The selection process itself, no."  (Id. at 50.)  There is no evidence that the selection process was instituted for a racially discriminatory purpose or had a disparate effect on black officers.

(2)  PSAF1 ¶ 42:  "Also after Lt. Brown and Lt. Owens got on the SWAT team, Cobb County began to require SWAT team members to have the P.O.S.T. certification for SWAT officers, whereas before this was not required."

---

[48] Lt. Brown could not recall ever applying to attend the FBI Academy. (Brown Dep. [65] 56.)

37

This requirement applied to officers of all races, and there is no evidence the certification requirement was instituted for a racially discriminatory purpose or had a disparate effect on black officers.

(3)   PSAF1 ¶ 49:  "Lt. Jeffrey Adcock and Lt. Dale Bolenbaugh, both white, were selected to go to command college and have it paid for by the [CCPD], but when Lt. Brown requested to do so in 2010, his request was denied."

Without knowing the racial composition of all officers qualified to attend command college and those selected to attend, the Court cannot draw plaintiffs' inference—that Lt. Brown was not selected because of his race.  For the same reason, the Court deems immaterial PSAF1 ¶¶ 51-52, which proposes that Lt. Brown expressed interest in serving in narcotics and MCS, but the MCS position was given to Lt. Mitchell (white),[49] and PSAF1 ¶ 53, which proposes that "Lt. Owens requested to be assigned to the internal affairs department, but the position was given to Lt. Ledford."

(4)   PSAF1 ¶ 54:  "Bolenbaugh disciplined a black female officer after she and a white male officer got into an argument after the white male

_____

[49] For lack of foundation, the Court excludes the portion of PSAF1 ¶ 51 stating Lt. Brown's opinion that Lt. Mitchell was less qualified than he.

38

officer said he knew a black officer had been driving his vehicle since there was chicken grease on the steering wheel."

The discriminatory remark from the unidentified white officer is not probative. See Holifield, 115 F.3d at 1563-64. Nor is Lt. Bolenbaugh's decision to discipline the black officer, as the record citation does not provide any basis for the Court to conclude that she was disciplined because she was black. (See Owens Dep. [71] 66-67.)

    (5)    PSAF1 ¶ 55: "The upper chain of command has listened to lieutenants regarding managerial disputes, but in the case of Lt. Brown, Deputy Chief Mull took the side of a white subordinate that Lt. Brown sought to discipline and transferred Lt. Brown."

The fact does not preclude the possibility that Deputy Chief Mull had a legitimate reason to side with Lt. Brown's subordinate. Even if the Court assumed that Deputy Chief Mull transferred Lt. Brown for racially discriminatory reasons, the fact would have little probative value, because Deputy Chief Mull was not the decisionmaker for any of the challenged actions. See Holifield, 115 F.3d at 1563-64.

    (6)    PSAF1 ¶ 56: "Because black officers felt they were being treated in a discriminatory fashion, there was a diversity training class."

39

The Court excludes the portion of PSAF1 ¶ 56 proposing that the training class was held because black officers felt they were being treated in a discriminatory manner, because it is speculative.  (Brown Dep. [65] 100 ("I think the department felt like there was a problem with how blacks were being–how blacks felt they were being treated and how whites were feeling about the black officers [in] the department.").)

> (7)   PSAF1 ¶ 57:  "During the diversity class, a film was shown to discuss racial issues and the feelings of minorities, and Merrifield stood up and announced that he was appalled at having to sit in the class and view the film."

In Lt. Brown's recollection, Lt. Merrifield declared that he was being "treated like a child" and "didn't need this training."  (Brown Dep. [65] 101.)  Insensitivity to sensitivity training is not evidence of racial bias.  Further, Lt. Merrifield was not the decisionmaker for the challenged actions.  See Holifield, 115 F.3d at 1563-64; see also supra note 12.

> (8)   PSAF1 ¶ 58:  "Captain Gallmon, an African American, was the only African American to serve as a captain in the [CCPD] in the last ten years, and he was forced to resign for driving under the influence."

The portion of PSAF1 ¶ 58 stating that Captain Gallmon was "forced to resign" as a result of his DUI is not supported by the record.  The record only

40

establishes that he resigned.  (See Owens Dep. [71] 127-28 (merely stating that Captain Gallmon "resigned"); DSMF1 Ex. MM [76-2] (duplicate of Captain Gallmon's August 15, 2010 letter of resignation).)  The inference plaintiffs want the Court to draw—that Captain Gallmon was forced to resign because he is black—is not supported by the record.[50]

### F.   Plaintiffs' Complaints About Discriminatory Promotions

In 2009, Lt. Brown and another African-American lieutenant met with Mr. Hankerson to complain that they were being passed over for promotions and assignments because of their race.  (PSAF1 ¶ 34; R-PSAF1 ¶ 34.)  Mr. Hankerson told Lt. Brown that he "had his eye on" the Department and was concerned that the Sheriff's Office was more progressive in its promotions of African Americans.  (PSAF1 ¶ 35.[51])  Lt. Owens also met with Mr. Hankerson to discuss what he

---

[50] Plaintiffs allege that white officers charged with driving under the influence were able to remain employed with the CCPD.  (PSAF1 ¶ 59.)  Although the Court has excluded PSAF1 ¶ 59 for lack of foundation, it notes that, if true, a difference in discipline may have been appropriate, because Captain Gallmon was high-ranking. See Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1280 (11th Cir. 2008) (finding that a battalion chief was not a suitable comparator to a deputy chief because of "the material differences in their respective rank and job responsibilities").

[51] The Court overrules defendants' objection to PSAF1 ¶ 35, because the proposed fact is supported by the record citations provided.  (R-PSAF1 ¶ 35.)

AO 72A
(Rev.8/82)

perceived as a lack of promotions for African-American males.  (Owens Dep. [71] 118-21.)  Mr. Hankerson promised Lt. Owens that he would "look into it."  (Id. at 119-21.[52])  Lt. Owens also expressed his interest in being appointed a captain to Director Lloyd and Chief Hatfield.  (PSAF1 ¶ 48; R-PSAF1 ¶ 48.)

Around 2009, Lt. Brown also shared his concerns with the command staff.  He and other black officers complained to Chief Hatfield and Deputy Chiefs Ron Storey and John Houser that they were not receiving promotions and favorable assignments because of their race.  (PSAF1 ¶ 45; R-PSAF1 ¶ 45.[53])  Deputy Chief Storey told Lt. Brown that his complaint was legitimate, and that he should have been considered and assigned to better units in light of the amount of time he had been a lieutenant,

---

[52] The Court sustains defendants' objection to the portion of PSAF1 ¶ 37 proposing that "Hankerson agreed with Lt. Owens that African Americans were not being treated fairly in the [CCPD]," because the proposed fact is not supported by the record citation to Lt. Owens's deposition.  (R-PSAF1 ¶ 37.)  When plaintiff Owens was asked if Mr. Hankerson had agreed or disagreed with his assessment of racial discrimination in the Department, he responded, "[Mr. Hankerson] said he disagreed–I mean he agreed, because he said he was going to look into it." (Owens Dep. [71] 121-22.)  Mr. Hankerson's willingness to make inquiries about Lt. Owens's allegations of racial bias does not mean he agreed that the CCPD treated African Americans unfairly.

[53] The Court excludes the portion of PSAF1 ¶ 45 proposing that this meeting transpired in 2009, because it is not supported by the record citation provided.  (See Brown Dep. [65] 38 (when asked when this meeting occurred, Lt. Brown responded, "Maybe in 2009").)

42

and that white lieutenants with less time in rank had received special unit assignments.   (PSAF1 ¶ 46; R-PSAF1 ¶ 46 (admitted that plaintiff Brown so testified).)  Lt. Brown expressed his interest in being appointed a captain.  (PSAF1 ¶ 47; R-PSAF1 ¶ 47.)

## G.   Chief Houser's Captain Appointments:  2010-2011

On August 10, 2010, John Houser, the current police chief, assumed command of the CCPD.  (DSMF1 ¶¶ 4, 23; R-DSMF1 ¶¶ 4, 23.)  Chief Houser, all agree, had the authority to appoint captains.  (PSAF1 ¶ 4; R-PSAF1 ¶ 4.)  In 2010 and 2011, he had the opportunity to appoint two.  (DSMF1 ¶ 25; R-DSMF1 ¶ 25.)  Initially, Chief Houser used his predecessor's selection process.  (DSMF1 ¶ 26.[54])  He considered

_____

[54] Plaintiffs dispute DSMF1 ¶ 26 with the same response the Court addressed and overruled supra note 39.  (R-DSMF1 ¶ 26.)  Plaintiffs further dispute DSMF1 ¶ 26 with two lengthy, argumentative objections that violate the Local Rules.  See N.D. Ga. R. 56.1B.(2)a.(1).  First, they argue that they were "much more qualified" under Chief Hatfield's criteria than any other candidate, and infer from this that Chief Houser did not use his predecessor's selection process.  (R-DSMF1 ¶ 26.)  Second, they assert that the fact is "conclusory, argumentative, irrelevant, and immaterial because [p]laintiffs contend that all purported selection procedures for captains were, based upon their superior qualifications and the other facts in this case, pretext for race discrimination and retaliation."  (Id.)  The Court overrules the objections and deems DSMF1 ¶ 26, which is supported by the record citations provided, admitted.  Plaintiffs respond to numerous other proposed facts in DSMF1 by repeating the second of the argumentative objections they make in response to DSMF1 ¶ 26.  When the Court addresses and overrules this objection hereafter, the Court refers to it as the "pretext argument."  (See, e.g., infra note 55.)

43

every lieutenant as a candidate for a promotion and had members of the command staff rank their top five or six candidates in order of preference.  (Id. ¶ 27.[55])  To fill the two slots, Chief Houser selected Lt. Steven Goodyear in August 2010 and Lt. Jeff Adcock in May 2011.  (Id. ¶ 29; R-DSMF ¶ 29.[56])  Both men are white.  (Houser Dep. [68] 160.)[57]

---

[55] Plaintiffs dispute DSMF1 ¶ 27 with the same response addressed and overruled supra note 39, and they object to the fact with the pretext argument addressed and overruled supra note 54. (R-DSMF1 ¶ 27.)  Plaintiffs further dispute DSMF1 ¶ 27 by arguing that Chief Houser did not assign the rankings of the command staff any weight. (R-DSMF1 ¶ 27; see also PSAF1 ¶ 78.)  This response fails to refute the proposed fact.  Finally, plaintiffs object on the basis that the fact is "conclusory and argumentative because [they] were obviously not considered as candidates for captain on an equal basis with their colleagues, since lesser qualified white lieutenants were promoted instead."  (R-DSMF1 ¶ 27.)  This objection is argumentative and violates the Local Rules.  See N.D. Ga. R. 56.1B.(2)a.(1).  The Court overrules plaintiffs' responses and deems DSMF1 ¶ 27, which is supported by the record citation provided, admitted.

[56] Plaintiffs object to DSMF1 ¶ 29 with the pretext argument addressed and overruled supra note 54. (R-DSMF1 ¶ 29.)  The Court disregards this response and accepts plaintiffs' admission.  (See id.)

[57] Without sustaining plaintiffs' argumentative objections (R-DSMF1 ¶ 28), the Court excludes DSMF1 ¶ 28, which proposes that Lts. Goodyear and Adcock "were among the most highly recommended" candidates, because the proposed fact is not supported by a citation to evidence.  Pursuant to Local Rule 56.1B.(1)(a), the Court will not consider these proposed facts.  See SCI, Inc. v. Engineered Concepts, Inc., No. 1:10-CV-1416-CC, 2013 WL 163665, at *1 n.7 (N.D. Ga. Jan. 14, 2013); Shinn v. AMF Bowling Ctr., Inc., No. 1:07-cv-235-WSD, 2008 WL 687324, at *1 n.1 (N.D. Ga. Mar. 11, 2008).

In a memorandum announcing Lt. Goodyear's appointment, Chief Houser listed Lt. Goodyear's qualifications, which include: (1) "good performance" ratings from 2006 through 2008; (2) no "recent, relevant disciplinary history"; (3) his "extensive and varied experience" over 27 years with the CCPD; (4) his work as a NIMS instructor and assistance with multi-agency training exercises; and (5) his education, which included 25 college credit hours, completion of a professional management program, and several other professional certifications. (PSAF1 ¶ 65; Houser Dep. Ex. 24 [68-1].) The memorandum does not note command staff input. (PSAF1 ¶ 66; R-PSAF1 ¶ 66.) Lt. Goodyear received official reprimands in 1998 and 2007 for preventable automobile accidents. (PSAF1 ¶ 67.[58])

In a memorandum announcing Lt. Adcock's appointment, Chief Houser listed Lt. Adcock's qualifications, which include: (1) "good performance" ratings from 2008 through 2010; (2) no "recent, relevant disciplinary history"; (3) his "extensive and varied experience" over 19 years with the CCPD; and (4) his education and

---

[58] Defendants contend that this fact is immaterial because the "[l]etters of reprimand for vehicle accidents were excluded from disciplinary history and not considered for Captain appointment." (R-PSAF1 ¶ 67.) In 2012, new selection criteria excluded both preventable and unpreventable automobile accidents from relevant disciplinary history. (See DSMF1 ¶ 44.) When Lt. Goodyear was appointed in August 2010, this was not the rule. Accordingly, the Court overrules the objection and deems PSAF1 ¶ 67 admitted.

45

training, which included a bachelor's degree in criminal justice, a master's in public administration, and 3,542 hours of P.O.S.T. credits. (PSAF1 ¶ 68; Houser Dep. Ex. 25 [68-1].) This memorandum does not mention that the command staff gave input. (PSAF1 ¶ 69; R-PSAF1 ¶ 69.) Chief Houser issued a second memorandum (like the first, it was dated May 5, 2011) indicating that he had convened a command staff meeting on March 29, 2011, and that the command staff held Lt. Adcock in "high regard." (PSAF1 ¶ 70, citing Houser Dep. Ex. 26 [68-1]; R-PSAF1 ¶ 70 (admitted that memo references command staff input).)[59]

---

[59] The Court excludes PSAF1 ¶ 73, which proposes that Lt. Brown managed uniform officers and detectives for eleven years, while Lt. Adcock had no experience managing investigative or detective units, and no experience in the Criminal Investigations Unit. PSAF1 ¶73's supporting citations (see Owens Dep. [71] 86; Brown Dep. [65] 68-69) do not demonstrate that plaintiffs have personal knowledge of Lt. Adcock's management experience. See Fed. R. Evid. 602. Furthermore, the fact is immaterial because it does not rule out that Lt. Adcock had other relevant management experience. The Court sustains defendants' objection to PSAF1 ¶ 75, which proposes that at the time of his appointment to captain, Lt. Adcock had received multiple letters of reprimand, while Lt. Brown had received only one, because the proposed fact is not supported by the record citation provided. (R-PSAF1 ¶ 75.) Lt. Brown could not give a definite answer about Lt. Adcock's disciplinary record. (See Brown Dep. [65] 72 (asked whether Lt. Adcock had received "a couple of letter[s] of reprimand[]," Lt. Brown replied, "I think so").) Additionally, Lt. Brown's deposition testimony does not establish that he had personal knowledge of Lt. Adcock's disciplinary history. See Fed. R. Evid. 602.

46

### H.   The CCPD Develops a Defined Process for Captain Appointments

In early 2012, Chief Houser consulted with Tony Hagler, the Director of Human Resources, and Human Resource Manager Kathleen Daniel to standardize the process for selecting police captains. (DSMF1 ¶¶ 30-31.[60])  The Chief had received negative feedback about the informal appointment process he was using and wanted Ms. Daniel's recommendations for making the process seem fair to the candidates. (PSAF1 ¶ 86.[61])  Ms. Daniel was assigned to collaborate with Chief Houser and others in developing the criteria and weighting used to rank candidates for a promotion to captain. (DSMF1 ¶ 6.[62])  Defendants refer to the result of this collaboration as the "defined process" or the "selection procedures."

_____

[60] Plaintiffs dispute DSMF1 ¶¶ 30 and 31 by arguing that Chief Houser sought Ms. Daniel's assistance after receiving negative feedback about the captain appointment process. (R-DSMF1 ¶¶ 30-31.)  The Court overrules plaintiffs' argumentative objections and deems DSMF1 ¶¶ 30 and 31, which are supported by the record citations provided, admitted. See N.D. Ga. R. 56.1B.(2)a.(1).

[61] The Court overrules defendants' objection to PSAF1 ¶ 86 because the proposed fact is supported by the record citations provided. (R-PSAF1 ¶ 86.) The Court excludes DSMF1 ¶ 5 as duplicative of DSMF1 ¶ 31.  The Court adds that Chief Houser never intimated that the process for selecting captains was in fact unfair.  Appearances count, as this Court is aware.  See Offutt v. United States, 348 U.S. 11, 13 (1954) ("[J]ustice must satisfy the appearance of justice.").

[62] Plaintiffs dispute DSMF1 ¶ 6 with the response addressed and overruled supra note 60.  (R-DSMF1 ¶ 6.)

On February 27, 2012, Chief Houser's office e-mailed all lieutenants, notifying them that the captain selection process was underway and setting an application deadline. (DSMF1 ¶ 32, citing Defs.' Mot. Summ. J. Ex. G. [59-15]; R-DSMF1 ¶ 32.)  The e-mail directed applicants to complete a questionnaire and submit a resume.  (DSMF1 ¶¶ 32-33; R-DSMF1 ¶¶ 32-33.[63])  To be eligible for promotion, lieutenants needed to have served three continuous years in rank "as of March 1, 2009."  (DSMF1 ¶ 34, as modified by R-DSMF1 ¶ 34.)

On March 7, 2012, Ms. Daniel sent Chief Houser an e-mail soliciting information about the knowledge, skills, and abilities a police captain must possess. (Defs.' Mot. Summ. J. Ex. H [59-16].[64])  A spreadsheet with a column for each criterion on which the candidates would be evaluated was created for use in tallying scores and recording the "promotional points" received by the candidates.  (DSMF1

---

[63] Plaintiffs object to DSMF1 ¶ 33 with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 33.)  The Court disregards this response and accepts plaintiffs' admission.  (See id.)

[64] The Court sustains plaintiffs' objection to DSMF1 ¶ 35, which proposes that Ms. Daniel provided Chief Houser with information concerning the essential functions, knowledge, skills, and abilities needed to perform the duties and responsibilities of captain, because the proposed fact is not supported by the record citations provided.  (R-DSMF1 ¶ 35.)  The Court restates the proposed fact to reflect the contents of Ms. Daniel's e-mail accurately.  (See Defs.' Mot. Summ. J. Ex. H [59-16].)

¶ 36; Defs.' Mot. Summ. J. Ex. I [59-17].[65])  Chief Houser authorized a panel composed of DPS managers to interview and rate the candidates.  (DSMF1 ¶ 37.[66]) Ms. Daniel drafted uniform questions for the panel to ask the interviewees.  (Id. ¶ 38.[67])  She created uniform "Captain Promotional Rating Forms" (id. ¶ 39; R-

---

[65] Plaintiffs object to DSMF1 ¶ 36 with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 36.)  Plaintiffs dispute DSMF1 ¶ 36 by arguing that "[s]ince Houser has been the Chief of Police, he has been the ultimate decisionmaker with respect to appointments of police officers to the rank of captain." (R-DSMF1 ¶ 36.)  The purpose of the response is unclear, but as far as the Court can tell plaintiffs suggest that the selection procedures are beside the point because they were not a pure numbers game and did not deprive Chief Houser of a decision-making role.  This response overlooks that the selection procedures significantly constrained Chief Houser's authority to appoint the candidate of his choosing.  As explained below, in 2012 he was able to select a captain from among the three highest-scoring candidates.  In 2013, he could make his pick from among the five highest-scoring candidates.  The candidate's scores are also relevant because they suggest which candidates were most qualified for a promotion.  The Court overrules plaintiffs' response and deems DSMF1 ¶ 36, which is supported by the record citations provided, admitted.

[66] Plaintiffs dispute DSMF1 ¶ 37 with the same response addressed and overruled supra note 65, and object to the fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 37.)

[67] Plaintiffs dispute DSMF1 ¶ 38 with the same response addressed and overruled supra note 65, and object to the fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 38.)  Plaintiffs further dispute DSMF1 ¶ 38 by arguing that the defined process did not exist until April 2012, and that before the defined process "command staff may have made notes about their top five selections for a captain appointment, but there was no weight to any of it and no rating." (R-DSMF1 ¶ 38.)  This objection is out of place because DSMF1 ¶ 38 has

49

DSMF1 ¶ 39) that supervisors used to evaluate a candidate's "command readiness" (DSMF1 ¶ 39, citing Defs.' Mot. Summ. J. Ex. K [59-19]; Daniel Decl. [59-4] ¶ 11).[68]

Chief Houser named subject matter experts ("SMEs") to work with him and Ms. Daniel to develop the evaluation criteria and determine the weight assigned to each factor. (DSMF1 ¶ 40.[69]) The SMEs were Major Paula Sparks (white female), Major Sampson (black male), Major Prince (white male), Deputy Chief Storey (white male), and Chief Houser (white male). (Id. ¶ 41; R-DSMF1 ¶ 41.[70]) The SMEs agreed that candidates should be judged on the following criteria: (1) length

nothing to do with command staff rankings. The Court overrules the objection and deems DSMF1 ¶ 38, which is supported by the record citations provided, admitted.

[68] Plaintiffs dispute DSMF1 ¶ 39 with the response addressed and overruled supra note 65, and object to the fact with the pretext argument addressed and overruled supra note 54. (R-DSMF1 ¶ 39.) Plaintiffs further object that Ms. Daniel did not have personal knowledge of the proposed fact. (Id.) The Court overrules the objection because Ms. Daniel's declaration demonstrates that she had personal knowledge. (See Daniel Decl. [59-4] ¶ 1.)

[69] Plaintiffs dispute DSMF1 ¶ 40 with the same response addressed and overruled supra note 65, and object to the fact with the pretext argument addressed and overruled supra note 54. (R-DSMF1 ¶ 40.)

[70] Plaintiffs object to DSMF1 ¶ 41 with the pretext argument addressed and overruled supra note 54 and the response addressed and overruled supra note 65. (R-DSMF1 ¶ 41.) The Court disregards these objections and accepts plaintiffs' admission. (See id.)

of time in rank as lieutenant, (2) education, (3) disciplinary history, (4) supervisory evaluations, (5) command staff rating, (6) interview panel rating, and (7) fitness scores. (DSMF1 ¶ 42; R-DSMF1 ¶ 42.[71]) During a March 29, 2012 meeting that Ms. Daniel facilitated, the SMEs reached a consensus on the weight assigned to each of the evaluation criteria:

| Table 1 | |
|---|---|
| Length of time in rank as lieutenant | up to 5 promotional points |
| Education | up to 5 promotional points |
| Disciplinary history | up to 15 promotional points |
| Supervisory evaluation | up to 20 promotional points |
| Command staff rating | up to 30 promotional points |
| Interview panel rating | up to 20 promotional points |
| Fitness evaluation | up to 5 promotional points |

---

[71] Plaintiffs object to DSMF1 ¶ 42 with pretext argument addressed and overruled supra note 54 and the same response addressed and overruled supra note 65. (R-DSMF1 ¶ 42.) The Court disregards these objections and accepts plaintiffs' admission. (See id.)

51

(DSMF1 ¶ 43.[72])  With regard to disciplinary history, the SMEs agreed to consider a candidate's past three years of discipline and to exclude all discipline relating to vehicle accidents or damage of a County vehicle (preventable or unpreventable).  (Id. ¶ 44, as modified by R-DSMF1 ¶ 44.[73])  The reason the selection procedures did not

---

[72] Plaintiffs dispute DSMF1 ¶ 43 with the same response addressed and overruled supra note 65, and object to the fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 43.)  Plaintiffs further dispute DSMF1 ¶ 43 by contending that in March 2012, points were not awarded for time as a lieutenant, disciplinary history, education, and sick leave balance.  (R-DSMF1 ¶ 43, citing Houser Dep. [68] 107 & Ex. 53 [68-1].)  The Department's failure to award candidates points for sick leave balance is immaterial, because sick leave balance was not one of the selection criteria.  (See supra Table 1; Houser Dep. [68] 91-93.)  Contrary to plaintiffs' assertion, points were awarded in March 2012 for time as a lieutenant, disciplinary history, and education.  (See Defs.' Mot. Summ. J. Ex. O [59-23].)  Plaintiffs utilize this meritless response with regard to other proposed facts in DSMF1.  When the Court addresses and overrules this response hereafter, the Court refers to it as the "response regarding point tabulation."  (See, e.g., infra note 78.)  Plaintiffs also contend that in April 2012, the appointment process was revised to account only for the most recent three years of disciplinary history.  (Id., citing Houser Dep. [68] 155-57 & Ex. 58 [68-1].)  They correctly note that the procedures accounted for three years of disciplinary history; this fact does not, however, refute that a candidate could earn as much as fifteen points for disciplinary history.  Accordingly, the Court overrules plaintiffs' objection and deems DSMF1 ¶ 43 admitted.  The Court excludes DSMF1 ¶ 102 as duplicative of DSMF1 ¶ 43 and other facts in DSMF1.

[73] DSMF1 ¶ 44 proposes that the SMEs set the "look back period" at five, not three, years.  Plaintiffs dispute DSMF1 ¶ 44, arguing that in April 2012, the disciplinary history look back period was revised from five to three years.  (R-DSMF1 ¶ 44.)  Although plaintiffs' citations do not support that a revision was made in April, the record establishes that in 2012 a ten-year period was proposed, Chief

penalize candidates for car accidents, Chief Houser explained, is that officers, by virtue of their duties, "are going to dent a car from time to time." (Houser Dep. [68] 105). The disciplinary history factor did not exclude letters of reprimand. Lt. Brown alleges that in the past the CCPD had not considered letters of reprimand in making promotional decisions. (PSAF1 ¶ 85.)

---

Houser recommended five, but the committee settled upon three. (Daniel Dep. [70] 29-30, 39-40; Houser Dep. [68] 94-98; Daniel Decl. [59-4] ¶ 64; see also Defs.' Mot. Summ. J. Ex. O [59-23] (reflecting that the past three years of a candidate's disciplinary history were considered in March 2012); DSMF1 ¶ 105 (proposing that the 2012 Procedures were announced in February 2012 and the three-year look back period extended to February 2009).) Accordingly, the Court modifies DSMF1 ¶ 44 to reflect that the look back period in 2012 accounted for the past three, not five, years of discipline. Plaintiffs further object to DSMF1 ¶ 44 with the pretext argument addressed and overruled supra note 54. (R-DSMF1 ¶ 44.) The Court excludes DSMF1 ¶ 105 as duplicative of DSMF1 ¶ 44 and other facts in DSMF1. Without sustaining plaintiffs' objections (R-DSMF1 ¶¶ 45-46), the Court excludes DSMF1 ¶¶ 45 and 46, which describe the system by which the command staff ranked candidates, because the proposed facts are not adequately supported by the record citations provided. (R-DSMF1 ¶¶ 45-46.) The Court sustains defendants' objection to PSAF1 ¶ 102, which proposes that Chief Houser decided that the disciplinary history factor should not account for driving-relating discipline, because the record citation shows that a committee, of which Chief Houser was a member, made this decision. (R-PSAF1 ¶ 102, citing Houser Dep. [68] 104; see also Houser Dep. [68] 95-96.) Furthermore, the disciplinary history factor did not exclude all forms of driving-related discipline, but discipline resulting from damage to a County vehicle. (See DSMF1 ¶ 44; Daniel Decl. [59-4] ¶¶ 82-83.) The factor did, therefore, account for the suspension that Lt. Owens received after he used a County vehicle for personal business. See infra Part I.P.

On April 10, 2012, Mr. Hagler raised a concern about the command staff rating with Chief Houser and Ms. Daniel.  "For the future," he wrote in an e-mail, "I think the [c]ommand staff rating should be a more objective process with defined criteria as this rating carries a high weight in the overall selection process."[74] (PSAF1 ¶ 109, citing Houser Dep. Ex. 58 [68-1]; R-PSAF1 ¶ 109 (admitted partial quote of Houser Dep. Ex. 58).)  Mr. Hagler suggested that Chief Houser have a more limited role in the process.  (PSAF1 ¶ 109, citing Houser Dep. Ex. 58 [68-1] ("We also talked about the Chief possibly not being a part of the initial selection panel process and the SME weighting panel for the future with the Chief doing final interviews and selection of the top candidates."); R-PSAF1 ¶ 109.)[75]

---

[74] It appears that the committee took Mr. Hagler's advice here; in 2013 the command staff scored each candidate on ten defined criteria.  (See Defs.' Mot. Summ. J. Ex. Y [59-33].)

[75] PSAF1 ¶ 100 proposes that Mr. Hagler's e-mail also recommended that the disciplinary history factor be revised "to limit any perception of subjectivity in the selection process." (PSAF1 ¶ 100, citing Daniel Dep. Ex. 58 [70-1].)  Mr. Hagler did not explain why that factor could be viewed as subjective or how, in his opinion, it could be revised to limit the perception of subjectivity.  Accordingly, the Court excludes PSAF1 ¶ 100 as immaterial.

54

**I.      The March 2012 List**

In March 2012, panel interviews, command staff ratings, and supervisory evaluations were completed.  (Daniel Decl. [59-4] ¶ 22.[76])  Additional data for the candidates—time in rank, disciplinary history, fitness, and education—were collected.  (Defs.' Mot. Summ. J. Ex. O [59-23].[77])  Each candidate's raw scores were then weighted and assigned promotional points according to the 3/29/12 criteria and weighting schedule (see supra Table 1).  (DSMF1 ¶ 49.[78])  The scores were

---

[76] The Court excludes DSMF1 ¶ 47, which proposes that the selection process was completed in April 2012, and restates the proposed fact to reflect Ms. Daniel's declaration accurately.  (See Daniel Decl. [59-4] ¶ 22.)  Any dispute over whether the process was completed in March or April 2012 is immaterial.

[77] The Court excludes DSMF1 ¶ 48, which proposes that Chief Houser's administrative staff collected this data, and restates the proposed fact to reflect the record citation accurately.  (See Defs.' Mot. Summ. J. Ex. O [59-23].)

[78] Plaintiffs dispute DSMF1 ¶ 49 with the same response addressed and overruled supra note 65 and the response regarding point tabulation addressed and overruled supra note 72, and object to the fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 49.)  They further dispute DSMF1 ¶ 49 by arguing that the record citations do not account for all of the candidates' disciplinary infractions.  (R-DSMF1 ¶ 49.)  This contention is irrelevant, because a candidate's past three years of discipline were considered in March 2012, not his or her entire disciplinary history. Furthermore, the Court overrules plaintiffs' objection that DSMF1 ¶ 49 is not supported by the record citations provided.  (R-DSMF1 ¶ 49.)  Because plaintiffs have not validly disputed DSMF1 ¶ 49, the Court deems it admitted.

55

entered into a spreadsheet, dated March 7, 2012 ("March 2012 List"). (Id. ¶ 50,

citing Defs.' Mot. Summ. J. Ex. O [59-23].[79]) Per the tally, the five highest scoring

candidates, in descending order, were Dwayne Pickett (94), Ernest VanHoozer (83),

Sydney Ellis (81), Kevin Flynn (63), and T.R. Alexander (63). (Id. ¶ 51.[80])

---

[79] Plaintiffs dispute DSMF1 ¶ 50 with the response regarding point tabulation addressed and overruled supra note 72 and the same response addressed and overruled supra note 78, and object to the fact with the pretext argument addressed and overruled supra note 54. (R-DSMF2 ¶ 50.) Furthermore, the Court overrules plaintiffs' objection that DSMF1 ¶ 50 is not supported by the record citation provided. (R-DSMF1 ¶ 50.) However, the Court excludes the portion of DSMF1 ¶ 50 proposing that the spreadsheet bears the wrong date (03/07/12), because it is not supported by the record citation provided.

[80] DSMF1 ¶ 51 states that the scores were tallied in April 2012 and that the document is mistakenly dated March 7, 2012. Because defendants offer no support for that proposition, the Court accepts the record citation at face value. Plaintiffs dispute DSMF1 ¶ 51 with the response regarding point tabulation addressed and overruled supra note 72 and the same response addressed and overruled supra note 78, and object to the fact with the pretext argument addressed and overruled supra note 54. (R-DSMF1 ¶ 51.) Plaintiffs further dispute DSMF1 ¶ 51 by contending that Chief Houser "decided for racially and/or retaliatory reasons to use only certain factors and criteria in the 'defined process.'" (R-DSMF1 ¶ 51.) Plaintiffs argue, for instance, that their scores would have been different if Chief Houser had not excluded driving-related discipline. (Id.) The Court overrules plaintiffs' lengthy, argumentative response. See N.D. R. Ga. 56.1B.(2)a.(1). Plaintiffs respond to a number of other proposed facts in DSMF1 by repeating this argumentative objection. When the Court addresses and overrules this objection hereafter, the Court refers to it as the "discriminatory criteria argument." (See, e.g., infra note 81.) Lastly, plaintiffs also argue that Lt. Pickett was not appointed under the selection procedures. (Id.) For reasons discussed infra note 83, this response has no merit. The Court overrules plaintiffs' many responses to DSMF1 ¶ 51 and deems the

Plaintiffs Brown and Owens received 45 and 38 promotional points, respectively. (Id. ¶ 52.[81])  Six candidates received promotional points based on command staff ratings; the remaining eight candidates received zero points in that category.  (Defs.' Mot. Summ. J. Ex. O [59-23].[82])  On April 5, 2012, Chief Houser promoted Lt. Pickett to the rank of captain.  (DSMF1 ¶ 53; R-DSMF1 ¶ 53.)[83]  Dwayne Pickett is white.  (Houser Dep. [68] 160.)

─────────────

proposed fact, which is supported by the record citation provided, admitted.

[81] Plaintiffs dispute DSMF1 ¶ 52 with the discriminatory criteria argument addressed and overruled supra note 80, and object to the fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 52.)

[82] The Court excludes DSMF1 ¶ 76, which misstates the record (five candidates received points from the command staff) and does not support its assertion as to the racial composition of candidates with a citation to the record, and restates the proposed fact to reflect the record citations accurately.

[83] PSAF1 ¶ 79 proposes, in relevant part, that Chief Houser appointed Lt. Pickett using Chief Hatfield's selection process, before the defined process was instituted.  (R-PSAF1 ¶ 79.)  Contrary to plaintiffs' contention, Chief Houser's testimony does not support this proposed fact.  Chief Houser repeatedly expressed uncertainty on this matter.  (See Houser Dep. [68] 85, 91, 102-03, 108-10.) Documentary evidence fills in the gaps in Chief Houser's recollection.  The March List shows that the criteria by which Lt. Pickett was promoted was identical to that which the SMEs settled upon in their March 29, 2012 meeting and was published two months later, in the document titled "Cobb County Department of Public Safety Police Department Selection Procedures:  Police Captain."  (See Defs.' Mot. Summ. J. Exs. O & P [59-23, 59-24].)  Accordingly, the Court excludes PSAF1 ¶ 79 and a similar fact, PSAF1 ¶ 105.

**J.      2012 Selection Procedures**

On May 21, 2012, Chief Houser, Mr. Hagler, and the Public Safety Director approved and executed a document titled "Cobb County Department of Public Safety Police Department Selection Procedures:  Police Captain" ("2012 Procedures"). (DSMF1 ¶ 54; R-DSMF1 ¶ 54.[84])  The 2012 Procedures formalized the selection process that the SMEs and Human Resources had devised earlier that year.  (DSMF1 ¶ 55.[85])  The document provided that the selection process would be announced by e-mail to all eligible lieutenants.  (Id. ¶ 56; R-DSMF1 ¶ 56 (admitted that the document so states); Defs.' Mot. Summ. J. Ex. P [59-24].)  As basic eligibility requirements, candidates needed to have a high school diploma or GED, a valid driver's license, Georgia P.O.S.T. Peace Officer Certification, and three years of

---

[84] Plaintiffs object to DSMF1 ¶ 54 with the pretext argument addressed and overruled supra note 54 and the same response addressed and overruled supra note 65.  (R-DSMF1 ¶ 54.)  The Court disregards these responses and accepts plaintiffs' admission.  (See id.)

[85] Plaintiffs dispute DSMF1 ¶ 55 with the discriminatory criteria argument addressed and overruled supra note 80.  (R-DSMF1 ¶ 55.)

58

experience as a lieutenant.  (DSMF1 ¶ 56; R-DSMF1 ¶ 56 (admitted that the document so states)[86]; Defs.' Mot. Summ. J. Ex. P [59-24].)

The selection criteria can be divided into a subjective component and an objective component.  The subjective component has three parts:  ratings by the command staff and an interview panel, and evaluations by a candidate's supervisors. The 2012 Procedures state that the command staff would convene to rank all candidates "based on a review of past performance, discussion of supervisory capabilities and [the command staff member's] experience working with the candidate." (Defs.' Mot. Summ. J. Ex. P [59-24], at 2; <u>see also</u> DSMF1 ¶ 58.[87])  A panel comprised of individuals at least one rank above the candidates would convene to interview all candidates, asking them an identical set of questions.  (DSMF1 ¶ 57; R-DSMF1 ¶ 57 (admitted that the document so states).[88])  The candidates' current

_____

[86] Plaintiffs object to DSMF1 ¶ 56 with the pretext argument addressed and overruled <u>supra</u> note 54.  (R-DSMF1 ¶ 56.)  The Court disregards the objection and accepts plaintiffs' admission.  (<u>See</u> <u>id.</u>)

[87] Plaintiffs dispute DSMF1 ¶ 58 with the same response addressed and overruled <u>supra</u> note 65, and object to the fact with the pretext argument addressed and overruled <u>supra</u> note 54.  (R-DSMF1 ¶ 58.)

[88] Plaintiffs object to DSMF1 ¶ 57 with the pretext argument addressed and overruled <u>supra</u> note 54 and the same response addressed and overruled <u>supra</u> note 65.  (R-DSMF1 ¶ 57.)  The Court disregards the objections and accepts plaintiffs'

and former supervisors would fill out a supervisory rating form, and the supervisors' ratings would be averaged for a "Final Supervisory Rating Score." (Defs.' Mot. Summ. J. Ex. P. [59-24], at 2; see also DSMF1 ¶ 58.)  The objective component assigned points based on a candidate's (1) length of time in the rank of lieutenant, (2) disciplinary history, (3) education, and (4) fitness. (Defs.' Mot. Summ. J. Ex. P. [59-24], at 2.)

The 2012 Procedures adopted the weighting determined by the SMEs in March 2012 (see supra Table 1). (DSMF1 ¶ 59.[89])  The look back period for disciplinary history was three years, and discipline resulting from vehicular accidents or damage was not considered. (Id. ¶ 100.[90])  Designated weights would then be applied to each candidate's raw scores to obtain a "Final Selection Score." (Id. ¶ 60.)

---

admission. (See id.)

[89] Plaintiffs dispute DSMF1 ¶ 59 with the same response addressed and overruled supra note 65, and object to the fact with the pretext argument addressed and overruled supra note 54. (R-DSMF1 ¶ 59.)

[90] Plaintiffs dispute DSMF1 ¶ 100 by arguing about the disciplinary history criteria. Their argument, however, appears to admit the proposed fact. (R-DSMF1 ¶ 100 ("[O]n April 10, 2012, a revision or 'clarification' was made to the appointment process so that only the most recent three years of disciplinary history of a candidate for captain would be considered.").)  Given that admission, and the lack of merit to plaintiffs' response, the Court overrules the objection and deems DSMF1 ¶ 100 admitted.

60

Candidates would be ranked according to their final scores and Chief Houser could make his selection from the three top-scoring candidates. (Id.[91]) When an additional captain position came available, the fourth highest-scoring candidate would be moved into the top three for consideration. (Id. ¶ 61.[92]) The 2012 Procedures contained the caveat that a new SME panel could "meet to change weighting if circumstances change such as more emphasis being placed on fitness and education." (PSAF1 ¶ 98, quoting Defs.' Mot. Summ. J. Ex. P [59-24], at 3; R-PSAF1 ¶ 98.)

**K.    The June 2012 List**

A spreadsheet titled "Candidates for Captain 06/27/12" ("June 2012 List") contained information identical to the March 2012 List, except it did not list Lt. Pickett and arranged the candidates in order of the amount of promotional points

---

[91] Plaintiffs object to DSMF1 ¶ 60 with the pretext argument addressed and overruled supra note 54. (R-DSMF1 ¶ 60.) They further dispute DSMF1 ¶ 60 by arguing that the weighting was subject to change. (R-DSMF1 ¶ 60.) Because this denial fails to refute the proposed fact, the Court overrules it and deems DSMF1 ¶ 60, which is supported by the record citation provided, admitted.

[92] Plaintiffs object to DSMF1 ¶ 61 with the pretext argument addressed and overruled supra note 54, and dispute the fact with the same response addressed and overruled supra note 65. (R-DSMF1 ¶ 61.)

61

they had received.  (DSMF1 ¶ 62.[93])  Lt. T.R. Alexander was tied for third-highest

scorer.  (Id. ¶ 63.[94])  On June 27, 2012, Chief Houser promoted Lt. Alexander to the

rank of captain.  (Id. ¶ 64; R-DSMF1 ¶ 64.)  He chose Lt. Alexander over higher-

scoring candidates Ellis (white male) and VanHoozer (white male).  (DSMF1 ¶ 65.[95])

---

[93] Plaintiffs object to DSMF1 ¶ 62 with the pretext argument addressed and overruled supra note 54, and dispute the fact with the same response addressed and overruled supra note 65.  (R-DSMF1 ¶ 62.)

[94] Plaintiffs dispute DSMF1 ¶ 63 with the discriminatory criteria argument addressed and overruled supra note 80.  (R-DSMF1 ¶ 63.)  They further dispute the fact by arguing that Lt. Alexander's score is inaccurate because the March 2012 List reflects none of his disciplinary history.  (Id.)  The proposed fact, however, relates to the June 2012 List.  Regardless, the Court has reviewed the exhibits plaintiffs cite in support of this assertion (see Houser Dep. Exs. 38, 96, 98-100 [68-1]) and determines that all of Lt. Alexander's discipline not accounted for in the June 2012 scoring either falls outside the three-year look back period or resulted from damage to a County vehicle (which was not considered relevant disciplinary history).  See infra Part III.A.3.c.(2).  Accordingly, the Court overrules the objection and deems DSMF1 ¶ 63, which is supported by the record citations provided, admitted.

[95] Plaintiffs dispute DSMF1 ¶ 65 with the discriminatory criteria argument addressed and overruled supra note 80, and object to the fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 65.)  They further dispute the fact by arguing that the scores are inaccurate because the discipline of Lts. Alexander, Ellis, and VanHoozer was not included in the tally.  (Id.)  The Court has reviewed the exhibits plaintiffs cite in support of this assertion (see Houser Dep. Exs. 38, 96, 98-100 [68-1]) and determines that all of the discipline not accounted for in the scoring either falls outside the three-year look back period or resulted from damage to a County vehicle.  See infra Part III.A.3.c.(2)-(3).  Accordingly, the Court overrules the objection and deems DSMF1 ¶ 65, which is supported by the record citations provided, admitted.

AO 72A
(Rev.8/82)

The opening filled by Lt. Alexander was an administrative position in the Records Unit.  (Id. ¶ 66.[96])  Lt. Alexander had been working as a lieutenant in that unit for some time.  (Houser Dep. [68] 121.)[97]

_____

[96] Plaintiffs dispute DSMF1 ¶ 66 by noting that Chief Houser did not advertise the position as captain of the Records Unit and that Lt. Alexander's appointment memorandum did not mention the position was Records Unit specific, and by arguing that Lt. Alexander could have continued to head the Records Unit without being appointed a captain.  (R-DSMF1 ¶ 66.)  This response fail to refute the proposed fact.  Any dispute regarding DSMF1 ¶ 66 is immaterial because Lt. Alexander's score, unlike plaintiffs', placed him within the top three candidates.

[97] The Court excludes PSAF1 ¶ 113, which asserts that "it was not necessary" for Chief Houser to appoint Lt. Alexander a captain for him to continue managing the Records Unit.  That proposed fact states plaintiff Brown's opinion, which lacks foundation.  (See Brown Dep. [65] 121, cited in PSAF1 ¶ 113.)

**L.     The July 2012 List**

By July 2012, two additional lieutenants, Haakon Hagebak and Tate Ledford, had accumulated three years in rank and were now eligible for promotion. (DSMF1 ¶ 67; R-DSMF1 ¶ 67 (admitted the officers had three years in rank by July 2012).[98]) Chief Houser added the newly-eligible candidates to the list. (DSMF1 ¶ 68.[99]) In July, the interview panel reconvened to interview Lts. Hagebak and Ledford; other data for these two candidates were obtained. (Id. ¶ 69.[100]) The command staff rated all eligible candidates. (Id. ¶ 70.[101]) Chief Houser's staff computed the final scores.

---

[98] Plaintiffs object to DSMF1 ¶ 67 with the pretext argument addressed and overruled supra note 54. (R-DSMF1 ¶ 67.) The Court disregards this objection and accepts plaintiffs' admission. (See id.)

[99] Plaintiffs dispute DSMF1 ¶ 68 by arguing for sixteen lines that the selection procedures were adopted for racially discriminatory and retaliatory reasons. (R-DSMF1 ¶ 68.) Because this objection violates the Local Rules, see N.D. Ga. R. 56.1B.(2)a.(1), the Court overrules it. The Court deems DSMF1 ¶ 68, which is supported by the record citation, admitted.

[100] Plaintiffs object to DSMF1 ¶ 69 with the pretext argument addressed and overruled supra note 54, and dispute the fact with the same response addressed and overruled supra note 65. (R-DSMF1 ¶ 69.)

[101] Plaintiffs object to DSMF1 ¶ 70 with the pretext argument addressed and overruled supra note 54, and dispute the fact with the same response addressed and overruled supra note 65. (R-DSMF1 ¶ 70.)

AO 72A
(Rev.8/82)

(Id. ¶ 71.[102])  This process resulted in the July 20, 2012 Candidates for Captains List

("July 2012 List").  (Id. ¶ 72.[103])  The July 2012 List did not include Lt. Everett

Cebula's July 19, 2012 letter of reprimand under disciplinary history.  (PSAF1 ¶

118; R-PSAF1 ¶ 118.)

The three highest-scoring candidates on the July 2012 List—those Chief

Houser had the discretion to promote—were Lts. VanHoozer (93), Ellis (81), and

Barry Little (64).  (DSMF1 ¶¶ 73-74; R-DSMF1 ¶ 74 (admitted that the record

citation supports).[104])  Lt. Brown scored 45 promotional points, and Lt. Owens

scored 38. (DSMF1 ¶ 73.) Five candidates received command staff scores sufficient

---

[102] Plaintiffs dispute DSMF1 ¶ 71 with the discriminatory criteria argument addressed and overruled supra note 80, the pretext argument addressed and overruled supra note 54, and the same response addressed and overruled supra note 65.  (R-DSMF1 ¶ 71.)

[103] Plaintiffs dispute DSMF1 ¶ 72 with the discriminatory criteria argument addressed and overruled supra note 80, the pretext argument addressed and overruled supra note 54, and the same response addressed and overruled supra note 65.  (R-DSMF1 ¶ 72.)

[104] Plaintiffs dispute DSMF1 ¶ 73 with the discriminatory criteria argument addressed and overruled supra note 80, and the same response addressed and overruled supra note 65.  (R-DSMF1 ¶ 73.)  They object to DSMF1 ¶ 74 with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 74.)  The Court disregards this objection and accepts plaintiffs' admission of DSMF1 ¶ 74. (See id.)

65

to be awarded promotional points; nine candidates received zero promotional points in this category.  (Defs.' Mot. Summ. J. Ex. R. [59-26].[105])  On August 30, 2012, Chief Houser promoted Lt. VanHoozer to the rank of captain.  (DSMF1 ¶ 75; R-DSMF1 ¶ 75.)

### M.      Plaintiffs File EEOC Charges

On July 31, 2012, Lt. Brown filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against the CCPD, alleging that he was denied assignments to special units and appointments to captain because of his race.  (PSAF1 ¶ 123; R-PSAF1 ¶ 123.)  On October 8, 2012, Lt. Owens filed a charge of discrimination with the EEOC, alleging that the CCPD denied him promotions to captain because of his race.  (PSAF1 ¶ 124; R-PSAF1 ¶ 124.)

Whenever a Cobb County police officer filed an EEOC charge, Chief Houser would receive a notice via certified mail.  (Houser Dep. [68] 127.)  "A lot of times" he would turn the notices over to the County Attorney's Office.  (Id.)  He was not aware that Lt. Brown had filed a charge until after plaintiffs instituted this lawsuit.

---

[105] The Court excludes DSMF1 ¶ 77, which misstates the record (four candidates received points from the command staff) and does not support the racial composition of candidates with a citation to the record, and restates the proposed fact to reflect the record citation accurately.  (See Defs.' Mot. Summ. J. Ex. R. [59-26].)

66

(Id. at 126.)  He could not recall whether he discovered that Lt. Owens had filed a charge after or before the lawsuit was filed.  (Id. at 127-28.)[106]

Plaintiffs note that the EEOC has yet to issue them right to sue letters on their claims under Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000 *et seq.* (Pls.' 1st Resp. 12 n.6.)  Upon receiving their notices of right to sue, they anticipate seeking leave to amend their First Amended Complaint to include discrimination and retaliation claims under Title VII.  (Id.)

**N.      2013 Revisions to 2012 Procedures**

In 2013, Chief Houser worked with Human Resources to refine the selection procedures.  (DSMF1 ¶ 78.[107])  Chief Houser reported that candidates were still dissatisfied with the process and that the community was providing feedback. (PSAF1 ¶ 128, as modified by R-PSAF1 ¶ 128.)  On March 7, 2013, Chief Houser,

---

[106] The Court sustains defendants' objection to PSAF1 ¶ 125, which proposes that Chief Houser "was aware of the charges of discrimination filed by Brown and Owens either through paperwork he received or notification by the Cobb County Attorney's Office," because the proposed fact is not supported by the record citations provided. (R-PSAF1 ¶ 125.) Further, *whether* Chief Houser knew about the charges is not a material fact.  For purposes of evaluating plaintiffs' Section 1981 retaliation claim, the material fact is *when* Chief Houser knew.  In the four sentences preceding this note, the Court summarizes the relevant record citations.

[107] Plaintiffs dispute DSMF1 ¶ 78 with the same response addressed and overruled supra note 60.  (R-DSMF1 ¶ 78.)

67

Mr. Hagler, and the Public Safety Director executed a document titled "Cobb County Department of Public Safety Police Department Selection Procedures: Police Captain" ("2013 Procedures"), which amended the 2012 Procedures. (DSMF1 ¶ 80, citing Defs.' Mot. Summ. J. Ex. V [59-30]; R-DSMF1 ¶ 80.[108])   The County employees involved in amending the 2012 Procedures were Chief Houser, Ms.

---

[108] The Court excludes the portion of DSMF1 ¶ 80 proposing that the 2013 Procedures were drafted in February 2013, because that portion of the fact is not supported by the record citations provided and is immaterial.  The Court sustains defendants' objection to PSAF1 ¶ 126, which proposes that "[o]n or about December 26, 2012, Houser promulgated a different policy as to the weighting for the factors involved in Houser's appointments to captain," because the proposed fact is not supported by the record.  (R-PSAF ¶ 126.)  PSAF1 ¶ 126 refers to a document titled "Weighting For Captain Promotional Process 12/26/2012."  (See Houser Dep. Ex. 72 [68-1].)  The rating system outlined in the document does not reflect the 2012 or 2013 Procedures.  Chief Houser emphasized at his deposition that the selection procedures "were a work in progress and these forms were ever changing."  (Houser Dep. [68] 172).  Of the 12/26/2012 form, he stated, "I don't know that we ever officially did this because we wanted to take all the subjectivity out of the weighting process.  So I think this is probably something that might have been discussed but was never put in place."  (Id.)  Chief Houser could not say whether the 12/26/2012 criteria had been used during any of the promotion cycles (id. at 173), but there is no indication in the record that it ever was.  Therefore, even if Chief Houser had "promulgated" this set of procedures, PSAF1 ¶ 126 would be immaterial, because no captain was appointed between December 26, 2012 and the execution of the 2013 Procedures in March 2013.  For these reasons, the Court also excludes as immaterial PSAF1 ¶ 127, which describes one facet of the 12/26/12 criteria.

68

Daniel, the Public Safety Director, Deputy Chief Prince, and Sr. Associate County Attorney Mark Adelman.  (DSMF ¶ 81.[109])

The following revisions were made per group consensus:

(1)    Chief Houser had the discretion to appoint a captain from the top five ranked candidates (previously the top three);

(2)    The disciplinary history look back period was extended to five years (previously three years);[110]

(3)    The command staff rating process was revamped so that a 1-5 sliding scale was used to measure command readiness;

(4)    The interview panel and captain promotional ratings were changed to use a multiplier instead of the previous 0-100 range;

(5)    The education factor was changed to allow points only for degrees conferred, not for "equivalency education";[111]

---

[109] Plaintiffs dispute DSMF1 ¶ 81 with the same response addressed and overruled supra note 65, and object to the fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 81.)

[110] The Court sustains defendants' objection to PSAF1 ¶ 132, which suggests that Chief Houser alone instituted this alteration, because, as noted above, the revisions were made by group consensus.  (R-PSAF1 ¶ 132.)  The Court excludes the portion of DSMF1 ¶ 82 proposing that the 2013 Procedures modified the disciplinary history criterion so that candidates would not lose points for preventable and unpreventable accidents, because that had been the rule in 2012. (DSMF1 ¶ 44.)

[111] The Court excludes PSAF1 ¶ 94, which proposes that Lts. Brown and Owens had "higher education than many of their white counterparts, and then the process was changed so that there were no higher points for having higher

(6)     Time in rank was measured by years and months, not merely years.

(DSMF1 ¶¶ 82-84.[112])

_____

education."  For one, the record citation to Lt. Owens's deposition lays no foundation for the assertion that plaintiffs possessed more education than many of their white counterparts.  (See Owens Dep. [71] 109-10.)  Indeed, the evidence shows that a number of other lieutenants had advanced degrees. (Defs.' Mot. Summ. J. Ex. Q [59-25] (in June 2012, of the thirteen candidates, only one did not possess a college degree, and four candidates had a master's degree).)  Education wise, plaintiffs were similarly situated to their white counterparts.  The second portion of the proposed fact is not supported by the record.  The 2012 Procedures were not revised in 2013 so as to eliminate points for higher education.  In both 2012 and 2013, education was worth five percent of a candidate's total score.  By limiting points to degrees conferred, rather than for equivalency education, the 2013 Procedures actually put a higher premium on a college education than the 2012 Procedures. Plaintiff Owens's suggestion that when the committee noticed they were better educated than their white counterparts it rewrote the rules to make educational credentials count for nothing is doubly misguided.

[112] Plaintiffs dispute DSMF1 ¶ 82 with the same response addressed and overruled supra note 65, and object to the fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 82.)  Plaintiffs further dispute DSMF1 ¶ 82 by recounting the evolution of the disciplinary history factor and arguing about its subjectivity.  (R-DSMF1 ¶ 82.)  This broad, argumentative objection violates the Local Rules.   See N.D. Ga. R. 56.1B.(2)a.(1).   Plaintiffs' admission that "[d]efendants changed the procedures yet again in 2013" does not admit the proposed fact; it is another improper response.  The Court overrules these responses and deems DSMF1 ¶ 82, which is supported by the record citations provided, admitted.  Plaintiffs dispute DSMF1 ¶¶ 83 and 84 with the same response addressed and overruled supra note 65, and object to the facts with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶¶ 83-84.)  Plaintiffs further dispute DSMF1 ¶ 84 by arguing that the education factor was weighted less in 2013 because Lts. Brown and Owens had more education than their white counterparts.

70

**O.**   **Chief Houser's Appointments to Captain:  2013**

In 2013, sixteen lieutenants, including Lts. Owens and Brown, participated in the captain selection process.  (DSMF1 ¶ 85; R-DSMF1 ¶ 85.)  A panel composed of police and fire department majors from Marietta, Floyd, and Fulton Counties, and Rome, Georgia, interviewed the candidates in February 2013.  (DSMF1 ¶ 86.[113])  Command staff rankings and supervisory evaluations were completed.  (Id. ¶ 87.[114])  Data regarding time in rank, disciplinary history, fitness, and education were

_____

(R-DSMF1 ¶ 84.)  This is a legal argument, not a proper response.  See N.D. Ga. R. 56.1B.(2)a.(2).  Moreover, as explained supra note 111, the argument has no merit.  The Court overrules the objections and deems DSMF1 ¶¶ 83 and 84, which are supported by the record citations provided, admitted.  Further, the Court excludes DSMF1 ¶¶ 101 and 109 as duplicative of DSMF1 ¶ 82.

[113] Plaintiffs object to DSMF1 ¶ 86 with the pretext argument addressed and overruled supra note 54, and dispute the fact with the same response addressed and overruled supra note 65.  (R-DSMF1 ¶ 86.)

[114] Plaintiffs object to DSMF1 ¶ 87 with the pretext argument addressed and overruled supra note 54, and dispute the fact with the same response addressed and overruled supra note 65.  (R-DSMF1 ¶ 87.)

71

assembled for each candidate, and Ms. Daniel and Lt. Merrifield[115] double-checked the accuracy of the scoring.  (Id. ¶ 88[116]; Daniel Decl. [59-4] ¶ 51.)

On May 3, 2013, the CCPD released the 2013 Captain's List.  (DSMF1 ¶ 89, citing Defs.' Mot. Summ. J. Ex. T [59-28]; R-DSMF1 ¶ 89.)  The seven highest scorers were Lts. Hagebak (88.44), Ellis (88.42), Little (87.02), Padilla (85.74), Flynn (85.62) and James Bullock and Destiny Davidson (tied at 84.6).  (DSMF ¶

_____

[115] The Court sustains defendants' objection to PSAF1 ¶ 129, which proposes that "[d]uring the appointment process in 2013, Houser asked Merrifield to work with Sarah Maness in the Chief's Office to get the disciplinary history for the candidates for captain," because the proposed fact is not supported by the record citations provided.  (R-PSAF1 ¶ 129.)  Furthermore, the Court excludes as immaterial PSAF1 ¶ 130, which proposes that Lt. Merrifield provided information about the candidates during the 2013 Procedures.  The fact is only relevant if the Court were to credit plaintiffs' arguments that Lt. Merrifield has exhibited bias against black persons and that the disciplinary history records Lt. Merrifield was charged with collecting were incomplete in favor of white candidates.  (See Pls.' 1st Resp. 4, 11-13.)  Neither contention has a real basis in the record, however.  See supra note 12; infra Part III.A.3.c.

[116] Plaintiffs object to DSMF1 ¶ 88 with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 88.)  They further dispute DSMF1 ¶ 88 by noting that "[o]ne of the ratings spreadsheets for 2013 does not include five years of disciplinary history, and the other does not include driving-related discipline as a result of Houser's decision to exclude driving-related discipline."  (R-DSMF1 ¶ 88 (citations omitted).)  This response does not refute the proposed fact. Therefore, the Court overrules the objection and deems DSMF1 ¶ 88,which is supported by the record citation provided, admitted.

72

90.[117])  Lts. Brown and Owens scored 67.76 and 58.76, respectively, the lowest scores on the 2013 Captain's List.  (Id. ¶ 91.[118])  On May 10, 2013, Chief Houser promoted Lts. Hagebak and Little to the rank of captain.  (Id. ¶ 92; R-DSMF1 ¶ 92.)  Both men are white.  (Houser Dep. [68] 161.)  The racial composition of the unsuccessful candidates was twelve white and two black officers.  (DSMF1 ¶ 93; R-DSMF1 ¶ 93.)  It was after this round of promotions, on May 29, 2013, that plaintiffs filed the instant lawsuit.  (PSAF1 ¶ 143; R-PSAF1 ¶ 143.)

After Lts. Hagebak and Little received promotions, Lts. Bullock and Davidson, previously tied for sixth place, were among the five highest-scoring

---

[117] Plaintiffs dispute DSMF1 ¶ 90 with the discriminatory criteria argument addressed and overruled supra note 80, and object to the fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 90.)  They further dispute DSMF1 ¶ 90 by arguing that relevant disciplinary actions of Lts. Hagebak and Little and other officers were not included in the scoring.  (R-DSMF1 ¶¶ 90.)  The Court has reviewed the exhibits plaintiffs cite in support of this assertion (Houser Dep. Exs. 38, 90-91 [68-1]) and determines that all of the discipline not accounted for in the scoring either falls outside the five-year look back period or resulted from damage to a County vehicle.  Accordingly, the Court overrules the objection and deems DSMF1 ¶ 90, which is supported by the record citations provided, admitted.

[118] Plaintiffs dispute DSMF1 ¶ 91 with the same responses addressed and overruled supra notes 65 and 117, and the discriminatory criteria argument addressed and overruled supra note 80.  They object to the fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 91.)

candidates.  (DSMF1 ¶ 94.[119])  On August 18, 2013, Chief Houser appointed Lt.

Davidson a captain.  (Id. ¶ 95; R-DSMF1 ¶ 95.)  On October 13, 2013, Chief Houser

appointed Lt. Ellis a captain.  (DSMF1 ¶ 97; R-DSMF1 ¶ 97.[120])  Davidson and Ellis

are both white.  (Houser Dep. [68] 161.)

### P.    Application of the Disciplinary History Factor (2012-2013)

On December 16, 2010, Chief Houser issued Lt. Brown a letter of reprimand

charging him with conduct unbecoming of an officer.  (DSMF1 ¶ 103; R-DSMF1 ¶

103.)

In November 2010, Lt. Owens was involved in a traffic collision while

operating a Cobb County take-home vehicle.  (Defs.' Mot. Summ. J. Ex. BB [60-2],

at 2.)  At the time of the collision, Lt. Owens was driving to work after dropping off

military orders at Fort Gillem.  (Id.)  His business at Fort Gillem was not related to

---

[119] Plaintiffs dispute DSMF1 ¶ 94 with the discriminatory criteria argument addressed and overruled supra note 80, and object to the fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 94.)

[120] Plaintiffs dispute DSMF1 ¶ 97 with the discriminatory criteria argument addressed and overruled supra note 80, and object to the fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 97.)  The Court disregards these responses and accepts plaintiffs' admission.  (See id.)

74

his police duties, and Fort Gillem was not on his route to work.  (Id.)  DPS Safety Policy 9.02 governs take home vehicle assignments and prohibits operation of a "restricted use vehicle assignment" for personal use, "with no exceptions."[121] (DSMF1 ¶ 104; Defs.' Mot. Summ. J. Ex. BB [60-2], at 3.)  On January 24, 2011, Lt. Owens received a two-day suspension for violating DPS Policy 9.02.  (DSMF1

---

[121] PSAF1 ¶ 61 proposes that Lt. Owens was a critical incident commander and thus authorized to drive a County vehicle when off-duty.  Lt. Owens claims that during a meeting with Chief Houser and Deputy Chief Storey, he advised his superiors that DPS Policy 9.02 was "out of date" and that officers had been "operating under different guidelines since Chief Hatfield [had] been there." (Owens Dep. [71] 137-38.)  Under these guidelines, he alleged, critical incident commanders were authorized to drive County vehicles while off-duty so they could respond to critical incidents.  (Id. at 138.)  Plaintiff Owens's allegation that he was authorized to drive the vehicle is self-serving, conclusory, and unsupported by any evidence in the record.  Therefore, the Court excludes it.  Lt. Owens claimed that Chief Houser told him that he "understood" his position, but "based on what happened with Captain Gallmon" (i.e., a DUI charge), he had to "take action against Lt. Owens." (PSAF1 ¶ 62.)

¶ 104.[122])  In a memorandum charging Lt. Owens with the violation, Chief Houser

explained his reasons for issuing a two-day suspension:

> Like Deputy Chief Storey, I considered your response on Part III of the
> Employee Violation form.  You indicated that you were told that your
> use of an assigned vehicle fell under Key Command due to your
> assignment as an Assistant Critical Incident Commander.  Further, you
> indicated that you were on your way to work, that the policy is 13 years
> old, and the policy does not cover Critical Incident Commanders.
> However, the policy is clear and states that only employees holding the
> rank or position of a Precinct Commander and above are considered to
> be *Key Command Vehicle Assignment* and may operate a vehicle with
> no restrictions.  All other *Take-Home Vehicle Assignments* fall under
> *Category 2 - Restricted Use Vehicle Assignment, or Category 3 - On-
> Call Vehicle Assignments.*  Your assignment of a take-home vehicle
> clearly would be on *a restricted on-call status, and as assigned by a*

---

[122] Plaintiffs dispute DSMF1 ¶ 104, arguing that Lt. Owens was suspended
because of his race and in retaliation for engaging in statutorily protected activity.
(R-DSMF1 ¶ 104.)  This argumentative response violates the Local Rules.  See N.D.
Ga. R. 56.1B.(2)a.(1).  The Court overrules the objection and deems DSMF1 ¶ 104,
which is supported by the record citation provided, admitted.  The Court sustains
defendants' objection to PSAF1 ¶ 60, which proposes that other officers merely
received reprimands or one-day suspensions for vehicle accidents, because the
proposed fact is not supported by the record citations provided.  (R-PSAF1 ¶ 60.)
The fact is immaterial as well.  Lt. Owens was not punished for causing a car
accident but for operating a County vehicle without authorization.  Discipline
resulting from an at-fault car accident where the officer was authorized to operate the
vehicle is not an appropriate comparator.  See Rioux, 520 F.3d at 1280 ("A
comparator is an employee similarly situated to the plaintiff in all relevant respects."
(alteration in original, quotation marks omitted)).

*Department Head in preparation for or during emergency operations.* Use of vehicles in *Category 2 and Category 3* are restricted and may only be used to conduct official business, with no exceptions.

Your response was discussed with you when you arrived for your pre-disciplinary hearing.  After this brief discussion, you said that you wished to waive your official pre-disciplinary hearing and would accept the proposed discipline. . . . .

Lastly, like Deputy Chief Storey, I considered the impact that this incident may have upon the Department.  The Department is and has always been subject to public scrutiny.  Public scrutiny has never been higher due to the current economy and any appearance or perception that the Department is wasting or misusing taxpayer resources calls the Department into question.  The use of your assigned vehicle could cast the Department in a negative light and is not what the public expects, not what the Department accepts or expects, and not what Cobb County Government expects.  Your misuse of your assigned vehicle could negatively affect the Department both in reputation and financially. Similar violations could result in further discipline up to and including termination of your employment.

Additionally, your violation of policy put the vehicle at the location where it was "totaled" in a vehicle crash.  While I note that you were not "at fault" in the crash, your violation of policy put the vehicle in the location where it was struck by the "at fault[]" driver.  As such, your violation of policy had a significant financial impact on the County.

(Defs.' Mot. Summ. J. Ex. BB [60-2], at 4.)

2012's three-year disciplinary history look back period encompassed Lt. Brown's December 2010 letter of reprimand and Lt. Owens's January 2011 suspension; because of these infractions, out of a possible fifteen points for

77

disciplinary history, Lt. Brown received ten points and Lt. Owens received zero. (DSMF1 ¶ 106; R-DSMF1 ¶ 106 (admitted that the discipline occurred within three years of July 2012).[123])  Even if plaintiffs had received the maximum number of points in disciplinary history, neither would have attained "top three scorer status." (DSMF1 ¶¶ 107-08.[124])

2013's five-year look back period accounted for both the letter of reprimand and suspension.  (DSMF1 ¶ 110; R-DSMF1 ¶ 110 (admitted that both infractions occurred within the three years before 2013).[125])  Had the 2013 Procedures accounted for the past three years of disciplinary period, the look back period would still have

---

[123] Plaintiffs object to DSMF1 ¶ 106 with the pretext argument addressed and overruled supra note 54. (R-DSMF1 ¶ 106.)  The Court disregards the objection and accepts plaintiffs' admission.  (See id.)

[124] Plaintiffs dispute DSMF1 ¶¶ 107 and 108 with the discriminatory criteria argument addressed and overruled supra note 80, and object to the facts with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶¶ 107-08.) They further dispute DSMF1 ¶ 108 by imagining what Lt. Alexander's score might have been had defendants calculated disciplinary history differently. (R-DSMF1 ¶¶ 108.)  This argumentative response violates the Local Rules.  See N.D. Ga. R. 56.1B.(2)a.(1).  Accordingly, the Court overrules the objection and deems DSMF1 ¶ 108, which is supported by the record citations provided, admitted.

[125] Plaintiffs object to DSMF1 ¶ 110 with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 110.)  The Court disregards the objection and accepts plaintiffs' admission.  (See id.)

78

captured both disciplinary incidents.[126]  (DSMF1 ¶ 111; R-DSMF1 ¶ 111 (admitted that the letter of reprimand and suspension were issued within three years of July 2012).)  If plaintiffs had received the maximum number of points in disciplinary history, neither would have attained "top five scorer status."  (DSMF1 ¶ 112.[127])

### Q.    2014 Revisions to 2013 Procedures

In March 2014, Human Resources contracted with CPS HR Consulting ("CPS"), a personnel management consulting firm, to develop and administer the captain promotional assessment.  (DSMF1 ¶¶ 7, 113.[128])  CPS conducted an analysis

---

[126] Under the Department's standard operating procedures, a disciplinary event is deemed to have occurred on the date the discipline is issued, not the day the infraction occurred.  (DSMF1 ¶ 99; R-DSMF1 ¶ 99.)

[127] Plaintiffs object to DSMF1 ¶ 112 with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 112.)  They further dispute DSMF1 ¶ 112 by imagining what the candidates' scores might have been had the disciplinary history score been calculated different.  (R-DSMF1 ¶ 112.)  They also assert that the "'final score' is . . . presented in accordance with a weighting scheme that departs from previous decisionmaking criteria and which devalues the superior educational, training, and fitness qualifications of [p]laintiffs."  (Id.)  These responses are argumentative and violate the Local Rules.  See N.D. Ga. R. 56.1B.(2)a.(1).  Accordingly, the Court overrules plaintiffs' objections and deems DSMF1 ¶ 112, which is supported by the record citations provided, admitted.

[128] The Court sustains plaintiffs' denial of the portion of DSMF1 ¶ 7 proposing that CPS lead the 2014 promotional assessment, because that assertion is not supported by the record citation provided.  (R-DSMF1 ¶ 7.)  Plaintiffs object to DSMF1 ¶¶ 7 and 113 with the pretext argument addressed and overruled supra note

of the police captain position, developed an examination plan, prepared examination materials, and administered the assessment.  (DSMF1 ¶ 114; R-DSMF1 ¶ 114 (admitted that Ms. Daniels so declared).[129])  CPS, along with the command staff and Ms. Daniel, discussed how best to measure the knowledge, skills, and abilities required for successful performance of the captain position.  (DSMF1 ¶ 115.[130])

The command staff and Ms. Daniel, in accord with CPS's suggestion, determined that a candidate's performance on exercises that measured their knowledge, skills, and abilities would comprise 50 percent of his or her score.

_____

54.  (R-DSMF1 ¶¶ 7, 113.)  With regard to DSMF1 ¶ 113, plaintiffs admit that HR contracted with CPS, but do not admit that the purpose of the contract was to develop and administer the process.  (R-DSMF1 ¶ 113.)  The Court deems the disputed portion of DSMF1 ¶ 113 admitted because it is supported by the record citation provided.

[129] Plaintiffs object to DSMF1 ¶ 114 with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 114.)  The Court disregards this objection and accepts plaintiffs' admission.  (See id.)

[130] Plaintiffs object to DSMF1 ¶ 115 with the pretext argument addressed and overruled supra note 54, and they dispute the fact with the same response addressed and overruled supra note 65.  (R-DSMF1 ¶ 115.)

80

(Daniel Decl. [59-4] ¶ 88; Defs.' Mot. Summ. J. Ex. EE [60-5], at 11-12.[131])  The

weight afforded the command staff rating, previously 30 percent of a candidate's

score, was modified to 25 percent.  (Id. ¶ 117.[132])  The remaining 25 percent of the

score was based on length of time as a lieutenant (5 percent), education (5 percent),

fitness (5 percent), and disciplinary history (10 percent).  (Id. ¶ 118.[133])  These were

the same percentage allocations as the 2012 and 2013 Procedures, with the exception

of disciplinary history (formerly 15 percent).  (Id. ¶ 119.)[134]

---

[131] The Court excludes DSMF1 ¶ 116 and restates the proposed fact to reflect
the record accurately.

[132] Plaintiffs object to DSMF1 ¶ 117 with the pretext argument addressed and
overruled supra note 54, and they dispute the fact with the same response addressed
and overruled supra note 65.  (R-DSMF1 ¶ 117.)

[133] Plaintiffs dispute DSMF1 ¶ 118 with the pretext argument addressed and
overruled supra note 54, and they dispute the fact with the same response addressed
and overruled supra note 65.  (R-DSMF1 ¶ 118.)

[134] Plaintiffs object to DSMF1 ¶ 119 with the pretext argument addressed and
overruled supra note 54, and they dispute the fact with the same response addressed
and overruled supra note 65.  (R-DSMF1 ¶ 119.)  However, the Court modifies
DSMF1 ¶ 119, which proposes that all percentage allocations were the same in 2014
as in 2012 and 2013, to reflect the record citation accurately.  (See Daniel Decl. [59-
4] ¶ 89.)

81

On February 8, 2014, Lt. Brown retired from the CCPD; he did not participate in the 2014 Procedures.[135]  (DSMF1 ¶ 120; R-DSMF1 ¶ 120.)  Lt. Owens, one of eleven candidates (two black and nine white), participated in the 2014 Procedures.  (DSMF1 ¶¶ 121, 123; R-DSMF1 ¶¶ 121, 123.)  CPS compiled the candidates' final scores.  (DSMF1 ¶ 122.[136])  The lowest-scoring candidate was Ronald Alter, a white male; Lt. Owens ranked tenth; Orrin Hamilton, another black male, ranked seventh.  (Id. ¶ 123.[137])  In 2014, Chief Houser appointed one captain, Lt. James Ferrell (white male), the highest scoring candidate.  (Id. ¶ 124; R-DSMF1 ¶ 124 (admitted that Lt.

---

[135] The Court sustains defendants' objection to PSAF1 ¶ 148 (see R-PSAF1 ¶ 148), which proposes that Lt. Brown resigned after he experienced retaliation, because the proposed fact states a legal conclusion in violation of the Local Rules. See N.D. Ga. R. 56.1B.(1)(c).

[136] Plaintiffs dispute DSMF1 ¶ 122 with the same response addressed and overruled supra note 65 and with the discriminatory criteria argument addressed and overruled supra note 80.  They object to the fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 122.)

[137] Plaintiffs dispute this portion of DSMF1 ¶ 123 with the same response addressed and overruled supra note 65 and the discriminatory criteria argument addressed and overruled supra note 80.  They object to this fact with the pretext argument addressed and overruled supra note 54.  (R-DSMF1 ¶ 123.)

Ferrell received the appointment).[138])  Lt. Owens has not been promoted to the rank of captain.  (PSAF1 ¶ 149; R-PSAF1 ¶ 149.[139])

## II.   **SUMMARY JUDGMENT STANDARD**

The "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact."  Rice-Lamar v. City of Fort Lauderdale, Fla., 232 F.3d 836, 840 (11th Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Those

---

[138] Plaintiffs object to DSMF1 ¶ 124 with the pretext argument addressed and overruled supra note 54, and they dispute the fact with the same response addressed and overruled supra note 65.  (R-DSMF1 ¶ 124.)

[139] The Court excludes the portion of PSAF1 ¶ 149 proposing that "[s]everal other individuals who are less qualified than Lt. Owens have been appointed to captain since Davidson was promoted," because the citation to Lt. Owens's declaration does not lay any foundation for this conclusory assertion.  (See Owens Decl. [79-2] ¶ 11.)  Moreover, the fact is immaterial.  Plaintiff Owens can establish pretext based on relative qualifications only by showing that he was substantially better qualified than the candidates chosen for promotion.  See infra Part III.A.3.d.

materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quotation marks omitted). Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. Anderson, 477 U.S. at 252. If in response the non-moving party does not sufficiently support an essential element of her case as to which she bears the burden of proof, summary judgment is appropriate. Rice-Lamar, 232 F.3d at 840. "In determining whether genuine issues of material

84

fact exist, [the Court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party." Id. (citing Anderson, 477 U.S. at 255).

In deciding a summary judgment motion, the court's function is not to resolve issues of material fact but rather to determine whether there are any such issues to be tried. Anderson, 477 U.S. at 249-50. The applicable substantive law will identify those facts that are material. Id. at 248. Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment. Id. Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. For factual issues to be "genuine," they must have a "real basis in the record." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quotation marks and citation omitted). When the record as a whole could not lead a rational trier of fact to find for the non-movant, there is no "genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.   ANALYSIS

The First Amended Complaint raises the following claims:

(1)     race discrimination under Section 1981 (asserted via 42 U.S.C. § 1983);

(2)     race discrimination under the Equal Protection Clause of the Fourteenth Amendment (asserted via 42 U.S.C. § 1983);

(3)     retaliation under Section 1981 (asserted via 42 U.S.C. § 1983);

(4)     discrimination under USERRA; and

(5)     retaliation under USERRA.

Defendants move for summary judgment on all five claims, which the Court discusses in turn.

### A.     Summary Judgment Should Be Entered for Defendants on Plaintiffs' Section 1981 Race Discrimination Claim

"Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." Ferrill v. Parker Grp., Inc., 168 F.3d 468, 472 (11th Cir. 1999).  Plaintiffs allege that defendants violated Section 1981 when, on account of plaintiffs' race, defendants failed to promote them to the rank of captain and denied them assignments and transfers to special units.[140]  (First Am. Compl. ¶ 67.)

_____

[140] Plaintiffs assert their Section 1981 claims via 42 U.S.C. § 1983.  Section 1983 provides the exclusive remedy against state actors for violations of rights

86

An employer's failure to promote an employee because of race violates Section 1981.  Bryant v. Jones, 696 F. Supp. 2d 1313, 1321 (N.D. Ga. 2010) (before the Civil Rights Act of 1991, "a failure to promote claim could be brought under § 1981 only if the promotion rose to the level of an opportunity for a new and distinct relationship between the employee and the employer"; the 1991 Act enables an employee to bring a failure to promote claim under Section 1981 "even where the promotion would not amount to a new and distinct relationship" (internal quotation marks omitted)).  The denial of a transfer because of race violates Section 1981 if the transfer "involve[s] an increase in pay, prestige or responsibility or otherwise materially alter[s] the employee's employment status for the better."  Burch v. P.J. Cheese, Inc., 935 F. Supp. 2d 1259, 1275, 1277 (N.D. Ala. 2013) (internal quotation marks omitted).  Thus, if plaintiffs' race was the reason defendants failed to promote plaintiffs or give them assignments that would materially improve their employment status, defendants violated Section 1981.

---

contained in Section 1981.  Butts v. Cnty. of Volusia, 222 F.3d 891, 893 (11th Cir. 2000).

87

Section 1981 and Title VII are parallel remedies against discrimination that have the same requirements of proof and employ the same analytical framework.[141] Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).  Under the McDonnell Douglas evidentiary framework—developed in the Title VII context, but equally applicable to a Section 1981 claim—plaintiffs have the initial burden of establishing a prima facie case of unlawful discrimination.  Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997).  Establishment of the prima facie case creates a presumption that the employer discriminated on an illegal basis.  Id. "[If] [defendants are] silent in the face of the presumption, the court must enter judgment for . . . plaintiff[s] because no issue of fact remains in the case."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  To rebut the prima facie case, defendants must articulate legitimate, nondiscriminatory reasons for their actions.  Id.  After defendants make this showing, plaintiffs have "a full and fair

---

[141] As noted above, plaintiffs anticipate seeking leave to amend their First Amended Complaint to add Title VII race discrimination claims when they receive right-to-sue letters from the EEOC.  Given the undersigned's recommendation that plaintiffs' Section 1981 and Equal Protection Clause claims be dismissed, any Title VII race discrimination claim plaintiffs may attempt to bring in the future would be subject to dismissal.  Thus, the Court would likely deny plaintiffs leave to file a second amended complaint raising such claims.  See Hall v. United Ins. Co. of Am., 367 F.3d 1255, 1262-63 (11th Cir. 2004) (a district court may properly deny leave to amend under Rule 15(a) if the amendment "would be futile").

88

opportunity" to demonstrate that the proffered reasons are mere pretexts. Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1181-82 (11th Cir. 2010). To defeat summary judgment, plaintiffs must "present[] evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of [defendants'] legitimate, nondiscriminatory reasons." Evans v. McClain of Ga., Inc., 131 F.3d 957, 965 (11th Cir. 1997) (per curiam). Although McDonnell Douglas shifts the burden of production to defendants to rebut the prima facie case, plaintiffs "always bear[] the ultimate burden of proving discriminatory treatment by a preponderance of the evidence." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).

### 1.    **Prima Facie Case**

To establish a prima facie case of failure to promote, plaintiffs must show: (1) that they are members of a protected class; (2) that they were qualified for and applied for the promotion; (3) that they were rejected; and (4) that other equally or less qualified employees who were not members of the protected class were promoted. Combs, 106 F.3d at 1539 n.11. Defendants concede this piece of the puzzle. (Defs.' 1st Br. 7 & n.6.) The Court agrees that plaintiffs have sufficient facts to make out a prima facie case of failure to promote. They belong to a

89

protected class,[142] they were qualified to be captains, and each time they applied for or were considered for a promotion, an equally or less qualified candidate outside of the protected class was selected.

Defendants contest plaintiffs' prima facie case with regard to the alleged denials of assignments and transfers to special units. (Defs.' 1st Br. 7-8.) Their arguments receive no response in plaintiffs' First Response Brief. Therefore, the Court deems this claim abandoned and **RECOMMENDS** that summary judgment be **GRANTED** to defendants on plaintiffs' claim that they were denied assignments and transfers to special units because they are African American.[143] See Burnette v. Northside Hosp., 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) (Duffey, J.) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party."); Welch v. Delta Air Lines, Inc., 978 F. Supp.

---

[142] The protected class element is essentially a non-issue in employment discrimination cases "because everyone has a race (or sex, or national origin)." Hague v. Thompson Distribution Co., 436 F.3d 816, 820 (7th Cir. 2006).

[143] As a result, the Court excludes as immaterial DSMF1 ¶¶ 126-34, which relate to plaintiffs' special unit assignments and transfer requests.

1133, 1137 (N.D. Ga. 1997) ("Plaintiff's failure to respond to Defendant's argument alone entitled Defendant to summary judgment on these claims.").[144]

## 2.    Legitimate, Nondiscriminatory Reasons

At the second step of McDonnell Douglas, the burden of production shifts to defendants, who have an obligation to justify their actions by producing legitimate, nondiscriminatory reasons for the challenged actions.[145] This burden is "exceedingly light."  Turnes v. AmSouth Bank, NA, 36 F.3d 1057, 1061 (11th Cir. 1994) (quotation marks omitted).  Defendants "need not persuade the court that [they were] actually motivated by the proffered reasons.  It is sufficient if [defendants'] evidence raises a genuine issue of fact as to whether [they] discriminated against [plaintiffs]." Burdine, 450 U.S. at 254-55 (citation omitted).  Nevertheless, in a failure to promote case, "[a] defendant may not merely state that the employment decision was based on the hiring of the 'best qualified' applicant, but must articulate specific reasons for

---

[144] The undersigned notes that plaintiffs had good reason to abandon this claim.  In arguing that their qualifications surpass those of their white colleagues, plaintiffs state that they have more experience in special units than their white colleagues.  (Pls.' 1st Resp. 21.)  That position is hard to square with their claim that their white colleagues received superior special unit assignments.

[145] Plaintiffs allege that ten promotions made by Chief Houser violated Section 1981.  They do not oppose on race discrimination grounds any promotions made under Chief Hatfield.

91

that applicant's qualifications, such as seniority, length of service in the same position, personal characteristics, general education, or experience in comparable work." Bailey v. City of Huntsville, 517 F. App'x 857, 863 (11th Cir. 2013) (per curiam).

Plaintiffs argue that the Court must deny summary judgment as to the promotions of Lts. Goodyear, Adcock, and Pickett, because defendants have not offered legitimate, nondiscriminatory reasons for each of them. (Pls.' 1st Resp. 18.) In the record are appointment memoranda setting forth the reasons that Chief Houser promoted Lts. Goodyear and Adcock; the reasons given are specific and nondiscriminatory. (See Houser Dep. Exs. 24 & 25 [68-1].) While the record does not contain a similar memorandum setting forth the reasons for Lt. Pickett's selection, he was appointed under the selection procedures created by Chief Houser, Ms. Daniels, the SMEs, and other County personnel. (See Defs.' Mot. Summ. J. Ex. O [59-23].) Defendants have presented a detailed account of the criteria Chief Houser used to make promotions in 2012, 2013, and 2014. Accordingly, defendants have met their exceedingly light burden of articulating nondiscriminatory reasons for the promotions of Lts. Goodyear, Adcock, and Pickett, as well as for the other promotions plaintiffs challenge. See Smith v. State of Ga., 749 F.2d 683, 685, 687

92

(11th Cir. 1985) (defendant articulated legitimate, nondiscriminatory reason for not promoting plaintiff where plaintiff ranked third in evaluation of candidates, and defendant promoted only the two highest-ranked employees).

### 3. Pretext

The prima facie case now rebutted, plaintiffs are afforded an opportunity to show that defendants' stated reasons are pretexts for discrimination. Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1308 (11th Cir. 2012). To establish pretext, plaintiffs must "establish that each of the . . . proffered reasons . . . was not the true reason for the employment decision." Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks and citation omitted). Plaintiffs "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006). Under the latter approach, plaintiffs "must show weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's rationale." Holland v. Gee, 677 F.3d 1047, 1055-56 (11th Cir. 2012) (internal quotation marks omitted). Plaintiffs are "not allowed to recast an employer's proffered

93

nondiscriminatory reasons or substitute [their] business judgment for that of the employer." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id.[146]

### a.   Pre-Selection Procedures

Plaintiffs initially argue that "[b]efore there were complaints by Lt. Brown and other black officers, there *was* no [promotional] process. . . . This by itself is evidence of pretext." (Pls.' 1st Resp. 19 (citing Carter v. Three Springs Residential Treatment, 132 F.3d 635, 644 (11th Cir. 1998)).) In Carter, the Circuit noted that an employer's "failure to promulgate hiring and promotion policies can be circumstantial evidence of discrimination." 132 F.3d at 644. Where hiring and promotion criteria are unwritten and *ad hoc*, "greater scrutiny" should apply. Howard v. BP Oil Co., 32 F.3d 520, 526 (11th Cir. 1994). Sometimes, this level of

---

[146] Questions of fact in employment discrimination cases are both sensitive and difficult, and there is seldom eyewitness testimony as to the employer's mental processes. However, the Eleventh Circuit has cautioned that trial courts should not treat discrimination differently from other ultimate questions of fact. Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." Chapman, 229 F.3d at 1026.

94

scrutiny leads to an inference of pretext.  For example, in <u>Lane v. Ogden Entertainment, Inc.</u>, 13 F. Supp. 2d 1261 (M.D. Ala. 1998), the court found that the defendant's failure to maintain a written hiring policy was "enough to give the [d]efendant some problem on summary judgment."  <u>Id.</u> at 1276-77.

Between 2008 and 2011, Chiefs Hatfield and Houser selected upper management using a set of unwritten criteria.  An unfixed and highly subjective hiring process can furnish a "ready mechanism for racial discrimination," <u>Harris v. Birmingham Bd. of Educ.</u>, 712 F.2d 1377, 1383 (11th Cir. 1983), but here, the unwritten criteria served as a mechanism for the promotion of two African Americans, Captain Gallmon and Major Sampson, to the highest levels of management, <u>see</u> <u>Murray v. Gilmore</u>, 406 F.3d 708, 715 (D.C. Cir. 2005) ("[A selectee] within the same protected class cuts strongly against any inference of discrimination . . . .").  Nor was the criteria *ad hoc*.  The memoranda that accompanied the captain appointments reveal a uniformity to the criteria on which the candidates were evaluated (e.g., performance ratings, discipline, education, training, and experience). (<u>See</u> Defs.' Mot. Summ. J. Exs. S,1, S,10 & S,11 [59-27].)

This is a far cry from <u>Lane</u>, where the defendant's hiring practices were marred by "confusion and arbitrariness."  13 F. Supp. 2d at 1266.  The defendant

gave the Lane court no way to determine why others were hired, and not the plaintiff. Id. at 1265.  This Court has a way of making that determination—the detailed memoranda setting forth reasons for the captain promotions.  Contrary to the consistent and concrete (albeit not promulgated) criteria here, in Lane, the desired qualifications were such vagaries as the "needs that [the decisionmaker] thought were understood in the industry," and the applicants were evaluated solely on the decisionmaker's "experience as an executive in the industry." Id. (internal quotation marks omitted).  Under the very different facts of this case, defendants' failure to promulgate a written promotion policy before 2012 does not lead to an inference of pretext.

### b.    The Selection Procedures

For plaintiffs, the "entire story" of the selection procedures is evidence of pretext. (Pls.' 1st Resp. 19; see also Owens Dep. [71] 109 (critiquing the selection procedures as a "setup . . . biased towards your African-Americans").) They contend that the selection procedures were "nothing but a shell game designed to obscure continued race discrimination and retaliation" against them.  (Pls.' 1st Resp. 2.) Leaving for later their arguments that the procedures were applied in a racially discriminatory manner, the Court addresses plaintiffs' arguments that the procedures

96

were devised with the purpose of giving white candidates an edge in the promotional process.

### (1)    Disciplinary History Factor

Plaintiffs allege that in early 2012 Chief Houser "started manipulating the promotional process" to further the "shell game." (Pls.' 1st Resp. 10.) In this regard, they have three grievances: (1) Chief Houser changed a policy, formerly in effect, that letters of reprimand would not be considered in promotions, (2) he adopted a three-year look back period for disciplinary history, after consideration was given to ten and five years, and (3) he included the proviso that the criteria could change if circumstances warranted. (Id. at 10-11.) According to plaintiffs, this "sleight of hand" resulted in the promotion of Lt. Alexander. (Id. at 11.)

Plaintiffs' argument that Chief Houser manipulated the disciplinary history criteria to favor white candidates does not belong to the realm of reasonable inference. To begin with, plaintiffs depict Chief Houser as the bad actor (see, e.g., Brown Dep. [65] 14 (singling out Chief Houser as having a discriminatory animus against African Americans)), but it was an entire committee with African-American representation who by consensus devised the criteria. The committee's decision to account for a candidate's letters of reprimand in calculating his or her disciplinary

97

history score did not unduly disadvantage plaintiffs.  Lt. Owens had no letters of reprimand, and Lt. Brown had two, the same as or fewer than some white candidates, such as Lts. VanHoozer (two), Davidson (four), and Alexander (three).  (See Houser Dep. Exs. 21-22, 38, 96, 98-99, 123 [68-1].)

As for the length of the look back period, at the time of the 2012 Procedures Lts. Owens and Brown were the only candidates with qualifying discipline in the previous three years.  (See Defs.' Mot. Summ. J. Ex. O [59-23].)  A ten-year look back period—which appears to be plaintiffs' preference—inevitably would have captured more disciplinary events and caused additional candidates to lose points in the discipline category.  But regardless of whether the 2012 Procedures had used a three-year or ten-year period, the result would have been the same—Lts. Brown and Owens would not have received the promotion they desired.  For instance, in June 2010 Lt. Brown received ten of the fifteen points available in disciplinary history, Lt. Owens received zero, and the other eleven candidates received the maximum. (Defs.' Mot. Summ. J. Ex. Q [59-25].)  The record does not contain the evidence necessary for the Court to calculate what every candidate's score would have been had the committee adopted a ten-year look back period.  Arguendo, let us presume that the eleven other candidates would, like Lt. Owens, have received zero points.

98

The three highest scorers would have been Lts. VanHoozer (68), Ellis (66), and Alexander and Flynn (tied with 48).  (See id.)  Lt. Brown scored 45 points and Lt. Owens scored 38.  Put differently, even if every other candidate had received the lowest disciplinary history score possible, plaintiffs still would not have been promoted.  The math simply fails to bolster plaintiffs' claim that the committee adopted the three-year look back period with the intent of placing them at a competitive disadvantage.  The disciplinary history criterion did not negatively impact either plaintiff.

Early in the development of the 2012 Procedures, Ms. Daniels asked Chief Houser, "Is it fair to go back 10 years on disciplinary history?"  (Defs.' Mot. Summ. J. Ex. H [59-16].)  The committee may have determined that a ten-year window was unfair to officers who had struggled at the start of their careers, but had reformed and in recent years become model employees.  Whether a ten-year period was unfair to candidates who had improved their records, whether a three-year period was too lenient to candidates whose checkered disciplinary histories made their recent clean streak appear anomalous, or whether letters of reprimand were appropriate to consider in the promotional process, are not issues for the Court to referee.  See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1092 (11th Cir. 2004) ("The role of

99

this Court is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgments. [The Court's] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." (internal quotation marks and citation omitted)).

### (2)    2013 Revisions to 2012 Procedures

Plaintiffs also complain about the caveat in the 2012 Procedures permitting the committee to change the criteria and weighting when and if circumstances warranted. In 2013, the committee took advantage of this caveat to revise the selection procedures, see supra Part I.N, but none of the changes hampered plaintiffs' ability to rise in the ranks.  The look back period's extension to five years did not impact plaintiffs' disciplinary history score.  As plaintiffs concede, if the look back period had remained three years in 2013, it would have accounted for the same discipline that hurt their scores in 2012.  (See R-DSMF1 ¶ 111.)  By awarding education points only for degrees conferred, the 2013 Procedures actually made plaintiffs more competitive; they both are college-educated and received the maximum points in that category.  As a result of this revision, Lt. Little (white), who did not have a college degree and had earned three points for education in 2012, received zero education points in 2013.  (Compare Defs.' Mot. Summ. J. Exs. Q & R [59-25, 59-26], with id.

Ex. T [59-28].)  Another revision allowed Chief Houser to select a captain from the five highest-scoring candidates instead of the top three.  Again, this change could only stand to benefit plaintiffs, who consistently scored near the bottom of the pack.

### (3)    Mutability

More generally, plaintiffs appear to object to the mutability of the captain selection process.  (See Owens Dep. [71] 96 ("[T]he process is never the same.  It changes every time.  You don't know what the process is going to be."); see also PSAF1 ¶ 84, excluded on materiality grounds.)  Between 2012 and 2014, the selection procedures were refined annually.  Changes in selection criteria are not necessarily evidence of pretext.  See Nichols v. Lewis Grocer, 138 F.3d 563, 568 (5th Cir. 1998) ("The promotion decision is a dynamic one, and the relative importance placed on various selection criteria cannot be expected to remain fixed and unyielding.").  The committee devised the selection procedures in response to complaints that Chief Hatfield's manner of selecting captains was unfair, and then altered the criteria in 2013 after Chief Houser received negative feedback about the 2012 Procedures.  There is no evidence that the committee tweaked the selection procedures—which, without revision, were working to advance candidates other than plaintiffs—to thwart the ambitions of Lts. Owens and Brown.  Indeed, as explained

above, the changes made in 2013 improved the chance that plaintiffs would be promoted.  The mutability of the selection procedures is consistent with Chief Houser's description of them as a "work in progress."  (Houser Dep. [68] 173.)

### (4)  Subjective Criteria

Plaintiffs contend that another instance of discriminatory design in the selection procedures is their "reliance on subjective command staff and supervisor ratings . . . [which are] clearly designed to create 'leeway for the promotion of people of a certain race.'"  (Pls.' 1st Resp. 20 (quoting Bass v. Bd. of Cnty. Comm'rs, Orange Cnty. Fla., 256 F.3d 1095, 1108 (11th Cir. 2001)).)

The Eleventh Circuit has recognized that subjective evaluations of job candidates "are often critical to the decisionmaking process."  Chapman, 229 F.3d at 1033.

> Take, for example, a job requiring continuing interaction with the public, such as a sales clerk or wait staff position.  Attitude, articulateness, and enthusiasm, as well as appearance, can be vitally important in such a job, yet there are few if any ways to gauge such qualities objectively or from a written application.

Id.  This is especially true for "employment decisions concerning supervisory or professional positions."  Id.; see also id. at 1034 ("Traits such as common sense, good judgment, originality, ambition, loyalty, and tact often must be assessed

102

primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position." (internal quotation marks and citation omitted)).[147]  The <u>Chapman</u> court noted that "[i]t is inconceivable that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation."  <u>Id.</u> at 1034.  Therefore, "[a]bsent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII or other federal employment discrimination statutes."  <u>Denney v. City of Albany</u>, 247 F.3d 1172, 1185 (11th Cir. 2001).

In <u>Bass</u>, which plaintiffs cite to support their argument that the selection procedure's reliance on subjective criteria is clear evidence of pretext, the white plaintiff brought a race discrimination lawsuit after he was laid off and rejected for a lieutenant-level position with a county fire department.  256 F.3d at 1098-100.  As part of the selection process, a panel interviewed the candidates.  <u>Id.</u> at 1099-100.

---

[147] The command staff ratings, which were weighted heavily, assessed such intangible assets as leadership abilities, communication skills, and reliability.  (<u>See</u> Defs.' Mot. Summ. J. Ex. Y [59-33].)

The fire chief submitted an affidavit stating that he had adopted the interview component "to create some leeway to allow us to promote minority candidates." Id. at 1099.  In holding that the plaintiff's evidence was sufficient to create a genuine issue of fact, the Bass court considered the chief's averment "circumstantial evidence of discriminatory intent" in the hiring process.  Id. at 1107, 1109.

Bass does not describe a comparable situation.  There, a high-ranking official provided a sworn statement indicating that subjective criteria were employed for a discriminatory purpose.  Here, there is no evidence whatsoever that the committee adopted subjective criteria such as the command staff and supervisory evaluations for the elbow room to advance white candidates.  Defendants' reliance on subjective criteria simply does not assist plaintiffs in establishing pretext.  See Keaton v. Cobb Cnty., 545 F. Supp. 2d 1275, 1310 (N.D. Ga. 2008) (concluding that "the use of subjective criteria did not violate Cobb County policy and therefore did not establish pretext"), report & recommendation adopted in part, id. at 1281, aff'd, No. 08-11220, 2009 WL 212097 (11th Cir. 2009) (per curiam); Stone v. Galaxy Carpet Mills, Inc., 841 F. Supp. 1181, 1187 (N.D. Ga. 1993) (noting that "use of subjective criteria is

104

not evidence of pretext" and that "[f]or professional and managerial positions, subjective criteria are more acceptable").[148]

In sum, the selection procedures employed by the CCPD do not reflect one hint of discriminatory animus.

### c.   **Application of the Selection Procedures**

Plaintiffs also contest the application of the selection procedures, whose bright lines they say Chief Houser "bent and broke" in favor of white candidates. (Pls.' 1st Resp. 19.) "An employer's violation of its own normal hiring procedure may be evidence of pretext." Bass, 256 F.3d at 1108. Thus, the Court examines whether the procedures were misapplied to give white candidates an unfair boost.

---

[148] While plaintiffs tended to fair poorly in subjective evaluations, it is not clear that a purely objective selection process would have guaranteed them a promotion. In June 2012, only one of the thirteen candidates lacked a college degree, and three candidates besides Lt. Owens had a master's degree. (Defs.' Mot. Summ. J. Ex. Q [59-25].) Five candidates had more time as a lieutenant than Lt. Owens, and two had more time in grade than Lt. Brown. (Id.) With 16 and 17 points, respectively, Lts. Owens and Brown scored slightly above the mean score in fitness (15.08); Lt. Brown's fitness score was tied with two other candidates' for second place and Lt. Owens's fitness score was tied with two other candidates' for third place. (Id.) The mean fitness score in 2013 was 15.55. (Defs.' Mot. Summ. J. Ex. T [59-28].) Lt. Owens scored below the mean (15.25). Lt. Brown's score exceeded the mean (17.75), but three candidates received higher fitness scores. (Id.) "The Court holds that, comparatively, [plaintiffs'] objective qualification[s] were not so much greater so as to render suspect [defendants'] reliance on subjective criteria in awarding the position." Stone, 841 F. Supp. at 1187-88.

### (1)   <u>Promotion of Lt. Pickett</u>

Plaintiffs claim that Lt. Pickett did not meet the minimum qualifications for appointment, and thus his selection is reason enough to deny summary judgment. (Pls.' 1st Resp. 18 n.10.)  In March 2012, to be eligible for promotion lieutenants had to have accumulated three years of in rank service "as of March 1, 2009."  (Defs.' Mot. Summ. J. Ex. G [59-15].)[149]  The parties do not agree on the meaning of this requirement.  Defendants read "as of March 1, 2009" to mean three years *counting forward from* March 1, 2009 (DSMF1 ¶ 34); for plaintiffs, the phrase indicates three years *by* March 1, 2009 (Pls.' 1st Resp. 10).  The term "as of" is "used to indicate a time or date at which something begins or ends."  <u>Merriam-Webster's Collegiate Dictionary</u> 68 (10th ed. 2001).  Thus, both readings fit the dictionary definition.[150]

---

[149] The final version of the 2012 Procedures, executed on May 21, 2012, required candidates to have, among other things, "three years [of] successful, knowledgeable and skilled experience as a County Police Lieutenant." (Defs.' Mot. Summ. J. Ex. P [59-24], at 2.)  It does not include the proviso, "as of March 1, 2009."  Therefore, that particular requirement was not maintained after the March 2012 List.

[150] The confusion here is occasioned by an unfortunate choice of words.  <u>See</u> Bryan A. Garner, <u>Garner's Modern Am. Usage</u> 68 (3d ed. 2009) ("*As of* should be used with caution.  Originally an Americanism, the phrase frequently signifies the effective date of a document, as when the document is backdated, postdated, or signed by various people at different times . . . .  When such a nuance is not intended, *as of* is the wrong phrase.").

106

In context, however, one reading makes infinitely more sense.  Plaintiffs' reading, in effect, would require six years of in rank service for promotion eligibility.  If Chief Houser's e-mail was attempting to convey that lieutenants were eligible for a promotion upon six years of in rank service, would it have chosen such an obtuse way to get that message across?  The e-mail also stated that the years served in rank had to be "continuous"  (Defs.' Mot. Summ. J. Ex. G [59-15].)  In other words, a lieutenant had to have served three years in rank *counting forward from* March 2009.  Other facts strongly suggest that defendants' interpretation was the one intended.  The 2012 Procedures issued in May required three, not six, years of in rank service.  (Defs.' Mot. Summ. J. Ex. P [59-24].)  During his deposition, Chief Houser reviewed his February 27, 2012 e-mail, which listed the requirements for the captain selection process in March 2012, and confirmed that a lieutenant with three years in grade was eligible for a promotion.  (Houser Dep. [68] 81-82; see also id. Ex. 34 [68-1]; Daniel Dep. [59-4] ¶ 25.)  Plaintiffs have not shown that defendants violated their own procedures in appointing Lt. Pickett a captain.

### (2)   **Promotion of Lt. Alexander**

Plaintiffs spot something "troubling" in the June 2012 promotion of Lt. Alexander.  "[T]he appointment memo and ratings spreadsheets said Alexander had

no discipline, but in reality, he had been reprimanded four times, twice in the last five years, and suspended in 2010." (Pls.' 1st Resp. 11.) Lt. Alexander had received three letters of reprimand, all dated outside the three-year period in effect in June 2012. (See Houser Dep. Exs. 96, 98-99 [68-1] (two letters of reprimand in 1986, one in July 2008).) Lt. Alexander's suspension resulted from a vehicle accident (id. Ex. 100 [68-1]), which the 2012 Procedures excluded from a candidate's disciplinary history score (see DSMF1 ¶ 44). Lt. Alexander's disciplinary history score was correctly calculated. Nothing troubling here.

### (3)     **Promotion of Lt. VanHoozer**

Plaintiffs complain that the July 2012 List omitted letters of reprimand that Lt. VanHoozer received in 1996 and on February 26, 2009, and a one-day suspension he received in 2005. (Pls.' 1st Resp. 12, citing Houser Dep. Exs. 20-22 [68-1].) The two letters of reprimand and the suspension fell outside of the three-year look back period in effect in July 2012. Lt. VanHoozer's disciplinary history score was correctly calculated.

### (4)     **Lt. Cebula**

Finally, plaintiffs complain that the July 2012 List improperly omitted Lt. Cebula's July 19, 2012 letter of reprimand. (Pls.' 1st Resp. 12.) The July 2012 List

108

was released on July 20, 2012.  (DSMF1 ¶ 72.)  It is not surprising that a letter of reprimand issued the previous day would be omitted from the tabulation.  A more convincing reason not to see discriminatory sleight of hand as the culprit, Lt. Cebula was the third lowest-scoring candidate in July 2012.  With the reprimand, he would have lost five points and been the second lowest-scoring of fourteen candidates. (See Defs.' Mot. Summ. J. Ex. R [59-26].)  Plaintiffs allege that Chief Houser bent the procedures so that he could promote the candidate of his choosing.  But this omission did not allow Chief Houser to promote Lt. Cebula and it did not affect plaintiffs' chances of being promoted.  The Court is not interested in every error defendants made in tabulating scores, only "an error too obvious to be unintentional."  Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996).

In sum, there is no proof that defendants misapplied the selection procedures to depress plaintiffs' scores or inflate the scores of white lieutenants.

### d.      Relative Qualifications

Plaintiffs next argue that they have demonstrated pretext with evidence that their qualifications were markedly superior to those of white lieutenants promoted to captain.  (Pls.' 1st Resp. 20-21.)  "[Q]ualifications evidence may suffice, at least

109

in some circumstances, to show pretext." <u>Ash v. Tyson Foods, Inc.</u>, 546 U.S. 454, 457 (2006) (per curiam).  "[A] plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted." <u>Springer v. Convergys Customer Mgmt. Grp. Inc.</u>, 509 F.3d 1344, 1349 (11th Cir. 2007) (per curiam) (second alteration in original, quotation marks omitted).  Rather, the plaintiff "must show that the disparities between the successful applicant's and [his] own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" <u>Brooks</u>, 446 F.3d at 1163 (quoting <u>Cooper v. S. Co.</u>, 390 F.3d 695, 732 (11th Cir. 2004)).

Acknowledging the significant showing they need to make, plaintiffs assert that an "[h]onest comparison of their qualifications with the white lieutenants promoted reveals a disparity in qualifications so obvious that a reasonable person would have promoted [them] every time." (Pls.' 1st Resp. 20-21.)  Defendants oppose plaintiffs' claim that they possessed "advanced degrees, experience in special units, POST certifications, and training that their white counterparts did not have, and less discipline." (<u>Id.</u> at 21.)  A comparison of plaintiffs' qualifications with those of officers appointed to captain between 2010 and 2014 reveals that plaintiffs

110

have not met their high evidentiary burden of showing that no reasonable person could have promoted other candidates over them.

### (1) Chief Houser's Appointments: Pre-Selection Procedures

Chief Houser appointed Lt. Goodyear a captain in 2010. Plaintiffs contend that their qualifications surpassed Lt. Goodyear's because they "had substantially more education and experience in special units than Goodyear, and less discipline at the time compared with Goodyear's two reprimands." (Pls.' 1st Resp. 8.) Plaintiffs have not shown that they had substantially more special unit experience than Lt. Goodyear, who had worked in Internal Affairs, narcotics, Special Traffic Enforcement Patrol, and the Criminal Investigations Unit. (Compare Houser Dep. Ex. 24 [68-1], with Part I.A, supra; see also PSAF1 ¶ 122; Brown Decl. [79-3] ¶¶ 9-10; Brown Dep. [65] 28 (identifying these assignments as "special units" or "career-building").) Lt. Goodyear had two letters of reprimand, but plaintiffs allege that there was at this time a policy that letters of reprimand were not considered in promotion decisions. Plaintiffs had superior academic credentials (Lt. Goodyear had 25 college credits, but no degree), but education was only one consideration in the promotional process. See Denney, 247 F.3d at 1187 ("As for Pinson, Plaintiffs assert

only that he had relatively more 'training' and had served as an 'acting Lieutenant.' But Defendants correctly counter that training was only one of the considerations taken into account by Chief Fields . . . .").  On the other hand, Lt. Goodyear had been on the force and in rank as a lieutenant longer than plaintiffs.  Despite now claiming that Lt. Goodyear's credentials are no match for his, during his deposition plaintiff Owens indicated that his own qualifications were "just as good as Goodyear's." (Owens Dep. [71] 84.)  He also opined that Lt. Goodyear was one of three other lieutenants beside himself who were highly qualified for the position of captain.  (Id. at 84-85.)

Chief Houser appointed Lt. Adcock a captain in 2011.  Plaintiffs argue that Lt. Brown should have been appointed instead because he was senior to Lt. Adcock, had fewer letters of reprimand, and had supervisory experience that Lt. Adcock lacked. (Pls.' 1st Resp. 9.)  The two latter points are not supported by admissible evidence (see supra note 59, excluding PSAF1 ¶¶ 73 and 75), and Lt. Adcock's appointment memorandum indicates he had supervisory experience (see Houser Dep. Ex. 25 [68-1]).  Even if Lt. Adcock had received one more reprimand than Lt. Brown, this does not meet the high bar for establishing pretext by a disparity in qualifications. (Plaintiffs' insistence that Lt. Adcock's letters of reprimand are a strike against his

112

candidacy conflicts with their claim that letters of reprimand were not considered in promotion decisions until the selection procedures.)  Lt. Brown had several more years with the Department and in grade than Lt. Adcock, but captain appointments were not based solely on seniority.  See Denney, 247 F.3d at 1187.  Lt. Adcock had a post-graduate degree in public administration with an emphasis in justice administration and had been adjutant to Chief Houser, both credentials Lt. Brown lacked.  (See Houser Dep. Ex. 25 [68-1].)

The disparity in qualifications is not so obvious that no reasonable person would have promoted Lts. Goodyear and Adcock instead of plaintiffs.

### (2)    Chief Houser's Appointments:  Post-Selection Procedures

The remainder of the challenged promotions were made by Chief Houser under some form of the selection procedures.  In light of the fact that Lts. Brown and Owens were the two lowest ranking candidates in 2012 and 2013, and Lt. Owens was the second lowest-ranking candidate in 2014, no reasonable jury could conclude that they were substantially more qualified for a promotion than the selected candidates. See Bell v. Donley, 928 F. Supp. 2d 174, 183 (D.D.C. 2013) (no reasonable jury could find that plaintiff was substantially more qualified for the position where she

113

placed ninth out of eleven candidates in evaluation).  By isolating specific criteria where they trumped the appointee (e.g., they are college-educated, while Lt. Hagebak, promoted in May 2013, was not) plaintiffs are, in essence, quarreling with the wisdom of the selection procedures.  The undersigned has already reviewed and rejected plaintiffs' arguments that the selection procedure's criteria, weighting, and application show pretext.  Perhaps the committee misjudged the relative importance of various criteria (education should have been weighted more heavily, etc.), but the Court will not venture down that road.  It is not within the Court's purview to question defendants' promotion criteria and their relative weighting.[151]  See Webb v. Int'l Bus. Machs. Corp., 458 F. App'x 871, 878 (11th Cir. 2012) (per curiam) (because plaintiff's qualifications were inferior based on the formal process used to evaluate candidates, "an argument that a comparison of [plaintiff's] qualifications against [another candidate] demonstrates pretext necessarily fails"); Conner v. Lafarge N. Am., Inc., 343 F. App'x 537, 542 (11th Cir. 2009) (per curiam) ("[Defendant's] reliance on the interviews alone, rather than in conjunction with the job posting requirements or the applicants' other qualifications, may not have been

---

[151] For this reason, the Court excludes as immaterial PSAF1 ¶¶ 80-83, 111, 114-17, 119-22, 134-40, 142, and 144-46.

wise, but it does not demonstrate pretext."); <u>Bell</u>, 928 F. Supp. 2d at 184 ("[E]ven

if the Court were to believe that Bell was victimized by . . . poor selection procedures

. . . , it cannot second-guess an employer's personnel decision absent demonstrably

discriminatory motive." (second alteration in original, internal quotation marks

omitted)); <u>Barnette v. Chertoff</u>, 453 F.3d 513, 517 (D.C. Cir. 2006) ("[C]ourts must

defer to the employer's decision as to which qualities required by the job . . . it

weights more heavily.").

In sum, a comparison of plaintiffs' qualifications with those of other

candidates does not turn up evidence of pretext.

### e.    <u>Statistical Proof</u>

To argue further that the articulated reasons for the adverse actions are

pretextual, plaintiffs invoke statistics that purportedly reveal a pattern of race

discrimination in the CCPD's hiring and promotions practices.  (Pls.' 1st Resp. 2-3,

21 & n.13.)  "[I]n individual disparate treatment cases, 'statistics *may* be relevant to

establish that an employer's articulated reason for an employment action is

pretextual.'"  <u>Ogletree v. City of Auburn</u>, 619 F. Supp. 2d 1152, 1170 (M.D. Ala.

2009) (quoting <u>Burney v. Rheem Mfg. Co.</u>, 196 F.R.D. 659, 667 (M.D. Ala. 2000));

<u>but see</u> <u>Carmichael v. Birmingham Saw Works</u>, 738 F.2d 1126, 1131 (11th Cir.

115

1984) ("[S]tatistics alone cannot make a case of individual disparate treatment."). PSAF1 sets forth facts to show that: (1) 11 percent of CCPD officers are African American, whereas the population of Cobb County is roughly 25 percent African American; (2) the Department has appointed only two African-American captains since 1971; in the last nine years alone, it has appointed fifteen captains; (3) in 2013, the Department had more than thirty lieutenants, but only two were black; and (4) between 2000 and 2006, the CCPD promoted eighteen white officers to sergeant; during that time it promoted only two black officers to sergeant. (See PSAF1 ¶¶ 24-29.)

Putting the doubtful admissibility of these facts aside for a moment, the purported statistics are not evidence of pretext because they are devoid of analytic value. Wilson, 376 F.3d at 1089 ("Statistics without any analytical foundation are virtually meaningless." (internal quotation marks omitted)). In Wilson, statistical evidence that two females had been chosen for vice president out of 44 open positions was not probative of pretext where the plaintiff did not offer "other relevant information, including the number of women who expressed interest in vice president positions." 376 F.3d at 1088-89. Similarly, plaintiffs have no evidence of the racial composition of the applicant pool for new hires or of the officers who were

116

eligible and qualified for promotions to sergeant, lieutenant, and captain. Therefore, their so-called statistical evidence is meaningless.[152]  See <u>Brown v. Am. Honda Motor Co.</u>, 939 F.2d 946, 952 (11th Cir. 1991) ("To say that very few blacks have been selected by [an employer] does not say a great deal about [the employer's] practices unless [a court] know[s] how many blacks have applied and failed and compare that to the success rate of equally qualified white applicants."); <u>Jefferson v. Burger King Corp.</u>, 505 F. App'x 830, 835 (11th Cir. 2013) (per curiam) (statistical data was meaningless where it did not "define the racial composition of the pool of individuals who were qualified for [a management] position nor the racial composition of the pool of individuals who applied"); <u>Ogletree</u>, 619 F. Supp. 2d at 1171 (statistical evidence that municipal defendant hired 48 Caucasian firefighters, but only five African-American firefighters, not probative of pretext because there was no evidence as to the total number of applicants and the percentage of African-Americans in that hiring pool); <u>Keaton</u>, 545 F. Supp. 2d at 1294 (where plaintiff did not present evidence of the racial makeup of the applicant pools they could not use statistical data to establish pretext).

---

[152] For this reason, the Court excludes as immaterial PSAF ¶¶ 24-29 and 58 (in part).

Another problem with much of plaintiffs' statistical evidence is that it lacks a foundation of personal knowledge.  (See, e.g., PSAF1 ¶ 29, citing Lt. Brown's declaration for this proposition:  "Between 2000 and 2006, the only two African American sergeants to be promoted to lieutenant were Lt. Owens and Lt. Brown; there were 18 white sergeants promoted to lieutenant during that time.").)  Because PSAF1 ¶¶ 24-29 are plainly immaterial, the Court will not address defendants' objections to the admissibility of those proposed facts.

As a counterweight to plaintiffs' statistical arguments, defendants have proffered evidence of their efforts in recent years to increase the racial and ethnic diversity of Cobb County's police force.  Major Prince avers that in 2011 Internal Affairs and other DPS components stepped up recruiting at traditionally black colleges and job fairs and reached out to leaders in minority communities.  (Prince Decl. [59-5] ¶ 4.)  Such efforts may have paid off.  In 2010, minorities comprised 21 percent of newly-hired officers; in 2011, 25 percent of new hires were minorities; and by 2012, the percentage of minority hires had swelled to 34 percent.  (Id.) Plaintiffs' race discrimination claims do not, of course, turn on whether the CCPD is doing enough to recruit minority candidates.  The undersigned's purpose in summarizing Cobb County's minority recruitment efforts and recent hiring data is

118

to show that, if plaintiffs had pursued statistical evidence with a solid analytic foundation, there is no guarantee it would have revealed a pattern of racial exclusion.

### f.    <u>Convincing Mosaic</u>

Plaintiffs' final pretext-based argument is that they have established triable claims of race discrimination under the "convincing mosaic" analysis of <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321 (11th Cir. 2011).  (Pls.' 1st Resp. 21-24.) <u>Smith</u> held that a plaintiff who fails to identify a similarly-situated comparator may still create a "triable issue concerning the employer's discriminatory intent" by showing "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  644 F.3d at 1328 (footnote and internal quotation marks omitted).  However, <u>Smith</u> did not abrogate the prima facie case requirement or offer an alternative to the entire <u>McDonnell Douglas</u> analytical framework.  <u>King v. Ferguson Enters., Inc.</u>, 971 F. Supp. 2d 1200, 1216 (N.D. Ga. 2013), <u>aff'd</u>, 568 F. App'x 686 (11th Cir. 2014) (per curiam).  Rather, <u>Smith</u> confirmed "the long-established law of this [C]ircuit:  <u>McDonnell Douglas</u> does not establish the only criteria for the prima facie case."  971 F. Supp. 2d at

1216[153]; see also Bell v. Crowne Mgmt., LLC, 844 F. Supp. 2d 1222, 1234 (S.D. Ala. 2012) (non-comparator evidence used to establish a prima facie case under Smith "must suggest discrimination with force similar to that implied by treating nearly identical offenders differently"). Here, resort to Smith's alternative to the McDonnell Douglas prima facie case is unnecessary for plaintiffs to survive summary judgment on their Section 1981 discrimination claims because they have evidence of similarly-situated comparators sufficient to establish the traditional McDonnell Douglas prima facie case. See supra Part III.A.1.

In any event, the mosaic of circumstantial evidence plaintiffs present is unconvincing. In Smith, the Circuit found that summary judgment was precluded because the evidence:

> (1) suggested that the reason Lockheed gave for firing [plaintiff] was pretext for racial animus; (2) established that Lockheed had a significant incentive to subject white employees to more harsh discipline than black employees; and (3) indicated that Lockheed "consciously injected race considerations into its discipline decision making without an adequate explanation for doing so."

King, 971 F. Supp. 2d at 1217 (quoting Smith, 644 F.3d at 1341). Plaintiffs frame their argument around these three points. (Pls.' 1st Resp. 22.)

---

[153] In affirming the district court, the Eleventh Circuit declined to decide whether this reading of Smith was correct. 568 F. App'x at 689.

120

First, plaintiffs argue that defendants' nondiscriminatory reasons for denying them promotions are pretextual in light of the "great discrepancies in the qualifications" of the chosen candidates and themselves and "surreptitious changes in the selection criteria that benefitted the white selectees at [their] expense." (Pls.' 1st Resp. 23-24.) As set forth in detail <u>supra</u> Part III.A.3.d, plaintiffs have not shown pretext by way of superior qualifications, and the changes in the selection criteria did not favor white candidates.

Second, plaintiffs argue that Chief Houser had a "motive" to institute a discriminatory promotional process because the CCPD has a history of creating burdensome employment procedures after blacks pushed for inclusion. (Pls.' 1st Resp. 23.) This "history" has no basis in the record. Taken as true, however, it would not instill Chief Houser with a motive for instituting a discriminatory promotional process.

Third, plaintiffs claim that Chief Houser injected race into his decision-making. (Pls.' 1st Resp. 24.) In <u>Smith</u>, a human resources director provided the disciplinary review committee with a spreadsheet to aid them in doling out discipline; the spreadsheet conspicuously reflected the race of each employee. 644 F.3d at 1336. This "injection of race into [the] decision-making process," the

Eleventh Circuit found, "yields an unavoidable inference that the employee's race impacted the discipline determination." Id. at 1346. Plaintiffs argue that a comparable situation occurred when Chief Houser, in issuing Lt. Owens a two-day suspension, stated that he was forced to discipline Lt. Owens because of "what happened with Captain Gallmon" (i.e., his resignation from the Department after a DUI charge). (Pls.' 1st Resp. 24.) Captain Gallmon and Lt. Owens are both black, but the relevant parallel is that two high-ranking officers were involved in driving-related misconduct. Whatever Chief Houser may have meant by referring to Captain Gallmon's resignation, he certainly was not implying, "I'm punishing you because you're black, just as I punished Captain Gallmon because he is black." The Smith court apprehended the "conscious" and explicit injection of race into decision-making. Cf. Williams v. Lindenwood Univ., 288 F.3d 349, 356 (8th Cir. 2002) ("[I]njecting *racial language* at all into the decision-making process creates the inference that race had something to do with the decision-making process." (emphasis added)). Chief Houser never referred to Lt. Owens's race or Captain Gallmon's race. By mentioning someone with a driving infraction who happened to be a member of a minority race during a conversation about discipline for driving infractions, Chief Houser did not transform the conversation into one about race.

122

To conclude, defendants proffer legitimate, nondiscriminatory reasons to explain why plaintiffs were not promoted to captain in 2010 through 2014, and plaintiffs have not rebutted those reasons and established that race discrimination was the real reason they were not promoted. Accordingly, the undersigned **RECOMMENDS** that defendants' First Motion for Partial Summary Judgment be **GRANTED** on plaintiffs' Section 1981 discrimination claim.

### B.   Summary Judgment Should Be Entered for Defendants on Plaintiffs' Equal Protection Clause Claim

Plaintiffs allege that defendants' failure to promote them also violated the Equal Protection Clause. Discrimination claims brought under the Equal Protection Clause, Section 1981, and Title VII are all subject to the same standards of proof and employ the same analytical framework. Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). Plaintiffs' race discrimination claims under Section 1981 and the Equal Protection Clause "effectively merge." Alexander v. Chattahoochee Valley Cmty. Coll., 325 F. Supp. 2d 1274, 1276 n.1 (M.D. Ala. 2004). As such, it is unnecessary for the Court to address plaintiffs' Equal Protection Clause claim separately from their Section 1981 discrimination claim. See Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). Consistent with its recommendation supra Part

123

III.A, the undersigned **RECOMMENDS** that defendants' First Motion for Partial

Summary Judgment be **GRANTED** on plaintiffs' Equal Protection Clause claim.

> ### C. Summary Judgment Should Be Entered for Defendants on Plaintiffs' Section 1981 Retaliation Claim

Section 1981 encompasses retaliation claims.  CBOCS West, Inc. v.

Humphries, 553 U.S. 442, 445, 451 (2008) (citing the Eleventh Circuit's decision in

Andrews v. Lakeshore Rehab. Hosp., 140 F.3d 1405, 1411-13 (11th Cir. 1998), as

one case in a "broad consensus" recognizing retaliation claims under Section 1981).

When analyzing claims of retaliation brought under Section 1981, the Eleventh

Circuit applies the analytical framework developed in McDonnell Douglas.  See

Bryant, 575 F.3d at 1307; see also Smith v. City of Fort Pierce, Fla., 565 F. App'x

774, 776 (11th Cir. 2014) (per curiam) (Title VII's anti-retaliation framework applies

to Section 1981 claims).

Under the McDonnell Douglas framework, plaintiffs must establish a prima

facie case by showing that (1) they engaged in statutorily protected activity, (2) they

suffered a materially adverse action, and (3) there was a causal connection between

elements one and two.  Kidd v. Mando Am. Corp., 731 F.3d 1196, 1211 (11th Cir.

2013).  In their First Response Brief, plaintiffs lump together their discrimination

and retaliation claims without addressing the prima facie case of retaliation, which differs from that of discrimination. It is obvious, however, that plaintiffs engaged in statutorily protected activity when they filed EEOC charges alleging race discrimination. Smith, 565 F. App'x at 777. Likewise, there is no dispute that plaintiffs suffered materially adverse actions when defendants denied them promotions to captain. See Gray v. Hale, 212 F. App'x 952, 957 (11th Cir. 2007) (per curiam) (where an employee is qualified for a promotion, the repeated denial of that promotion is an adverse action under Title VII); accord Miller-Goodwin v. City of Panama City Beach, Fla., 385 F. App'x 966, 971 (11th Cir. 2010) (per curiam).

The prima facie case is incomplete, however, because plaintiffs have no probative evidence of a causal connection between their protected activity and subsequent materially adverse action. The requisite connection may be inferred from close temporal proximity between the protected activity and the materially adverse action. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam). The time between plaintiffs' EEOC charges—Lt. Brown filed his charge on July 31, 2012, and Lt. Owens filed his in October of that year—and the next adverse action (denials of promotion in May 2013) was ten and seven months. Therefore, temporal proximity between the protected activity and adverse action is

125

insufficient to establish causation here.  See Brown, 597 F.3d at 1182 (three-month span between protected activity and employment action too long).[154]

Absent close temporal proximity, plaintiffs "must offer additional evidence to demonstrate a causal connection, such as a pattern of antagonism or that the adverse action was the 'first opportunity' for the employer to retaliate." Jones v. Suburban Propane, Inc., 577 F. App'x 951, 955 (11th Cir. 2014) (per curiam); see also Maestas v. Segura, 416 F.3d 1182, 1189 (10th Cir. 2006) ("Other evidence of causation may include evidence the employer expressed opposition to the employee's speech or evidence the speech implicated the employer in serious misconduct or wrongdoing." (citation omitted)).

Presenting no alternative evidence of causation, plaintiffs fail to make out a prima facie case of retaliation.  Prima facie case or not, plaintiffs have no retaliation claim because they are unable to rebut defendants' legitimate, nonretaliatory

---

[154] Plaintiffs seem to allege that the materially adverse action was the alterations to the selection criteria made in December 2012, two months after Lt. Brown filed a charge, not the promotions they were denied in May 2013.  (See Pls.' 1st Resp. 13 ("Within a few months after [plaintiffs filed their EEOC charges], more changes were made to the captain selection procedures in December 2012."). Although two months is temporally close for the purposes of a prima facie case of retaliation, the revision of the 2012 Procedures was not a materially adverse employment action, if only for the reason that none of the revisions adversely affected plaintiffs' chances of attaining a promotion.  See supra Part III.A.3.b.(2).

126

explanation for the adverse actions, as discussed <u>supra</u> Part III.A.2.-3.  <u>See</u> <u>Florence v. Novo Nordisk Inc.</u>, 569 F. App'x 906, 911 (11th Cir. 2014) (per curiam) ("Additionally, even if [plaintiff] had not abandoned the issue, and he had established a *prima facie* case, Florence did not show that Novo's proffered legitimate, nondiscriminatory reason for its actions was merely a pretext for retaliation, for the same reasons he did not show that the reason was merely a pretext for age discrimination.").

Accordingly, the undersigned **RECOMMENDS** that defendants' First Motion for Partial Summary Judgment be **GRANTED** on plaintiffs' Section 1981 retaliation claims.

### D.   Summary Judgment Should Be Denied Defendant Cobb County on Plaintiff Owens's USERRA Discrimination Claim

"Congress enacted USERRA to prohibit employment discrimination on the basis of military service as well as to provide prompt reemployment to those individuals who engage in non-career service in the military." <u>Coffman v. Chugach Support Servs., Inc.</u>, 411 F.3d 1231, 1234 (11th Cir. 2005) (citing 38 U.S.C. § 4301). As outlined in <u>Coffman</u>, Sections 4311 and 4312 of USERRA grant servicemen separate and distinct protections.  <u>Id.</u>  Section 4312, not at issue, addresses a

127

serviceman's reemployment rights.  Id. at 1235.  Section 4311, applicable here,

prohibits employers from discriminating against employees on the basis of military

service.  Id. at 1234.  It also prohibits employers from retaliating against individuals

(service members or not) who testify or give statements on behalf of a USERRA

claimant.  Id.  Subsection (a), the anti-discrimination provision, provides as follows:

> (a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

38 U.S.C. § 4311(a).

To establish a prima facie case, plaintiff Owens must demonstrate by a

preponderance of the evidence that his military membership or service was a

"motivating factor" in Cobb County's decision to deny him a promotion to ACU

captain.  Ward v. United Parcel Serv., 580 F. App'x 735, 738 (11th Cir. 2014) (per

curiam) (citing 38 U.S.C. § 4311(c)(1)).  "A motivating factor does not mean that it

had to be the sole cause of the employment action.  Instead, 'it is one of the factors

that a truthful employer would list if asked for the reasons for its decision.'"

Coffman, 411 F.3d at 1238 (quoting Brandsasse v. City of Suffolk, Va., 72 F. Supp.

128

2d 608, 617 (E.D. Va. 1999)); see also id. ("[M]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." (quotation marks omitted)).

When the employee has satisfied his prima facie burden, "the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." Coffman, 411 F.3d at 1238-39 (quotation marks omitted).[155]

---

[155] This procedural framework does not derive from McDonnell Douglas, but from the Supreme Court's decision in NLRB v. Transportation Management Corp., 462 U.S. 393 (1983). Sheehan v. Dep't of Navy, 240 F.3d 1009, 1013-14 (Fed. Cir. 2001). "Unlike the *McDonnell Douglas* framework [utilized in Title VII claims], the procedural framework and evidentiary burdens set out in section 4311 shift the burden of persuasion, as well as production, to the employer." Maxfield v. Cintas Corp. No. 2, 427 F.3d 544, 551 (8th Cir. 2005) (alteration in original, quotation marks omitted); see also Velázquez-García v. Horizon Lines of P.R., Inc., 473 F.3d 11, 16-17 (1st Cir. 2007).

1.     **Prima Facie Case**

A plaintiff may establish his USERRA prima facie case through direct or circumstantial evidence of discriminatory intent.[156]  Coffman, 411 F.3d at 1239.[157] The Court can infer discriminatory motivation from a variety of factors, such as:

> proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

Id. at 1238 (quoting Sheehan, 240 F.3d at 1014).

Plaintiff Owens argues that he has direct and circumstantial evidence that defendant denied him a promotion because of his military service.  (Pl.'s 2d Resp. 13-20.)  Regardless of its classification as direct or circumstantial—a point the

---

[156] The appointment plaintiff Owens contends that he was denied because of his military leave was not made pursuant to the "defined process" scoring system. Therefore, defendant Cobb County has not argued, as defendants did with respect to plaintiff Owens's race discrimination claim, that his score rendered him unqualified for the promotion.

[157] Direct evidence is evidence that, if true, proves the existence of a fact without inference or presumption.  Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997).  If the statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence.  Akouri v. Fla. Dep't of Transp., 408 F.3d 1338, 1347 (11th Cir. 2005).

130

parties dispute, but which is not material to the resolution of this claim[158]—the evidence plaintiff has presented is sufficient to establish that his military service was a motivating factor in the adverse action.

In February 2008, Chief Hatfield and the relevant decisionmaker, Director Lloyd, both informed Lt. Owens that his military leave status barred him from a promotion to captain.  Plaintiff was denied a promotion about four months later, while on military leave.  A decisionmaker's comments that evince a discriminatory bias, even when not made amidst the decisional process, may constitute circumstantial evidence of the decisionmaker's discriminatory attitude "when read in conjunction with the entire record."  Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291-92 (11th Cir. 1998).  Defendant contends that the four-month interval

---

[158] In an employment discrimination case decided under the McDonnell Douglas framework, a plaintiff who adduces direct evidence of discriminatory intent will generally survive summary judgment. See Calhoun v. EPS Corp., 36 F. Supp. 3d 1344, 1361 (N.D. Ga. 2014) ("In the usual case, when an employee presents direct evidence of discrimination (or retaliation), the employer then adduces competing evidence tending to show that it acted for some other, nondiscriminatory (or nonretaliatory) reason.  For example, the employer may insist that the employee underperformed, violated work rules, was disagreeable, or the like.  The conflicting evidence goes to a jury, who decides what to believe.").  Under the evidentiary framework used in USERRA cases, if an employee adduces direct evidence of discriminatory intent, the defendant still has the opportunity to prevail on summary judgment by establishing an affirmative defense.

131

between the remarks and the adverse action dispels an inference that the adverse action was motivated by Lt. Owens's military leave.  (Def.'s 2d Br. 11-13.)  The timing of the comments, however, is one factor; the Court must also consider their substance and context.  Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1362 (11th Cir. 1999).  The comments here came from two individuals with the authority to appoint captains, they directly concerned plaintiff Owens, and they offered a causal link between plaintiff's protected status and the adverse action (to paraphrase, "you cannot be promoted *because of* your military leave status").  These comments are significant pieces of circumstantial evidence.  The four-month gap between them and the adverse action does little to dampen the strong inference of discriminatory intent.   See Ross, 146 F.3d at 1288, 1291 (even though decisionmakers made discriminatory remarks about four years before they terminated plaintiff, "that did not prevent [plaintiff] from using these statements as evidence to persuade the jury that it should disbelieve [the employer's] proffered reason"); Damon, 196 F.3d at 1359, 1362-63 (decisionmaker's statement that he wanted "'aggressive, *young* men' like himself to be promoted is highly suggestive circumstantial evidence from which a jury could infer discriminatory animus," although it was made three months after he terminated plaintiff); Ryder v.

132

<u>Westinghouse Elec. Corp.</u>, 128 F.3d 128, 130-33 (3d Cir. 1997) (holding that remarks made one year after termination, and not directly about plaintiff, could be taken by a jury as an accurate reflection of the existing managerial attitude toward older workers).

To soften the impact of Director Lloyd's discriminatory remarks, defendant relies on the fact that Director Lloyd "retracted" those remarks—i.e., when confronted by plaintiff Owens, he stated that he had "misunderstood" the County Manager's position on plaintiff's eligibility for a promotion.  (Def.'s 2d Br. 4, 10-13.)  To the extent this can be called a retraction, it is not much of one.  Director Lloyd did not explain the nature of the "misunderstanding," and when Lt. Owens then requested that Director Lloyd "fix the problem," he replied ambiguously, "let me just get my stuff squared away."  Regardless, statements that are later retracted may be probative of discriminatory animus.  See <u>Gaskell v. Univ. of Ky.</u>, No. 09-244-KSF, 2010 WL 4867630, at *8 (E.D. Ky. Nov. 23, 2010) ("Although Troland has subsequently retracted these comments to some extent, they remain direct evidence of religious discrimination.").  Defendant's claim that Mr. Hankerson "stepped in and unequivocally resolved the promotion eligibility issue in [plaintiff's] favor" overstates the County Manager's actions.  (Def.'s 2d Reply 8-12.)  The

County Manager confirmed with Lt. Owens that he was eligible for promotion while on leave, but there is no evidence that he followed up with Director Lloyd or took steps to "resolve" the eligibility issue.

These arguments also presume that confusion over applicable law was the issue. But there is evidence of other, animus-based motivations. Director Lloyd told Chief Hatfield that he was unable to promote Lt. Owens because if a captain was not present to fulfill his duties, as Lt. Owens would not have been for a time, Mr. Hankerson would eliminate the position. Furthermore, Chief Hatfield expressed concerns over promoting Lt. Owens, because, as a military reservist, he was "gone more than he was there" and his absence would "have repercussions through the ranks."

Additional evidence creating a genuine issue of fact are the apparent inconsistencies in Director Lloyd and Chief Hatfield's actions and their testimony. At his deposition, Director Lloyd testified that to lead the ACU he "took the strongest lieutenant I could find and . . . put him over animal control, kicking and screaming." (Lloyd Dep. [69] 34.) This "no-nonsense manager" was Lt. Patellis. (Id. at 35.) Oddly, Director Lloyd declared that he did not consider Lt. Owens a viable candidate for the job because Lt. Owens had a "very strong personality" and

134

a "dominant managerial/command style." (Lloyd Decl. [61-7] ¶¶ 35-36.) Director Lloyd's ideal candidate and Lt. Owens, whom he considered unqualified for the position, sound awfully alike. Granted, Director Lloyd did distinguish between the lieutenants—Lt. Patellis was patient, tactful, and flexible, whereas Lt. Owens viewed the world in terms of black and white—but those descriptors do little to illustrate why Lt. Patellis may have been better suited for the ACU post, especially given the Janus-faced depiction of Lt. Patellis as an officer prized for his patience and flexibility, and for his no-nonsense, kicking and screaming management style.

Chief Hatfield alleges that, while serving as his adjutant, Lt. Owens took an unbending approach to management. His inflexibility created problems for Lt. Owens's peers, civilian employees, the command staff, even the public, and generated "needless clashes and problems in effective collaboration" between the chief's office and other County employees and offices. (Hatfield Decl. [61-4] ¶¶ 27-28.) Rather than advancing Chief Hatfield's agenda, Lt. Owens proved a positive hindrance to it. (Id. ¶ 29.) Lt. Owens's poor performance in the adjutant role "significantly influenced" Chief Hatfield's decision not to promote him. (Id. ¶ 30.)

Despite all this, when Director Lloyd was seeking a captain for the ACU, Chief Hatfield told Director Lloyd that he *needed* to take a look at Lt. Owens; he

135

commended Lt. Owens as a "good choice" for the job.  There is an explanation, defendant says; Chief Hatfield recommended Lt. Owens for the ACU position without knowledge of the specific "leadership style and approach" fitting to that post.  (Hatfield Decl. [61-4] ¶ 53.)  It is not clear, however, why an employee with a propensity for unnecessary conflict and a counterproductive management style had his name floated for a promotion at all.  Nor is it evident why Chief Hatfield would recommend for a high-level promotion in another department someone he did not trust with the same level of responsibility in his own.

Consider as well the finger pointing.  According to Chief Hatfield, Director Lloyd stated that Lt. Owens's military service disqualified him from a promotion. Director Lloyd's recollection differs; Chief Hatfield had concerns about promoting Lt. Owens while he was on leave because it would "have repercussions through the ranks."   Director Lloyd also deflected responsibility by saying it was Mr. Hankerson's directive that Lt. Owens not be promoted while on leave.  Mr. Hankerson denied this and alleged that he said the opposite.  These inconsistent accounts shift blame to different rungs on the managerial ladder, but one thing is clear: Mr. Hankerson, Director Lloyd, and Chief Hatfield all discussed Lt. Owens's military leave status and the effect it did or did not have on his ability to be

promoted.  Viewing the evidence and drawing all reasonable inferences in the light most favorable to plaintiff Owens, the Court finds that he has presented sufficient evidence to establish that his military service was a motivating factor in Director Lloyd's decision not to appoint him captain of the ACU.[159]

### 2.   **Affirmative Defense**

Notwithstanding the prima facie case, defendant Cobb County may prevail upon a showing that Director Lloyd would have made the same decision regardless of Lt. Owens's military service.  The affirmative defense burden has been described as a "high hurdle" and an "uphill climb."  <u>Mayeaux v. Hous. Indep. Sch. Dist.</u>, 986 F. Supp. 2d 842, 848, 850 (S.D. Tex. 2014).  To prevail, the employer "must show

---

[159] Defendant has not argued that plaintiff Owens's absence from work, rather than his military service, was the reason it denied him a promotion.  In any event, this argument would not have been successful.  <u>See</u> <u>Erickson v. U.S. Postal Serv.</u>, 571 F.3d 1364, 1368 (Fed. Cir. 2009) ("An employer cannot escape liability under USERRA by claiming that it was merely discriminating against an employee on the basis of his absence when that absence was for military service. . . .  The most significant—and predictable—consequence of reserve service with respect to the employer is that the employee is absent to perform that service.  To permit an employer to fire an employee because of his military absence would eviscerate the protections afforded by USERRA, the overarching goal of which is to prevent those who serve in the uniformed services from being disadvantaged by virtue of performing their military obligations.").

that its defense is so strong that any reasonable jury must accept it." <u>Maxfield</u>, 487 F.3d at 1138.

Defendant claims that, regardless of Lt. Owens's protected status, Director Lloyd would not have appointed him as ACU captain, and that a preponderance of the evidence proves it. (Def.'s 2d Br. 13-20.) Despite this proclamation, defendant begins not with a head-on rebuttal, but with a narrative of the process by which Director Lloyd replaced the ACU's civilian management with a sworn command—all irrelevant to its affirmative defense. (<u>Id.</u> 14-15.)

Defendant then asserts nondiscriminatory reasons for the appointment of Lt. Patellis. Director Lloyd's ideal candidate for the ACU post would have the "personality, demeanor, tact and people skills" to "deal with public demands and scrutiny," and manage civilian employees and a volunteer corps, all while overhauling the organization. (Def.'s 2d Br. 15-16.) He testified that he was familiar with Lt. Owens's work from his time as adjutant, and in his judgment Lt. Owens was not suited for the "'delicate' balances needed at the ACU" because "his style and decision-making approach [was] too inflexible [and] too 'black and white.'" (<u>Id.</u> at 16.)

138

Defendant arguably states a legitimate, nondiscriminatory reason under McDonnell Douglas. But an employer's affirmative defense in the USERRA setting demands more; the employer "must show, by a preponderance of the evidence, that the stated reason was *not* a pretext." Velázquez-García, 473 F.3d at 17. Defendant has not done so. To submit a conclusory, and somewhat vague, statement that the chosen candidate had a more flexible and tactful management style than plaintiff Owens pales in comparison to the mass of evidence defendants have marshaled in cases where courts have credited their affirmative defense. See Landolfi v. City of Melbourne, Fla., 515 F. App'x 832, 835-36 (11th Cir. 2013) (per curiam) (employer who denied plaintiff promotion established affirmative defense where it (1) presented significant evidence that the decisionmaker who denied plaintiff a promotion did not believe that he was trustworthy, made good decisions, exercised good judgment, or could work with others, and cited incidents to corroborate this belief, and (2) plaintiff had comparatively less experience and skills than the successful candidates); Madden v. Rolls Royce Corp., 563 F.3d 636, 638-39 (7th Cir. 2009) ("trial would be a waste of time" where terminated plaintiff's performance was dangerously incompetent and he had lied about his qualifications); Coyaso v. Bradley Pac. Aviation, Inc., No. 11-00267 JMS/RLP, 2012 WL 1580470, at *8 (D. Haw. May 3, 2012) (defendant

139

established it would have terminated plaintiff without regard to his military status where plaintiff violated the employer's workplace violence policy), aff'd, 578 F. App'x 715 (9th Cir. 2014).  Furthermore, defendant cannot show the absence of pretext where, as shown above, there is evidence that its nondiscriminatory reasons are pretextual.

In sum, plaintiff Owens has met his burden of establishing a prima facie case by a preponderance of the evidence, but defendant Cobb County has not met its burden of rebutting the presumption that plaintiff's military service was a motivating factor in the adverse action.  Accordingly, the undersigned **RECOMMENDS** that defendants' Second Motion for Partial Summary Judgment be **DENIED** on plaintiff Owens's USERRA discrimination claim.

### E.    Summary Judgment Should Be Entered for Defendant Cobb County on Plaintiff Owens's USERRA Retaliation Claim

USERRA further prohibits employers from taking adverse employment actions against individuals (1) who have taken action to enforce USERRA's protections, (2) who have testified in a USERRA proceeding, (3) who have participated in a USERRA investigation, or (4) who have exercised a right that USERRA provides.  Lisdahl v. Mayo Found., 633 F.3d 712, 720 (8th Cir. 2011)

(citing 38 U.S.C. § 4311(b)).  This section applies without regard to whether the person served in the uniformed services. 38 U.S.C. § 4311(b).  Although it "does not use the term 'retaliation,' the gravamen of [§ 4311(b)] is to prohibit adverse action taken in retaliation for involvement in the assertion of the substantive rights established by USERRA."  Quick v. Frontier Airlines, Inc., 544 F. Supp. 2d 1197, 1208 (D. Colo. 2008).  An employer violates § 4311(b) when an employee's protected activity is a motivating factor in the employer's adverse employment action, unless the employer proves that the action would have been taken in the absence of the protected activity.  Ward, 580 F. App'x at 739 (citing 38 U.S.C. § 3411(c)(2)).  To establish a retaliation claim under USERRA, the plaintiff must show, by a preponderance of the evidence, that his protected activity was a substantial or motivating factor in the adverse action taken against him.  Otero v. N.M. Corr. Dep't, 640 F. Supp. 2d 1346, 1353 (D.N.M. 2009); see also Crews v. City of Mt. Vernon, 567 F.3d 860, 868-70 (7th Cir. 2009) (adverse action must be "materially adverse").

Plaintiff Owens claims that Director Lloyd retaliated against him for his protected activity when he was denied promotions to captain in 2009.  Defendant does not dispute that plaintiff engaged in protected activity.  Accordingly, the Court

141

assumes that plaintiff's meetings with Mr. Hankerson and Director Lloyd were actions taken to enforce a protection afforded by USERRA. See 38 U.S.C. § 4311(b); 20 C.F.R. § 1002.23(a)(3). The Court also finds that Chief Hatfield's failure to promote plaintiff Owens to one of the three captain positions he filled in 2009 was an adverse employment action—another point undisputed by defendant. See supra Part III.C.

As for causation, the Eleventh Circuit has imported Title VII principles into the USERRA context. See Ward 580 F. App'x at 739. Therefore, a plaintiff can prove causation by showing a close temporal proximity between the protected activity and adverse action. See id. (citing Thomas, 506 F.3d at 1364). Lt. Owens took action to enforce his USERRA rights in February 2008, approximately ten months before Chief Hatfield promoted Lt. Merrifield (January 11, 2009), sixteen months before he promoted Lt. Bolenbaugh (June 28, 2009), and twenty two months before he promoted Lt. Batterton (December 13, 2009). Where, as here, "there is a delay of more than three months between the two events, then the temporal proximity is not close enough, and the plaintiff must offer some other evidence tending to show causation." Henderson v. FedEx Express, 442 F. App'x 502, 506 (11th Cir. 2011) (per curiam).

142

Such evidence may include facts demonstrating that the adverse action, although not temporally close to the protected activity, was the employer's first opportunity to retaliate against the employee. Jones, 577 F. App'x at 955; see also Pittman v. Marshall, No. 2:06-cv-507-WKW, 2007 WL 3049563, at *7 (M.D. Ala. Oct. 18, 2007) (finding sufficient temporal proximity where "upon [plaintiff's] reinstatement by the personnel board on January 3, 2006, and the first opportunity for her employer to possibly retaliate, the alleged series of harassing incidents began within sixteen days"); Dale v. Wynne, 497 F. Supp. 2d 1338, 1346 (M.D. Ala. 2007) ("In this instance, a six-week gap is enough to show temporal proximity, particularly because Dale's return to work was the first opportunity Wilson had to retaliate against her.").

Seeking to rely on a "first opportunity" rationale, plaintiff Owens contends that the 2009 captain openings presented Director Lloyd with his first opportunity to retaliate against him. (Pl.'s 2d Resp. 23.) There is no evidence that Director Lloyd had any input in Chief Hatfield's 2009 promotions. In any event, Director Lloyd's first opportunity to retaliate was in June 2008, when he had the opportunity to place Lt. Owens at the helm of the ACU, but gave that job to Lt. Patellis. Plaintiff euphemistically describes the denials of promotion in 2009 as "new" first

143

opportunities for retaliation.  (Id.)  Or, in other words, not first opportunities at all, but second, third, and fourth opportunities.  The first opportunity rationale is not viable here.

To link the protected activity and adverse action, plaintiff Owens is free to rely upon a "broad array" of evidence.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000).  Plaintiff contends that the reasons offered for Lt. Batterton's selection are unsupported by the record.  (Pl.'s 2d Resp. 23.)  "[Lt.] Batterton was supposedly chosen instead of Lt. Owens because of his law degree, but he had already been serving as a legal expert for Hatfield for the mere two years he had been a lieutenant."  (Id. at 23-24.)  This contention derives from two unsupported, faulty assumptions:  (1) that Lt. Batterton could not put his legal expertise to new and better uses as a captain, and (2) that Chief Hatfield was not entitled to promote a lieutenant who was already making use of his special expertise.  Further, Lt. Batterton's law degree was not the only reason he received a promotion.  In a memorandum announcing Lt. Batterton's appointment, Chief Hatfield wrote that he was promoting Lt. Batterton, among other reasons, on the basis of his "annual evaluations, time of service, extensive and varied experience, lack of recent, relevant disciplinary history, education/training and other activities."  (Defs.' Mot. Summ. J. Ex. S,11 [59-27], at

144

45-47.)  Lastly, plaintiff's contention that his qualifications so eclipse those of the three lieutenants promoted in 2009 that retaliation is the only conceivable explanation for the adverse action is not supported by the record.  (<u>Compare</u> Part I.A.1, <u>with</u> Defs.' Mot. Summ. J. Ex. JJ [60-13], at 25-34.)[160]

Plaintiff Owens has not a scintilla of evidence—certainly not a preponderance of the evidence—that defendant denied him a promotion in retaliation for his protected activity under USERRA.  He has only speculation.  (<u>See</u> Owens Dep. [71] 44 ("It seems to me like I was being blackballed, once I made that trek down to the county manager's office and the director's office that, you know, nothing was going to happen for me.").  Speculation, however, cannot defeat summary judgment. <u>Cordoba v. Dillard's Inc.</u>, 419 F.3d 1169, 1181 (11th Cir. 2005) ("'[U]nsupported speculation . . . does not meet a party's burden of producing some defense to a summary judgment motion.  Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.'" (second alteration in original) (quoting <u>Hedberg v. Ind. Bell Tel. Co.</u>, 47 F.3d 928, 931-32 (7th Cir. 1995)).  Therefore, the undersigned **RECOMMENDS**

---

[160] For this reason, the Court excludes as immaterial PSAF2 ¶¶ 58-66, 68-72.

that defendants' Second Motion for Partial Summary Judgment be **GRANTED** on plaintiff Owens's USERRA retaliation claim.

## IV.   CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that defendants' First Motion for Partial Summary Judgment [59] be **GRANTED** on plaintiffs' claims under Section 1981 and the Equal Protection Clause, and that defendants' Second Motion for Partial Summary Judgment [61] be **GRANTED** on plaintiff Owens's USERRA retaliation claim and **DENIED** on his USERRA discrimination claim.

The Clerk is **DIRECTED** to terminate the reference to the Magistrate Judge.

**SO RECOMMENDED**, this 18th day of May, 2015.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

146

AO 72A
(Rev.8/82)