IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMES BROWN and
CRAIG OWENS

                    **Plaintiffs,**

      **v.**

JOHN R. HOUSER, in his individual
capacity, and COBB COUNTY,
GEORGIA,

                    **Defendants.**

                              **1:13-cv-1807-WSD**

## OPINION AND ORDER

This matter is before the Court on Magistrate Judge Walter E. Johnson's Final Report and Recommendation ("R&R") [85] on Defendants John R. Houser and Cobb County, Georgia's ("Cobb County") (together, "Defendants") First Motion for Partial Summary Judgment [59] and their Second Motion for Partial Summary Judgment [61].

## I.   BACKGROUND

### A.   Facts[1]

This case arises from Plaintiffs Lieutenant James Brown ("Brown") and Lieutenant Craig Owens's ("Owens") (together, "Plaintiffs") allegation that Defendants failed to promote them to the rank of police captain because of their race.  Owens also alleges that Cobb County discriminated against him because of his military service, in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301, *et seq.*, and that Cobb County retaliated against him for exercising his rights under USERRA.  (First Am. Compl. [4] ¶¶ 77-92).

Mr. Owens was hired by the Cobb County Police Department ("CCPD") in 1989 and became a lieutenant on May 23, 2004 (Defs.' Statement of Material Facts on Counts I-III [76] ("DMSF1") ¶ 2; Pls.' Resp. to DSMF1 [79] ("R-DSMF1") ¶ 2).  Mr. Brown was hired by the CCPD in 1988 and became a lieutenant on December 31, 2000.  (DSMF1 ¶ 1; R-DSMF1 ¶ 1).  Plaintiffs are African

---

[1]     The facts are taken from the R&R and the record.  The Court finds no plain error in the facts.  To the extent that the parties have not objected to any specific facts determined in the R&R, the Court adopts them.  See Garvey v. Vaughn, 993 F.2d 776, 779 n.9 (11th Cir. 1993).  Specific objections to evidence rejected in the R&R are addressed in Section II, *infra*.

Americans.  (Brown Decl. [79-3] ¶ 7).  Plaintiffs' professional qualifications are summarized below.

         1.    *Owens*

Owens's professional experience includes positions as a SWAT team first responder, traffic death investigator, supervisor in the special operations division, an adjutant to the chief of police, a critical incident commander of the Metro Atlanta Critical Incident Response Team, and a supervisor in the Criminal Investigations Unit.  (Pls.' Statement of Additional Facts Presenting Genuine Issues for Trial as to Counts I-III [79-1] ("PSAF1") ¶¶ 11, 13; Defs.' Resp. to PSAF1 [82] ("R-PSAF1") ¶¶ 11, 13; Pls.' Statement of Additional Facts Presenting Genuine Issues for Trial as to Counts IV-V [78-1] ("PSAF2") ¶¶ 10-11; Defs.' Resp. to PSAF2 [83] ("R-PSAF2") ¶¶ 10-11).  The chief selected Owens to train at the FBI Academy.  (DSMF1 ¶ 125; R-DSMF1 ¶ 125; PSAF1 ¶ 12; R-PSAF1 ¶ 12).  Owens received the Bureau Commendation Award, Physical Fitness Award, Police Driving Award, State of Georgia Grant Writing Award, and several other honors.  (PSAF2 ¶ 13; R-PSAF2 ¶ 13).  He received annual "good performance" ratings from 2006 to 2012.  (PSAF1 ¶ 19; R-PSAF ¶ 19).

Owens holds a master's degree in public administration, a bachelor's of science in criminal justice, a graduate certificate in pre-command from the

Command General Staff College of the United States Army Command College, five certifications from the Georgia Peace Officer Standards and Training Council ("P.O.S.T."), and twenty other trainings and certifications in law enforcement, command, and management.  (PSAF1 ¶ 14; R-PSAF1 ¶ 14).  Owens is a Command Sergeant Major in the United States Army Reserves and served multiple tours of duty in Iraq and Afghanistan.  (PSAF2 ¶ 1; R-PSAF2 ¶ 1).

2.   *Brown*

Brown has a bachelor's degree in criminal justice and four P.O.S.T. certifications.  (PSAF ¶ 21; R-PSAF1 ¶ 21).  Brown managed the robbery and homicide unit.  (PSAF ¶ 22; R-PSAF ¶ 22).  He received annual "good performance" ratings from 2006 to 2012.  (PSAF1 23; R-PSAF1 ¶ 23).  Brown has been a member of the SWAT team.  (PSAF1 ¶ 39; R-PSAF1 ¶ 39).

B.   Cobb County Government

The government of Cobb County is organized into departments.  The Department of Public Safety ("DPS") includes a number of subsidiary departments and agencies.  (Defs.' Statement of Material Facts on Counts IV-V [75] ("DSMF2") ¶ 1; Pls.' Resp. to DSMF2 [78] ("R-DMSF2") ¶ 2).  DPS has administrative responsibility for the CCPD, and direct authority over certain police-related units, including Internal Affairs, 911 Emergency Center, Training

4

Center, and Animal Control Unit ("ACU").  (DSMF ¶ 3; R-DMSF ¶ 3).  DPS does not manage the CCPD's day-to-day operations, but represents the CCPD before the County Manager and Board of Commissioners on budgetary and funding issues. (Hatfield Decl. [61-4] ¶ 5).

Gary Lloyd served as director of DPS from 2003 to 2010.  (DSMF2 ¶ 2; R-DSMF2.  Director Lloyd reported to David Hankerson, the County Manager. (DSMF2 ¶ 6, R-DSMF2 ¶ 6).  Mr. Hankerson reports to the Board of Commissioners.  (DMSF2 ¶ 7; R-DSMF2 ¶ 7).  The DPS director is authorized to select and appoint police offers for assignment to certain DPS subsidiary departments, such as the ACU.  (DSMF2 ¶ 12; R-DSMF2 ¶ 12).  Officers appointed by the DPS director report to the DPS director, not the police chief. (DSMF2 ¶ 13, R-DSMF2 ¶ 13).

C.     Owens's Allegation Director Lloyd Denied Him a Promotion Because of His Military Service

Owens alleges he was denied a promotion to captain of the Animal Control Unit for discriminatory reasons.  The ACU was responsible for enforcing animal-related ordinances, dealing with vicious animals, managing the shelter and its adoption services, interfacing with animal rights organizations, managing a volunteer force, and representing Cobb County in connection with public interest groups and the media.  (DMSF2 ¶ 16; R-DMSF2 ¶ 16).  Civilians managed the

5

ACU from 2006 to 2008.  (DSMF2 ¶ 17).  In response to the Board of Commissioners' concerns about the unit, Director Lloyd replaced the ACU's civilian management with a sworn command.  (DSMF2 ¶ 18; R-DSMF2 ¶ 18).

In June 2007, the United States Army placed Owens on active duty. (DSMF2 ¶ 39, as modified by R-DMSF2 ¶ 39).  Owens took leave from the CCPD to serve in Afghanistan.  (Owens Decl. [79-2] ¶ 3; Owens Dep. [71] at 12).  While abroad, the chief of police, George Hatfield, sent Owens an e-mail notifying him that he had been selected as captain of the ACU.  (Owens Dep. [71] at 11, 13, 31; see also DSMF2 ¶ 41).  Chief Hatfield later retracted this statement, explaining that Director Lloyd would not allow Owens to be promoted while on military duty because, if he was, Mr. Hankerson would eliminate Owens's position.  (PSAF2 ¶ 35, citing, *inter alia*, Owens Dep. [71] 11-12; see also Defs.' Mot. Summ. J. Ex. H [61-10].)

In February 2008, while Owens was on rest and recuperation leave (Owens Decl. [79-2] ¶ 4), he met with Chief Hatfield and Deputy Chief Mull.  (Owens Dep. [71] at 12).  The Chief repeated that he had selected (or recommended) Owens for a promotion, but that Director Lloyd would not allow him to promote Owens.  (Id. at 11-12).  Chief Hatfield stated that this directive came from Hankerson.  (Id.).  About this same time, Chief Hatfield told Owens that "there

was a captain position coming open."  (PSAF2 ¶ 29).  Owens expressed to Chief

Hatfield his interest in being promoted to captain.  (Id. ¶ 30; R-PSAF2 ¶ 30).  He

also told Director Lloyd about his interest in being promoted to captain.  (PSAF2

¶ 31; R-PSAF2 ¶ 31).

Chief Hatfield and Director Lloyd discussed Owens's military leave and his

interest in being promoted.  (PSAF2 ¶ 32; R-PSAF2 ¶ 32).  Director Lloyd testified

that Chief Hatfield "had concerns about the perception of the rank and file of

promoting someone to [captain], or appointing them to a high rank, when that

person was gone more than they were there."  (Lloyd Dep. [69] at 61; see also

PSAF2 ¶ 33, as modified by R-PSAF2 ¶ 33).  Chief Hatfield believed promoting

someone who "was not present a lot" would have "repercussions through the

ranks."  (PSAF2 ¶ 34, as modified by R-PSAF ¶ 34; Lloyd Dep. [69] at 59).

 Concerned his military leave made him ineligible for promotion to captain,

Owens met with County Manager Hankerson to ask about his promotion eligibility

while on leave.  (PSAF2 ¶ 36; R-PSAF2 ¶ 36; DSMF2 ¶ 44).  Mr. Hankerson

assured Owens that he could compete for a promotion on the same footing as other

candidates and that he "lost no rights" because of his military obligations.

(DSMF2 ¶ 45; R-DSMF2 ¶ 45; PSAF2 ¶ 37; R-PSAF2 ¶ 37).  Mr. Hankerson's

testimony confirms the substance of this conversation.  (PSAF2 ¶ 37; R-PSAF2 ¶ 37).

Owens went straight from Mr. Hankerson's office to Director Lloyd's office. (PSAF2 ¶ 38; R-PSAF2 ¶ 38); Owens Dep. [71] 25).  Consistent with Chief Hatfield's account, Director Lloyd told Owens that he was ineligible for a promotion because of his military leave.  (PSAF2 ¶ 38; R-PSAF2 ¶ 38).  Director Lloyd added that County Manager Hankerson had told him this.  (PSAF2 ¶ 39; R-PSAF2 ¶ 39).  When Owens told Director Lloyd that Mr. Hankerson had just told him the opposite, Director Lloyd claims he had "misunderstood" Mr. Hankerson.  (PSAF ¶ 40; DSMF2 ¶ 46).  Owens then asked Director Lloyd whether he could "fix the problem."  Lloyd responded:  "[l]et me just get my stuff squared away."  (PSAF2 ¶ 42).

In March 2008, Owens returned to active duty in Iraq.  (PSAF2 ¶ 43; R-PSAF2 ¶ 43).  On March 6, 2008, Owens sent a letter to Chief Hatfield explaining the conversations between Director Lloyd, County Manager Hankerson, and him regarding the impact of his active duty service on promotion.  (PSAF2 ¶ 44, citing, *inter alia*, Hatfield Dep. Ex. 108 [67-1].)

Director Lloyd claims he wanted a no-nonsense ACU captain with the personality, demeanor, tact, and people skills required for the "delicate" task of

overhauling the unit's operations, interfacing with animal rights activists, and managing civilian employees.  (DSMF2 ¶ 28; R-DSMF2 ¶ 28; see also Prince Decl. [61-3] ¶ 11).  Director Lloyd and Major Ronald Prince, the DPS Executive Officer, knew Lieutenant Jeffrey Patellis's ("Patellis") management style and work ethic because of Patellis's assignment to the Training Center.  (DSMF2 ¶¶ 14-15, 31; R-DSMF2 ¶¶ 14-15).  Director Lloyd claims that, with input from Major Prince, he decided that Patellis, a "no-nonsense" manager, was "best suited to command the ACU in light of the operational issues at hand" because "his personality combined strong leadership skills with flexibility needed to lead the [ACU] through transition and deal with the pressure and scrutiny of animal rights groups."  (DSMF2 ¶¶ 29, 32-33; see also Prince Decl. [61-3] ¶ 15).

Director Lloyd knew Owens was eager to be appointed captain.  (DSMF2 ¶ 34; R-DSMF2 ¶ 34).  He testified that Owens:

> [d]idn't have the personality to deal with that position.  A lot of public affairs, a lot of dealing with the public and animal control rights-type people, and being able to communicate, talk to people.  Lieutenant Owens is more of a black and white person, no gray area with him.  Animal control is a very delicate position.

(Lloyd Dep. [69] at 78, quoted in DSMF2 ¶ 35).  Director Lloyd thought Owens was qualified to be a captain, but not of the ACU.  (PSAF2 ¶ 48, as modified by R-PSAF2 ¶ 48).  Chief Hatfield stated that Owens's "leadership and command

styles" were "firm, direct and unbending," and "could be viewed as rigid and lacking patience," creating "collateral problems with [c]ommand [s]taff, [p]olice peers and subordinates, and civilian employees and members of the public who did not respond well to Owens's style of leadership." (Hatfield Decl. [61-4] ¶ 27). He felt, however, that Owens was "very mission oriented and could do the job." (PSAF2 ¶ 47; R-PSAF2 ¶ 47). Chief Hatfield told Director Lloyd he "need[ed] to look at" Owens as a candidate for the ACU position because Owens "would be a good choice." (PSAF2 ¶ 47; R-PSAF2 ¶ 47; Hatfield Dep. [67-1] 42). He also recommended several other candidates. (DSMF2 ¶ 49).

The DPS created the ACU captain position in June 2008. (DSMF2 ¶ 48). On June 16, 2008, Director Lloyd appointed Patellis captain of the ACU, effective June 29, 2008. (DSMF2 ¶ 36; R-DSMF2 ¶ 36; Lloyd Decl. [61-7] ¶ 38). As stated in a memorandum, Director Lloyd promoted Patellis based on, among other reasons, his (1) "good" performance ratings in 2005 and 2006; (2) his Distinguished Performance Award and other awards, (3) a lack of "recent, relevant disciplinary history," and (4) his experience working for the DUI task force, STEP, the SWAT team, Internal Affairs, and the Training Center. (Defs.' Mot. Summ. J. Ex. S,12 [59-27] at 50-51).

10

Owens's active military duty ended by July 2008, and on July 28, 2008, he returned to full-time duty as a police lieutenant.  (DSMF2 ¶ 39; R-DSMF2 ¶ 39).

D.    Chief Hatfield's Captain Appointments:  2005-2010

From 2005 to 2010, George Hatfield served as police chief, reporting to Director Lloyd.  (DSMF1 ¶ 3; R-DSMF1 ¶ 3; DSMF2 ¶ 5; R-DSMF2 ¶ 5).  During this time, Chief Hatfield promoted seven lieutenants to captain.  (DSMF1 ¶ 13;  see also DSMF2 ¶ 50).  In 2009, Director Lloyd's role in the promotion process was to sign off on and approve funding for the appointments.  (DSMF2 ¶ 53).  Under Chief Hatfield's process, when a captain position became available, every lieutenant was considered as a candidate.  (DSMF1 ¶ 14).  Chief Hatfield, along with the command staff (all police captains, majors, and deputy chiefs), evaluated each lieutenant.  (Id.).  The appointment process was not well-defined, but Chief Hatfield's criteria accounted for a candidate's education, training, assignments, and disciplinary and complaint history.  (PSAF1 ¶¶ 6-7, R-PSAF1 ¶¶ 6-7).  With one exception (the appointment of Lt. Batterton), the captain selection process was as follows:

(a)     Chief Hatfield called a meeting of the command staff;

(b)    The command staff discussed each lieutenant's strengths, weaknesses, experience, history, training, discipline, education, assignments, and communication skills;

(c)     Chief Hatfield did not view any particular assignment or training as superior in terms of appointment readiness;

(d)     Direct supervisors and other command staff members provided firsthand information about each lieutenant;

(e)     To avoid biasing the group, Chief Hatfield offered no opinions or comments;

(f)     Each member of the command staff provided Chief Hatfield with rankings of the top five candidates he or she deemed most qualified;

(g)     Chief Hatfield considered all information and made his assessment based on the factors listed in subparagraphs (b), (d), and (f).

(DSMF1 ¶ 15). Chief Hatfield appointed the following captains:  T. Arnold (9/24/06), C. Cox (12/16/07), J. Quan (12/16/07), David Gallmon (4/17/08), Stephen Merrifield (1/11/09), Dale Bolenbaugh (6/28/09), and Brian Batterton (12/13/09).  (Id. ¶ 17; R-PSAF1 ¶ 17).  David Gallmon is African American. (Hatfield Decl. [59-3] ¶ 24).  Chief Hatfield also promoted Robert Sampson to the rank of major.  Mr. Sampson is African American.  (Lloyd Dep. [69] 51-52).

While Gary Lloyd was DPS director during the time that Lts. Merrifield, Bolenbaugh, and Batterton were appointed (see PSAF2 p 28; R-PSAF2 ¶ 28), Gary Hatfield decided to promote these three officers without input from Director Lloyd. (DSMF2 ¶ 52).  Chief Hatfield declared he did not believe Owens was the most highly qualified candidate for the appointment opportunities in 2009, based on his observation of Owens's managerial style as adjutant.  (Id. ¶ 59).

12

Owens alleges that, when he asked Chief Hatfield and Deputy Chief Mull why he was not appointed to captain in 2009, they told him "it was not up to them," but rather to Director Lloyd.  (PSAF2 ¶¶ 73-74; R-PSAF2 ¶ 73).  While Chief Hatfield does not recall making this remark, he states that when confronted with similar situations, "[i]n order to avoid detailed discussion regarding comparative merit of candidates," he would "typically refer[] the disappointed candidate to the fact that DPS 'signed off' on the appointment."  (Hatfield Decl. [59-3] ¶¶ 35-36).

E.  Plaintiffs' Complaints About Discriminatory Promotions

In 2009, Brown, and another lieutenant who is African American, met with County Manager Hankerson to complain that they were not receiving promotions and assignments on account of their race.  (PSAF1 ¶ 34; R-PSAF1 ¶ 34). Mr. Hankerson told Brown he "had his eye on" the Department and was concerned that the Sheriff's Office was more progressive in promoting African Americans. (PSAF1 ¶ 35).  Owens also met with Mr. Hankerson to discuss the lack of promotions of African American men.  (Owens Dep. [71] 118-21).  Mr. Hankerson told Owens he would "look into it."  (Id. at 119-21).  Owens also expressed to Director Lloyd and Chief Hatfield his interest in being promoted to captain. (PSAF ¶ 48; R-PSAF1 ¶ 48).

13

Around 2009, Brown shared his concerns about discrimination with the command staff.  He and other black officers told Chief Hatfield and Deputy Chiefs Ron Storey and John Houser that they were being passed over for promotions and assignments on account of their race.  (PSAF ¶ 45; R-PSAF ¶ 45).  Deputy Chief Storey told Brown that his complaint was legitimate, that he should have been considered for and assigned to better units given the length of time he had been a lieutenant, and that white lieutenants with less time in rank had received special unit assignments.  (PSAF1 46; R-PSAF1 ¶ 46).  Brown expressed his interest in being promoted to captain.  (PSAF1 ¶ 47; R-PSAF1 ¶ 47).

F.    Chief Houser's Captain Appointments:  2010-2011

On August 10, 2010, John Houser assumed command of the CCPD. (DSMF1 ¶¶ 4, 23; R-DSMF1 ¶¶ 4, 23).  Chief Houser had the authority to appoint captains.  (PSAF1 ¶ 4; R-PSAF1 ¶ 4).  In 2010 and 2011, he appointed two captains.  (DSMF1 ¶ 25; R-DSMF1 ¶ 25).  At first, Chief Houser used his predecessor's captain selection process.  (DSMF1 ¶ 26).  He considered all lieutenants as candidates for promotion and directed members of the command staff to rank their top five or six candidates in order of preference.  (Id. ¶ 27).  To fill the two openings for captain, Chief Houser chose Lt. Steven Goodyear in

14

August 2010 and Lt. Jeff Adcock in May 2011.  (Id. ¶ 29; R-DSMF ¶ 29).  Both

Mr. Goodyear and Mr. Adcock are white.  (Houser Dep. [68] at 160).

Chief Houser listed Lt. Goodyear's qualifications in a memorandum.  These

qualifications include:  (1) "good performance" ratings from 2006 through 2008;

(2) no "recent, relevant disciplinary history"; (3) his "extensive and varied

experience" over 27 years with the CCPD; (4) his work as a NIMS instructor and

assistance with multi-agency training exercises; and (5) his education, including 25

college credit hours, completion of a professional management program, and

several other professional certifications.  (PSAF1 ¶ 65; Houser Dep. Ex. 24

[68-1]).  The memorandum does not state whether command staff had input.

(PSAF1 ¶ 66; R-PSAF1 ¶ 66).  Lt. Goodyear received official reprimands in 1998

and 2007 for preventable automobile accidents.  (PSAF1 ¶ 67).

According to Chief Houser's memorandum, Lt. Adcock's qualifications

include:  (1) "good performance" ratings from 2008 through 2010; (2) no "recent,

relevant disciplinary history"; (3) his "extensive and varied experience" over 19

years with the CCPD; (4) his work as a NIMS instructor and assistance with multi-

agency training exercises; and (5) his education, including a bachelor's degree in

criminal justice, a master's degree in public administration, and 3,542 hours of

P.O.S.T. credits.  (PSAF1 ¶ 68; Houser Dep. Ex. 25 [68-1]).  The memorandum

does not state whether command staff provided input.  (PSAF1 ¶ 69; R-PSAF1
¶ 69).  In a second memorandum dated May 5, 2011, Chief Houser indicated that
he had convened a command staff meeting on March 29, 2011, and that the
command staff held Lt. Adcock in "high regard."  (PSAF1 ¶ 70, citing Houser
Dep. Ex. 26 [68-1]; R-PSAF1 ¶ 70).

     G.    <u>Development of Standardized CCPD Captain Appointment Process</u>

     In early 2012, Chief Houser consulted with Tony Hagler, Director of Human
Resources, and Kathleen Daniel, Human Resource Manager, to standardize the
process for selecting CCPD captains.  (DSMF1 ¶¶ 30-31).  Chief Houser had
received negative feedback on the informal process he had been using, and he
asked Ms. Daniel for recommendations for improving the process.  (PSAF1 ¶ 86).
On February 27, 2012, Chief Houser's office e-mailed all lieutenants, notifying
them that they needed to have served three continuous years in rank "as of
March 1, 2009" to be eligible for promotion.  (DSMF1 ¶¶ 32, 34; R-DSMF1 ¶¶ 32,
34).

     As part of the new selection process, a spreadsheet was created for use in
tallying scores for each criterion on which the candidates would be evaluated, and
for recording "promotional points" received by the candidates.  (DSMF1 ¶ 36;
Defs.' Mot. Summ. J. Ex. I [59-17]).  Chief Houser named subject matter experts

("SMEs") to work with him and Ms. Daniel to develop evaluation criteria and

determine the weight assigned to each factor.  (DSMF1 ¶ 40).  The SMEs consisted

of three white men, one white woman, and one black man.  (Id. ¶ 41; R-DSMF1

¶ 41).  On March 29, 2012, the SMEs decided on the following promotion criteria

and the weight assigned to the criteria:

| Table 1 | |
|---|---|
| Length of time in rank as lieutenant | up to 5 promotional points |
| Education | up to 5 promotional points |
| Disciplinary history | up to 15 promotional points |
| Supervisory evaluation | up to 20 promotional points |
| Command staff rating | up to 30 promotional points |
| Interview panel rating | up to 20 promotional points |
| Fitness evaluation | up to 5 promotional points |

(DSMF1 ¶ 43).  The SMEs also agreed to consider a candidate's past three years of

discipline and to exclude any discipline relating to vehicle accidents or damage of

a County vehicle.  (Id. ¶ 44, as modified by R-DSMF1 ¶ 44).  The disciplinary

history factor did not exclude letters of reprimand.  Brown claims that the CCPD

did not, in the past, consider letters of reprimand in the promotion process. (PSAF1 ¶ 85).

H.   The March 2012 List

In March 2012, promotion candidates' raw scores were determined, weighted, and assigned promotional points according to the March 29, 2012 criteria and weighting schedule (see supra Table 1).  (DSMF1 ¶ 49).  The scores were entered into a spreadsheet ("March 2012 List").  (Id. ¶ 50, citing Defs. Mot. Summ. J. Ex. O [59-23]).  The five highest scoring candidates were Dwayne Pickett (94), Ernest VanHoozer (83), Sydney Ellis (81), Kevin Flynn (63), and T.R. Alexander (63).  (Id. ¶ 51).  Plaintiffs Brown and Owens received 45 and 38 promotional points, respectively, and ranked well below the top tier candidates. (Id. ¶ 52).  On April 5, 2012, Chief Houser promoted Lt. Pickett to the rank of captain.  (DSMF1 ¶ 53; R-DSMF1 ¶ 53).  Lt. Pickett is white.  (Houser Dep. [68] at 160).

I.   2012 Selection Procedures

On May 21, 2012, Chief Houser, Mr. Hagler, and the Public Safety Director executed a document titled "Cobb County Department of Public Safety Police Department Selection Procedures:  Police Captain" ("2012 Procedures").  (DSMF1 ¶ 54; R-DMSF1 ¶ 54).  The 2012 Procedures formalized the selection process that

the SMEs and Human Resources created earlier that year.  (DMSF1 ¶ 55).  The 2012 Procedures adopted the weighting criteria determined by the SMEs in March 2012 (see supra Table 1).  (DMSF1 ¶ 59).  The look-back period for disciplinary history remained three years, and discipline for vehicular accidents or damage was not considered.  (Id.)  Chief Houser had authority to promote from the three top-scoring candidates.  (Id. ¶ 60).  The 2012 Procedures allowed the SME panel to "meet to change weighting if circumstances change such as more emphasis being placed on fitness and education."  (PSAF1 ¶ 98, quoting Defs.' Mot. Summ. J. Ex. P [59-24] at 3; R-PSAF1 ¶ 98).

J.  The June and July 2012 Lists

Similar to the March 2012 List, a spreadsheet was created in June 2012 arranging candidates for captain in order of promotional points each had received.  (DSMF1 ¶ 62).  Lt. T.R. Alexander (white male) was tied for third-highest points.  (Id. ¶ 63).  On June 27, 2012, Chief Houser promoted Lt. Alexander to captain.  (Id. ¶ 64; R-DSMF1 ¶ 64).  Chief Houser chose Lt. Alexander over higher scoring candidates Ellis (white male) and VanHoozer (white male).  (DSMF1 ¶ 65).

The three highest-scoring candidates on the July 2012 List were Lts. VanHoozer (93), Ellis (81), and Barry Little (64).  (DSMF1 ¶¶ 73-74; R-DMSF1 ¶ 74).  Brown scored 45 promotional points, and Owens scored 38.

19

(DSMF1 ¶ 73).  The July 2012 List did not include Lt. Cebula's July 19, 2012,

letter of reprimand under disciplinary history.  (PSAF1 ¶ 118; R-PSAF1 ¶ 118).

On August 30, 2012, Chief Houser promoted Lt. VanHoozer to the rank of captain.

(DMSF1 ¶ 75; R-DMSF1 ¶ 75).

K.    Plaintiffs File EEOC Charges[2]

On July 31, 2012, Brown filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC") against the CCPD, alleging he

was denied assignments to special units and appointments to captain because of his

race.  (PSAF1 ¶ 123; R-PSAF1 ¶ 123).  On October 8, 2012, Owens filed a charge

of discrimination, alleging the CCPD denied him promotions to captain because of

his race.  (PSAF1 ¶ 124; R-PSAF1 ¶ 124).  An EEOC charge filed by a CCPD

officer triggered a notice to Chief Houser by certified mail.  (Houser Dep. [68] at

127).  Chief Houser was not aware that Brown had filed a discrimination charge

until after Plaintiffs filed this lawsuit.  (Id. at 126).  He could not recall whether he

discovered Owens had filed a charge before or after the lawsuit was filed.  (Id. at

127-28).

---

[2]    The EEOC has yet to issue Plaintiffs right to sue letters on their claims.
Upon receiving their notices of right to sue, Plaintiffs anticipate seeking leave to
amend their First Amended Complaint to include Title VII discrimination and
retaliation claims.  (Pls.' 1st Resp. [72-1] 12 n.6).

L.      2013 Revisions to 2012 Procedures

Because candidates were still dissatisfied with the captain promotion process (PSAF1 ¶ 128, as modified by R-PSAF1 ¶ 128), on March 7, 2013, Chief Houser, Mr. Hagler, and the Public Safety Director executed a document titled "Cobb County Department of Public Safety Police Department Selection Procedures: Police Captain" ("2013 Procedures"), which amended the 2012 Procedures. (DSMF1 ¶ 80, citing Defs.' Mot. Summ. J. Ex. V [59-30]; R-DMSF1 ¶ 80).

The following were among the revisions made:  the top five ranked candidates could be promoted by Chief Houser; the disciplinary history look-back period was extended from three years to five years; the command staff rating process was changed to a sliding scale ranking of 1-5; and the education factor was changed to allow points only for degrees conferred, not for "equivalency education."  (DSMF1 ¶¶ 82-84).

M.      Chief Houser's Captain Appointments:  2013

In 2013, sixteen lieutenants, including Plaintiffs, participated in the captain selection process.  (DSMF1 ¶ 85; R-DSMF1 ¶ 85).  On May 3, 2013, the CCPD released the 2013 Captain's List.  (DMSF1 ¶ 89, citing Defs.' Mot. Summ. J. Ex. T [59-28]; R-DSMF1 ¶ 89).  The seven highest scorers were Lts. Hagebak (88.44), Ellis (88.42), Padilla (85.74), Flynn (85.62) and Bullock and Davidson (tied at

21

84.6).  (DMSF ¶ 90).  Brown and Owens received scores of 67.76 and 58.76,

respectively, the lowest scores on the 2013 Captain's List.  (Id. ¶ 91).  On

May 10, 2013, Chief Houser promoted Lts. Hagebak (white male) and Little (white

male) to the rank of captain.  (Id. ¶ 92; R-DSMF1 ¶ 92).  Plaintiffs filed the instant

suit after this round of promotions.  (PSAF1 ¶ 143; R-PSAF1 ¶ 143).

After the 2013 promotions were made, Lts. Bullock (white male) and

Davidson (white female), previously tied for sixth place, entered the group of the

five highest-scoring candidates.  (DSMF1 ¶ 94).  On August 18, 2013, Chief

Houser appointed Lt. Davidson captain.  (Id. ¶ 95; R-DSMF1 ¶ 95).  On

October 13, 2013, Chief Houser promoted Lt. Ellis to captain.  (DSMF1 ¶ 97;

R-DSMF1 ¶ 97).

### N.   Disciplinary History (2012-2013)

On December 16, 2010, Chief Houser issued Brown a letter of reprimand

charging him with conduct unbecoming an officer.  (DSMF1 ¶ 103; R-DSMF1

¶ 103).  On January 24, 2011, Owens received a two-day suspension arising from a

traffic collision while operating a Cobb County take-home vehicle in violation of

department regulations.  (DSMF1 ¶ 104; Defs.' Mot. Summ. J. Ex. BB [60-2] at 4).

The 2012 three-year disciplinary history look-back period included Brown's

December 2010 letter of reprimand and Owens's January 2011 suspension.

Accordingly, out of a possible fifteen points for disciplinary history, Brown received ten points and Owens did not receive any points. Even if Plaintiffs each received the full fifteen disciplinary history points, they would not have been in the top three candidates group. (DSMF1 ¶¶ 107-08).

The 2013 five-year look-back period included Brown's letter of reprimand and Owens's suspension. (DSMF1 ¶ 110; R-DSMF1 ¶ 110). A three-year look-back period also would have still included these disciplinary incidents. (DSMF ¶ 111; R-DSMF1 ¶ 111). Even if Plaintiffs received the maximum disciplinary history points, they would not have been among the top five candidates. (DSMF1 ¶ 112).

O.   2014 Revisions to 2013 Procedures

In March 2014, Human Resources engaged CPS HR Consulting ("CPS") to develop and administer the captain promotional assessment. (DSMF1 ¶¶ 7, 113). The point weighting was changed so that a candidate's knowledge, skills, and abilities comprised 50 percent of the score, the command staff rating changed from 30 percent to 25 percent of the score, and the disciplinary history changed from 15 to 10 percent of the score. (Daniel Decl. [59-4] ¶ 88, 117, 118; Defs.' Mot. Summ. J. Ex. EE [60-5] at 11-12). The remaining criteria weighting (time in rank,

education, and fitness) remained the same as in the 2012 and 2013 Procedures.  (Id. ¶ 119).

Brown retired from the CCPD on February 8, 2014, and did not participate in the 2014 Procedures.  (DSMF1 ¶ 120; R-DSMF1 ¶ 120).  Owens was one of eleven candidates (two black and nine white) who participated in the 2014 process. (DSMF1 ¶¶ 121, 123; R-DSMF1 ¶¶ 121, 123).  Owens ranked tenth.  (DSMF1 ¶ 123).  In 2014, Chief Houser appointed the highest-scoring candidate, Lt. James Ferrell (white male).  (Id. ¶ 124; R-DSMF1 ¶ 124).

B.    Procedural History

On May 29, 2013, Plaintiffs filed this action against Defendants, asserting numerous claims of race-based discrimination and unlawful retaliation under 42 U.S.C. § 1981, as well as race discrimination under the Equal Protection Clause of the Fourteenth Amendment.  Owens additionally alleged discrimination and retaliation under USERRA.  On October 17, 2014, Defendants moved for summary judgment [59, 61].  On May 18, 2015, Magistrate Judge Walter E. Johnson issued his R&R.  In it, the Magistrate Judge recommended that (i) Defendants' First Motion for Partial Summary Judgment [59] be granted on Plaintiffs' claims under Sections 1981 and the Equal Protection Clause, and (ii) that Defendants' Second

Motion for Partial Summary Judgment [61] be granted on Owens's USERRA retaliation claim and denied on his USERRA discrimination claim.

On June 15, 2015, Owens filed objections to the R&R ("Pl.'s Obj.") [89] on the ground that the Court should reject the Magistrate Judge's recommendation that summary judgment be granted on Owens's USERRA retaliation claim.  The same day, Cobb County filed objections to the R&R ("Def.'s Obj.") [88] on the ground that the Court should reject the Magistrate Judge's recommendation that summary judgment should be denied on Owens's USERRA discrimination claim.  On June 29, 2015, Owens filed a Response to Cobb County's Objections to the R&R [90].  No party objected to the Magistrate Judge's findings and conclusions regarding Plaintiffs' claims for race-based discrimination.

## II.    DISCUSSION

### A.    Legal Standards

#### 1.    *Standard of Review for R&Rs*

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam).  A district judge "shall make a *de novo* determination of those portions of the report or specified

25

proposed findings or recommendations to which objection is made."  28 U.S.C.

§ 636(b)(1).  If no party has objected to the report and recommendation, a court

conducts only a plain error review of the record.  United States v. Slay, 714 F.2d

1093, 1095 (11th Cir. 1983) (per curiam).

> 2.  *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the

burden of demonstrating the absence of a genuine dispute as to any material fact.

Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the

moving party has met this burden, the non-movant must demonstrate that summary

judgment is inappropriate by designating specific facts showing a genuine issue for

trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

The non-moving party "need not present evidence in a form necessary for

admission at trial; however, he may not merely rest on his pleadings."  Id.

"At the summary judgment stage, facts must be viewed in the light most

favorable to the nonmoving party only if there is a 'genuine' dispute as to those

facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Where the record tells two

26

different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment.  Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246.  The party opposing summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (internal quotations omitted).

B.    Plaintiffs' Race-Based Discrimination Claims

The First Amended Complaint raises the following race-based discrimination claims:  race discrimination under Section 1981 (asserted via 42 U.S.C. § 1983); race discrimination under the Equal Protection Clause of the

27

Fourteenth Amendment (asserted via 42 U.S.C. § 1983); retaliation under Section

1981 (asserted via 42 U.S.C. § 1983).  No party objects to the Magistrate Judge's

findings, and the Court conducts a plain error review of the Magistrate Judge's

findings and recommendations on these claims.  Slay, 714 F.2d at 1095.

"Section 1981 prohibits intentional race discrimination in the making and

enforcement of public and private contracts, including employment contracts."

Ferrill v. Parker Grp., Inc., 168 F.3d 468, 472 (11th Cir. 1999).  Under the

McDonnel Douglas evidentiary framework, "[a] plaintiff establishes a prima facie

case of discriminatory failure to promote by showing that (1) he is a member of a

protected class; (2) he was qualified and applied for the promotion; (3) he was

rejected despite his qualifications; and (4) other equally or less qualified employees

who were not members of the protected class were promoted."  Wilson v. B/E

Aerospace, Inc., 376 F.3d 1079, 1080 (11th Cir. 2005).    Defendants concede that

Plaintiffs established a prima facie case of failure to promote, and the Magistrate

Judge agreed a prima facie case was shown.  (R&R at 89; Defs.' 1st Br. 7 & n.6).[3]

---

[3]    The Magistrate Judge found that Plaintiffs did not respond to Defendants'
motion for summary judgment on Plaintiffs' prima facie case with regard to
alleged denials of assignments and transfers to special units, and therefore the
Plaintiffs had abandoned their claim.  (R&R at 90).  The Magistrate Judge
recommended granting Defendants' motion for summary judgment on this issue.
The Court finds no plain error in these findings and recommendation, and

The second step of the <u>McDonnell Douglas</u> analysis requires defendants to produce a legitimate, nondiscriminatory reason for their alleged discriminatory failure to promote.  This burden is "exceedingly light."  <u>Turnes v. AmSouth Bank, NA</u>, 36 F.3d 1057, 1061 (11th Cir. 1994) (quotations omitted).  The Magistrate Judge found that Defendants "presented a detailed account of the criteria Chief Houser used to make promotions in 2012, 2013, and 2014.  Accordingly, defendants have met their exceedingly light burden . . . ."  (R&R at 92).  The Court finds no plain error in this finding.

Where a prima facie case is rebutted, Plaintiffs have an opportunity to show that Defendants' stated reasons are pretexts for discrimination.  <u>Kragor v. Takeda Pharm. Am., Inc.</u>, 702 F.3d 1304, 1308 (11th Cir. 2012).   Plaintiffs must show "such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  <u>Combs v. Plantation Patterns, Meadowcraft, Inc.</u>, 106 F.3d 1519, 1528 (11th Cir. 1997).

Plaintiffs offered a number of theories in attempting to show that Defendants' stated reasons for their promotion decisions were pretexts for

---

Defendants' Motion for Summary Judgment is granted on Plaintiffs' claim that they were denied assignments and transfers to special units based on their race.

discrimination.  Plaintiffs first argued that Cobb County's initial lack of a

standardized promotional process itself was evidence of pretext.  (Pls.' 1st Resp.

[72-1] 19).  The Magistrate Judge deemed the criteria used by Chiefs Hatfield and

Houser to be sufficiently detailed and consistent to distinguish their hiring

practices from those cases where *ad hoc* and highly subjective hiring practices

were found to be a pretext for discrimination.  (R&R at 95-96).  Plaintiffs also

attempted to show that Chief Houser manipulated the promotional criteria to favor

white candidates (Pls. 1st Resp. 10), an assertion the Magistrate Judge found "does

not belong to the realm of reasonable inference."  (R&R at 97).  The Magistrate

Judge carefully demonstrated that Plaintiffs would not have received captain

promotions regardless of the changes to the promotional criteria, and that the 2013

revision in fact made Plaintiffs *more* competitive by allowing them to receive

maximum points in the education category.  (R&R 98-102).

Plaintiffs also argued that Chief Houser failed to adhere to the selection

procedures in an effort to favor white candidates.  (Pls.' 1st Resp. 19).  The

Magistrate Judge found that the promotions of Lts. Pickett, Alexander, VanHoozer,

and Cebula were made by following the procedures.  (R&R at 105-09).  The

Magistrate Judge found further that minor errors in score tabulation identified by

Plaintiffs could not reasonably be seen as discriminatory and, in any case, would not have affected the outcome.  (Id.).

The Magistrate Judge next rejected Plaintiffs' pretext argument that their qualifications were markedly superior to those of white lieutenants promoted to captain.  (R&R 109).  Comparing Plaintiffs' qualifications to those of Lts. Goodyear and Adcock does not show a disparity so obvious that no reasonable person would have promoted Lts. Goodyear and Adcock instead of Plaintiffs.  The Magistrate Judge also noted that Plaintiffs were consistently among the lowest-ranking candidates in 2012-2014, and "a comparison of plaintiffs' qualifications with those of other candidates does not turn up evidence of pretext." (R&R at 114-115).

Plaintiffs next support their pretext argument by claiming that a statistical analysis shows a pattern of race discrimination in the CCPD's hiring and promotion practices.  (Pls.' 1st Resp. 2-3, 21 & n.13).  The Magistrate Judge found that Plaintiffs failed to present any evidence of the racial composition of the applicant pool or of officers who were eligible and qualified for promotions.  The Magistrate Judge found their statistical evidence without any credible basis and effectively meaningless.  (R&R 116-17).  The Magistrate Judge also found that Plaintiffs failed to make out a viable pretext-based argument under the "convincing

mosaic" analysis of <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321 (11th Cir. 2011).  (R&R 119-122).

Plaintiffs having failed to rebut Defendants' legitimate, nondiscriminatory reasons to explain why Plaintiffs were not promoted, Magistrate Judge Johnson recommended that Defendants' First Motion for Partial Summary Judgment be granted on Plaintiffs' Section 1981 discrimination claim.  The Court finds no plain error in these findings or recommendation, and Defendants' Motion for Summary Judgment is granted on Plaintiffs' Section 1981 discrimination claim.

Noting that discrimination claims brought under the Equal Protection Clause, Section 1981, and Title VII are subject to the same standards of proof and employ the same analytical framework, the Magistrate Judge recommended that Defendants' First Motion for Partial Summary Judgment be granted on Plaintiffs' Equal Protection Clause claim.  The Court finds no plain error in these findings and recommendation, and Defendants' Motion for Summary Judgment is granted on Plaintiffs' Equal Protection Clause claim.

Finally, the Magistrate Judge found that Plaintiffs did not satisfy their burden to show a prima facie case on their Section 1981 retaliation claim, because they failed to present probative evidence of a causal connection between their protected activity and subsequent materially adverse action.  (R&R at 125-127).  A

causal connection may be inferred if there is close temporal proximity between the protected activity and the materially adverse action.  Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam).  The Magistrate Judge concluded that the time between Plaintiffs' EEOC charges (July and October 2012) and the next adverse action (no promotion in May 2013) was ten and seven months, and this extended period does not provide a temporal proximity sufficient for a reasonable juror to find that causation was established.  (R&R at 125-26).  Plaintiffs do not present any alternative evidence of causation, and their prima facie case thus fails.  The Court finds no plain error in these findings and recommendations.  Defendants' First Motion for Partial Summary Judgment is granted on Plaintiffs' Section 1981 retaliation claim.

### C.   Owens's USERRA Discrimination Claim

"Congress enacted USERRA to prohibit employment discrimination on the basis of military service as well as to provide prompt reemployment to those individuals who engage in non-career service in the military."  Coffman v. Chugach Support Servs., Inc., 411 F.3d 1231, 1234 (11th Cir. 2005) (citing 38 U.S.C. § 4301).  Section 4311 of USERRA grants service members separate and distinct protections.  Coffman, 411 F.3d at 1234.  Section 4311 prohibits employers from discriminating against employees on the basis of military service,

and prohibits employers from retaliating against individuals (service members or not) who testify or give statements on behalf of a USERRA claimant.  Id. Subsection (a), the anti-discrimination provision, provides:

> A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

38 U.S.C. § 4311(a).

To establish a prima facie case, Owens must show by a preponderance of the evidence that his military membership or service was a "motivating factor" in Cobb County's decision to deny him a promotion to ACU captain.  Ward v. United Parcel Serv., 580 F. App'x 735, 738 (11th Cir. 2014) (per curiam) (citing 38 U.S.C. § 4311(c)(1)).  "A motivating factor does not mean that it had to be the sole cause of the employment action.  Instead, 'it is one of the factors that a truthful employer would list if asked for the reasons for its decision.'" Coffman, 411 F.3d at 1238 (quoting Brandsasse v. City of Suffolk, Va., 72 F. Supp. 2d 608, 617 (E.D. Va. 1999)); see also id. ("[M]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." (quotation marks omitted)).

34

After the employee satisfies the prima facie burden, "the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." <u>Coffman</u>, 411 F.3d at 1238-39 (quotation marks omitted).[4]

        1.    *Prima Facie Case*

The Magistrate Judge found that Owens presented sufficient evidence to show that his military service was a motivating factor in Director Lloyd's decision not to appoint him captain of the ACU.[5]  This finding was based principally on the comments allegedly made by Chief Hatfield and Director Lloyd in February 2008 that Owens's military leave status barred him from, or excluded him from consideration for, a promotion to captain.

While Owens was in Afghanistan, Chief Hatfield allegedly retracted Owens's promotion to ACU captain, explaining in an e-mail that Director Lloyd would not allow Owens to be promoted while he was on active duty.  In

---

[4]     This procedural framework is founded on the Supreme Court's decision in <u>NLRB v. Transportation management Corp.</u>, 462 U.S. 393 (1983). <u>Sheehan v. Dep't of Navy</u>, 240 F.3d 1009, 1013-14 (Fed. Cir. 2001).  "Unlike the *McDonnell Douglas* framework [utilized in Title VII claims], the procedural framework and evidentiary burdens set out in section 4311 shift the burden of persuasion, as well as production, to the employer."  <u>Maxfield v. Cintas Corp. No. 2</u>, 427 F.3d 544, 551 (8th Cir. 2005) (alternation in original, quotation marks omitted); <u>see also</u> <u>Velázquez-García v. Horizon Lines of P.R., Inc.</u>, 473 F.3d 11, 16-17 (1st Cir. 2007).

[5]     There are at least disputed facts on whether it was a motivating factor.

February 2008, Chief Hatfield told Owens that he had selected (or recommended) Owens for a promotion, but reiterated that Director Lloyd would not allow him to promote Owens.  This directive not to hire, he said, came from County Manager Hankerson.  That same day, Director Lloyd told Owens that he was ineligible for a promotion because of his military leave, and that he was told this by Mr. Hankerson.  Owens was denied a promotion about four months later, while on active duty.

Relying on <u>Ross v. Rhodes Furniture, Inc.</u>, the Magistrate Judge noted that a decisionmaker's comments evincing a discriminatory bias may constitute circumstantial evidence of the decisionmaker's discriminatory attitude "when read in conjunction with the entire record."  146 F.3d 1286, 1291-92 (11th Cir. 1998). The Magistrate Judge concluded that Owens carried his burden to establish a prima facie case for a USERRA discrimination claim.  No party objects to this finding, and the Court finds no plain error in it.

### 2.   *Affirmative Defense*

The Magistrate Judge found that Cobb County did not meet its burden of rebutting the presumption that Owens's military service was a motivating factor in the adverse action.  Cobb County objects to the Magistrate Judge's finding, and the Court conducts its *de novo* review of his finding.

36

Cobb County must show, by a preponderance of the evidence, that Director Lloyd would have made the same decision not to promote Owens regardless of Owens's military service.  <u>Coffman</u>, 411 F.3d at 1239.  "All that is meant [by this standard] is that if the [employer] had two reasons for taking an adverse action against the [employee], one of them forbidden by the statute and the other not, and the [employer] can show that even if the forbidden one had been absent the adverse action would still have been taken, the [employee] loses."  <u>Madden v. Rolls Royce Corp.</u>, 563 F.3d 636, 638 (7th Cir. 2009).

"Courts have held that summary judgment for the employer is appropriate if the employer can produce uncontested evidence that it would have taken the adverse employment action even in the absence of an improper motive." <u>Murphy v. Radnor Tp.</u>, 542 Fed. App'x. 173, 177 (3rd Cir. 2013) (citing cases); <u>see also</u> <u>Leisek v. Brightwood Corp.</u>, 278 F.3d 895, 899 (9th Cir. 2002) (holding that the standard on summary judgment is whether the employer "has established as an uncontroverted fact that it would have terminated [the employee] even if he had not been a member of the [military forces]"); <u>Hill v. Michelin N. Am., Inc.</u>, 252 F.3d 307, 314 (4th Cir. 2001) (granting summary judgment where employer presented evidence which "clearly established that it would have fired [the employer for the proffered reasons] even in the absence of any improper motive")

One court has stated that this affirmative defense burden is a "high hurdle" and an "uphill climb."  Mayeaux v. Hous. Indep. Sch. Dist., 986 F. Supp. 2d 842, 848, 850 (S.D. Tex. 2014).  To prevail, the employer must show that its defense is so strong that any reasonable jury must accept it.  Maxfield, 487 F.3d at 1138. "Although the [employer] has the burden of proving that the adverse action would have been taken in any event," summary judgment is appropriate where the employer's evidence is "so compelling and so meagerly contested . . . that a trial would be a waste of time."  Madden, 563 F.3d at 638

Cobb County argues that it met its burden by showing that "the chosen candidate had a more flexible and tactful management style than plaintiff Owens." (R&R at 139).  Director Lloyd allegedly sought a candidate for the ACU post with the "personality, demeanor, tact and people skills" to "deal with public demands and scrutiny," and manage civilian employees and a volunteer corps, all while overhauling the organization."  (Def.'s 2d Br. 15-16).  Director Lloyd testified that, in his judgment, Owens was not suited for the "'delicate' balances needed at the ACU" because "his style and decision-making approach [was] too inflexible [and] too 'black and white.'" (Def.'s 2d Br. 15-16).  The Magistrate Judge found that Cobb County's proffered explanation "pales in comparison to the mass of evidence

defendants have marshaled in cases where courts have credited their affirmative defenses."  (R&R at 139).

Cobb County first argues that the "R&R imposes an erroneous evidentiary burden on the County" by requiring the employer to present a "'mass of evidence" that Owens was "unfit or incompetent to fill the position in question."  (Def.'s Obj. at 5, 10-11).  Cobb County misrepresents the Magistrate Judge's reasoning. Magistrate Judge Johnson did not find that Cobb County must show Owens was unfit or incompetent.  He simply compared the affirmative defense evidence offered by Cobb County to cases where courts have credited an employer's affirmative defense.  For example, in <u>Madden</u>, the Seventh Circuit found that "trial would be a waste of time" where the employer showed the terminated plaintiff's performance was dangerously incompetent and he had lied about his qualifications. 563 F.3d at 638-39.[6]  Judge Johnson does not suggest that Cobb County must show the same or similar facts as those in <u>Madden</u>.  He uses the case only as an example of a case in which the employer presented specific and sufficient evidence to carry its burden, and to show that the affirmative defense burden is robust.  Magistrate Judge Johnson here found that Cobb County offered "conclusory" and "vague"

---

[6]     The Magistrate Judge also compared the instant case to <u>Cayoso</u>, where the District of Hawaii held that an employer carried its affirmative defense burden by showing that the plaintiff violated the employer's workplace violence policy.

evidence and supposition on why Owens was not qualified and Patellis was.  (R&R at 139).

The Magistrate Judge applied the appropriate standard.  He correctly noted that, to prevail on a USERRA affirmative defense, the employer "must show, by a preponderance of the evidence, that the stated reason was *not* a pretext."  (R&R at 139 (citing <u>Velázquez-García v. Horizon Lines of P.R., Inc.</u>, 473 F.3d 11, 17 (1st Cir. 2007)).  <u>See also</u> <u>Coffman</u>, 411 F.3d at 1239.  The R&R points out that the descriptions of both candidates' management styles—the purported basis for candidate selection—were strikingly similar.  Cobb County's first objection is not persuasive.

Cobb County next objects that the R&R erroneously rejects facts that allegedly establish "specific County needs and priorities for a highly specialized position."  (Def.'s Obj. at 5).  The Magistrate Judge noted that Cobb County offered a "narrative of the process by which Director Lloyd replaced the ACU's civilian management with a sworn command—all irrelevant to its affirmative defense."  (R&R at 138).  Cobb County argues that the supposedly "irrelevant" evidence in fact supports that the 2008 captain position "had certain extraordinary requirements" that "justifiably and necessarily factored into the selection process." (<u>Id.</u> at 15-16).

40

Cobb County is correct that the Court should take into account evidence that supports that Director Lloyd viewed the ACU captain position as requiring specific talents. Considering this evidence, Cobb County has failed to carry its burden, because the existence of specific criteria is not the relevant consideration. Cobb County must establish the absence of a genuine issue of material fact as to whether those specific criteria would have compelled the selection of Patellis regardless of Owens's military service. The evidence they complain the Magistrate Judge ignored, standing alone, does not satisfy this burden, or they at least support that the facts on the selection criteria issue are disputed.

Judge Johnson listed specific inconsistencies in Director Lloyd's and Chief Hatfield's actions and testimony that cast significant doubt on whether any specific criteria compelled the selection of Patellis over Owens. For instance, at his deposition, Chief Hatfield alleged that, while serving as his adjutant, Owens took an unbending approach to management, creating problems and generating "needless clashes and problems in effective collaboration." (Hatfield Decl. [61-4] ¶¶ 27-28). Owens's poor performance in the adjutant role "significantly influenced" Chief Hatfield's decision not to promote him. (Id. ¶ 30). Despite this, when Director Lloyd was seeking a captain for the ACU, Chief Hatfield told Director Lloyd that he *needed* to take a look at Owens, and he commended Owens

as a "good choice" for the job.  Cobb County explained that the recommendation was made without knowledge of the specific "leadership style and approach" required of that post.  (Hatfield Decl. [61-4] ¶ 53).  This explanation is unsatisfactory and doubtfully credible—or at least the Court concludes a jury could find it so.  As the Magistrate Judge noted, it is unclear why an employee with a propensity for unnecessary conflict and a counterproductive management style would be recommended by Chief Hatfield at all, unless this propensity was exaggerated or untrue—an issue for a jury to decide.

The Magistrate Judge also found Director Lloyd's purportedly subjective reasons inconsistent in light of the fact that Lloyd said he preferred Patellis because he was a "no-nonsense manager," yet he testified that Owens had "a very strong personality" and a "dominant managerial/command style," so that Patellis and Owens "sound awfully alike."  (R&R at 135).  These inconsistencies undercut Cobb County's attempts to establish a causal link between the specific criteria for the ACU captain and the ultimate decision made by Director Lloyd.  Though Cobb County shows evidence of its needs for a specialized ACU position, this evidence, without more, is not enough to show that Director Lloyd would have made the same decision regardless of Owens's military service.  A jury must sort all of this out.

42

The inconsistencies described above also are fatal to Cobb County's final argument.  Cobb County argues that the R&R is "contrary to Eleventh Circuit axioms fully authorizing the employer's use of subjective criteria in managerial hiring/promotions" and "places the district court and/or jury in the position of 'a super-personnel department' to re-weigh [the employer's] decision-making process."  (Def.'s Obj. at 5-6).  Cobb County cites several Eleventh Circuit cases supporting an employer's right to rely on subjective evaluation of an individual's potential for success in making promotional decisions.  (Id. at 13-14).

The Magistrate Judge, however, thoughtfully considered the subjective criteria evidence offered by Defendant.  There simply are inconsistencies in Chief Hatfield's and Director Lloyd's accounts of the subjective criteria they purportedly applied in denying Owens a promotion to ACU captain.  A finding that Cobb County has not met its affirmative defense burden does not equate to placing the district court in the position of a super-personnel department.  It simply says this issue is for a finder of fact to decide.

Cobb County argues that it offered evidence that it would not have promoted Owens in the absence of any improper motive.  That evidence, however, is not "so compelling and so meagerly contested" that it demonstrates Owens would not have been promoted despite his military service.  See Madden, 563 F.3d at 638.

43

Construing all of the evidence in a light most favorable to Owens as the non-moving party, the Court on its *de novo* review finds that Cobb County has failed to establish the absence of a genuine issue of material fact as to whether Director Lloyd would have selected Patellis instead of Owens for promotion if Owens was not absent by reason of his military service.  Accordingly, Cobb County's objection to the Magistrate Judge's findings and recommendation on Owens's USERRA claim is overruled, and Defendants' Second Motion for Partial Summary Judgment on Owens's USERRA discrimination claim is denied.

> D.    Owens's USERRA Retaliation Claim

USERRA also prohibits employers from taking adverse employment actions against individuals (1) who have taken action to enforce USERRA's protections, (2) who have testified in a USERRA proceeding, (3) who have participated in a USERRA investigation, or (4) who have exercised a right that USERRA provides. Lisdahl v. Mayo Found., 633 F.3d 712, 720 (8th Cir. 2011) (citing 38 U.S.C. § 4311(b)).[7]  An employer violates Section 4311(b) when an employee's protected activity is a motivating factor in the employer's adverse employment action, unless the employer proves that the action would have been taken in the absence of the

---

[7]    Although it "does not use the term 'retaliation,' the gravamen of [Section 4311(b)] is to prohibit adverse action taken in retaliation for involvement in the assertion of the substantive rights established by USERRA."  Quick v. Frontier Airlines, Inc., 544 F. Supp. 2d 1197, 1208 (D. Colo. 2008).

protected activity.  Ward, 580 F. App'x at 739 (citing 38 U.S.C. § 3411(c)(2)).  To establish a retaliation claim under USERRA, Owens must show, by a preponderance of the evidence, that his protected activity was a substantial or motivating factor in the adverse action taken against him.  Otero v. N.M. Corr. Dep't, 640 F. Supp. 2d 1346, 1353 (D.N.M. 2009); see also Crews v. City of Mt. Vernon, 567 F.3d 860, 868-70 (7th Cir. 2009) (adverse action must be "materially adverse").

The Eleventh Circuit has imported Title VII principles into the USERRA context.  See Ward, 580 F. App'x at 739.  "In the context of employment retaliation cases, a plaintiff's burden to prove causation can be met by showing a close temporal proximity between the statutorily protected activity and adverse-employment action."  Id. (citing Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)).  In the absence of close temporal proximity, Owens must "offer additional evidence to demonstrate a causal connection, such as a pattern of antagonism or that the adverse action was the first opportunity for the employer to retaliate."  Id.  A plaintiff can also meet the causation requirement by showing inconsistent reasons given by the employer for the adverse employment action.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000); Waddell v. Small Tube Prods., Inc., 799 F.2d 69, 73 (3d Cir. 1986).

It is uncontested that Owens's meetings with Mr. Hankerson and Director Lloyd in February 2008 were statutorily protected expressions under USERRA. (R&R at 141-42 (citing 38 U.S.C. § 4311(b))).  These meetings took place approximately four months before Director Lloyd promoted Patellis (June 2008), ten months before Chief Hatfield promoted Lt. Merrifield (January 11, 2009), sixteen months before he promoted Lt. Bolenbaugh (June 28, 2009), and twenty two months before he promoted Lt. Batterton (December 13, 2009).  The Magistrate Judge found the temporal proximity was not sufficiently close to establish a prima facie case of USERRA retaliation, therefore Owens must offer additional evidence to demonstrate a causal connection.  The Court agrees.  See Henderson v. FedEx Express, 442 F. App'x 502, 506 (11th Cir. 2011) (per curiam) (holding that where "there is a delay of more than three months between the two events, then the temporal proximity is not close enough, and the plaintiff must offer some other evidence tending to show causation").

The Magistrate Judge concluded that "Plaintiff Owens has not a scintilla of evidence—certainly not a preponderance of the evidence—that defendant denied him a promotion in retaliation for his protected activity under USERRA.  He has only speculation."  (R&R at 145).  Owens objects, arguing that the Magistrate Judge erred by excluding certain evidence.  Specifically, Owens argues that the

46

Magistrate Judge should not have excluded evidence that Director Lloyd was "publicly exposed for having falsely embellished his own military record." (Pl.'s Obj. at 3). Owens contends that this evidence is relevant to show the motive of jealousy underlying Director Lloyd's animus against Owens for his military service. (Id. at 3-4). Even taking this evidence into account, the evidence amounts to mere speculation. "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Cordoba v. Dillard's Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (quotation omitted). There is nothing else in the record to support an inference that Director Lloyd retaliated against Owens because of jealousy, and this evidence alone is not enough to show causation.

Owens also seeks to show he was so much more qualified than the other candidates that retaliation is the only conceivable explanation for the adverse action. The Magistrate Judge concluded that Owens's contention is "not supported by the record." (R&R at 145). Owens argues that Magistrate Judge Johnson erred in excluding evidence that would show that Owens was more qualified than the candidates chosen for captain. (Pl.'s Obj. at 4, 7-8). Owens argues in favor of including evidence that he appeared on Good Morning America and on radio stations speaking on behalf of Cobb County, because such evidence shows he had

the skills to deal with the public that Director Lloyd claimed were necessary for the

ACU position.  (Pl.'s Obj. at 4).  Owens also argues for including evidence that

Patellis had more discipline and less education than Owens; that Merrifield had

more discipline, less special unit experience, and no P.O.S.T. certifications; and

that Bolenbaugh had less education, training, and time as a lieutenant and with the

department than Owens did.  While this evidence may be relevant, it does not

establish Owens's qualifications to be so strong as to show that retaliation is the

only reasonable explanation for his failure to be promoted.[8]

   Owens next relies on an argument based on the "first opportunity to

retaliate" doctrine.  In the absence of close temporal proximity, a plaintiff can

show causation by offering "additional evidence to demonstrate a causal

connection, such as a pattern of antagonism or that the adverse action was the first

opportunity for the employer to retaliate."  Ward, 580 F. App'x at 739.  Owens

argues that the 2009 captain openings presented Director Lloyd with his first

opportunity to retaliate against him.  (Pls.' 2d Resp. [73-1] at 23).  He argued that,

although policy dictated that Chief Hatfield had appointing authority between 2006

---

[8]   Owens does not argue that the 2008 selection of Patellis as ACU captain was
a retaliatory action.  He argues only that the 2009 captain selections were
retaliatory.  (See Pls.' 2d Resp. [73-1]; Pl.'s Obj.).  Accordingly, evidence that
Owens was more qualified than Patellis does not support Owens's retaliation
argument based on the 2009 promotions.  This evidence may support a retaliation
argument based on the 2008 ACU captain promotion.

and 2010, Director Lloyd, in fact, made all hiring decisions during this time, and that Hatfield admitted so.  (Id. at 2-3).  The Magistrate Judge concluded that there is no evidence Lloyd had any input in Hatfield's 2009 promotions, and, in any event, Director Lloyd's first opportunity to retaliate was in June 2008, when he appointed Patellis as ACU chief.  (R&R at 143).  The Magistrate Judge found that Owens's characterizations of the 2009 promotion denials as "new" first opportunities for retaliation were "not first opportunities at all, but second, third, and fourth opportunities."  (R&R at 143-44).

Owens argues that the Magistrate Judge misconstrues the law, and that the first opportunity to retaliate doctrine is not restricted to "only the next available position that the employer denied to the plaintiff."  (Pl.'s Obj. at 14).  The cases Owens cites in support of his argument do not apply the first opportunity to retaliate doctrine at all.[9]  It defies reason to interpret the doctrine to encompass anything but the *first* opportunity to retaliate.  See Rose v. Wal-Mart Stores East, Inc., No. 2:13-CV-1080, 2015 WL 1345718, at *8 (N.D. Ala Mar. 23, 2015) ("The 'first opportunity to retaliate' doctrine allows a plaintiff to prove the causation

---

[9]    See Porter v. Cal. Dep't of Corr., 419 F.3d 885, 895-96 (9th Cir. 2005) (relying on the "pattern of antagonism" rationale for finding a causal connection); Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000) (close temporal proximity showed a causal connection);  See Williams v. The Nashville Network, 132 F.3d 1123 (6th Cir. 1997) (no discussion of or reliance on the first available opportunity rationale).

element of a retaliation claim . . . if the plaintiff can show that the *defendant had*

*no earlier opportunity to retaliate* and that the evidence shows the events are not

completely unrelated." (emphasis added)). [10]  The Court agrees with the Magistrate

Judge's assessment that the first opportunity to retaliate was the 2008 ACU captain

appointment.[11]  As a result, the Court independently evaluates the evidence in the

---

[10]     See also Templeton v. First Tenn. Bank, N.A., 424 Fed. App'x 249, at *2
(4th Cir. 2011) ("Because Templeton resigned her employment shortly after she
complained of harassment, Templeton was retaliated against, if at all, upon the
employer's first opportunity to do so; *i.e.*, when Templeton expressed her interest
in being rehired approximately two  years after her resignation."); Dale v. Wynne,
497 F. Supp. 2d 1337, 1346 (M.D. Ala. 2007) ("In this instance, a six-week gap is
enough to show temporal proximity, particularly because Dale's return to work
was the first opportunity Wilson had to retaliate against her.").
[11]     Owens contends that there is "a disputed issue of material fact . . . as to
whether Lloyd was the decisionmaker with respect to the other remainder [*sic*] of
the promotions to captain other than Patellis before Lloyd stepped down as the
Director of Public Safety." (Pl.'s Obj. at 6-7).  This contention is irrelevant to
Owens's first opportunity argument, because, as discussed above, Chief Lloyd's
first opportunity for retaliation was the ACU captain promotion in 2008.
        Assuming Owens raises this objection to attempt to show a pattern of
antagonism, the argument requires the Court to make speculative leaps.  First, the
Court would have to find a genuine issue of material fact as to whether Director
Lloyd was the decisionmaker in 2009.  The Court then would be required to find a
genuine issue of material fact whether Lloyd's denials of promotion to Owens are
adequate to show a pattern of antagonism.  This argument, in turn, would be
contingent on Owens showing that Director Lloyd harbored some animus against
Owens stemming from Owens's assertion of his USERRA rights.  Owens's
proffered evidence does not and cannot satisfy these burdens, and there is no
logical progression to their argument because it is based on unwarranted and rank
speculation.

record on the 2008 ACU captain promotion under the first opportunity to retaliate doctrine.

Evaluating the facts of the 2008 ACU captain promotion, the Court finds inconsistencies in Director Lloyd's reasons for hiring Patellis instead of Owens sufficient to support an inference of causation. The Court agrees with the Magistrate Judge's conclusion that Director Lloyd's purportedly subjective reasons for hiring Patellis are inconsistent in light of the fact that Lloyd said he preferred Patellis because he was a "no-nonsense manager," yet he testified that Owens had "a very strong personality" and a "dominant managerial/command style," so that Patellis and Owens "sound awfully alike." (R&R at 135).[12] When considering the inconsistencies in light of the Court's finding that the 2008 ACU captain promotion was Director Lloyd's first opportunity to retaliate, the Court concludes, viewing the evidence as a whole, that there are facts sufficient to meet the causation element of Owens's prima facie case for USERRA retaliation. Our Circuit supports this conclusion.

---

[12]     Further, Chief Hatfield testified that, while serving as his adjutant, Owens took an unbending approach to management, creating problems and generating "needless clashes and problems in effective collaboration." (Hatfield Decl. [61-4] ¶¶ 27-28). Owens's poor performance in the adjutant role "significantly influenced" Chief Hatfield's decision not to promote him. (Id. ¶ 30). Despite this, when Director Lloyd was seeking a captain for the ACU, Chief Hatfield told Director Lloyd that he *needed* to take a look at Owens, and he commended Owens as a "good choice" for the job.

The Eleventh Circuit has held that a plaintiff can show causation in the absence of temporal proximity by offering "additional evidence to demonstrate a causal connection, such as a pattern of antagonism or that the adverse action was the first opportunity for the employer to retaliate." Ward, 580 Fed. App'x at 739. "Although timing and ongoing antagonism have often been the basis for the causal link," the Third Circuit has held, in well-reasoned opinions, that a "plaintiff may establish the connection by showing that the employer gave inconsistent reasons for [the adverse action]." Farrell, 206 F.3d at 280-81 (citing Waddell, 799 F.2d at 73)); see also Kahan v. Slippery Rock Univ. of Penn., 50 F. Supp. 3d 667, 701 (W.D. Penn. 2014).[13]  In Farrell, the Third Circuit took into account Farrell's supervisor's sexual advances, his involvement in the termination decision, the timing, and the inconsistent reasons given for termination to hold that Farrell had met the causation element of her prima facie case for retaliation. Id. at 286.

Here, Owens asserted his USERRA rights in February 2008, and was denied the ACU captain position in June 2008.  Though the temporal proximity between the protected activity and the adverse action, standing alone, is insufficient to raise an inference of causation, the Court also takes into account evidence (i) that the June 2008 promotion decision was Chief Lloyd's first opportunity to retaliate, and

---

[13]    The Court believes the reasoning in these cases would be applied by our Circuit.

(ii) that Chief Lloyd's reasons for promoting Patellis instead of Owens are, as discussed above, inconsistent.  Coupling the first opportunity causation inference with Chief Lloyd's inconsistent promotion explanations creates a factual issue whether Owens suffered retaliation when the June 2008 promotion decision was made.  Construing all of the evidence in favor of Plaintiff, the non-moving party, and mindful that "USERRA is to be liberally construed for the benefit of those who left private life to serve their country," Coffman, 411 F.3d at 1238 (citation and quotation omitted)—the Court finds, albeit barely, sufficient evidence to establish a genuine issue of material fact on Owens's USERRA retaliation claim. Cobb County has not presented adequate evidence to meet its burden to rebut Owens's prima facie case.

Accordingly, Owens's objection to the findings and recommendation in the R&R regarding Owens's USERRA retaliation claim is sustained, and Defendants' Second Motion for Partial Summary Judgment is denied on Owens's USERRA retaliation claim.

**III.  CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Magistrate Judge Walter E. Johnson's Final Report and Recommendation [85] is **ADOPTED AS MODIFIED**.

**IT IS FURTHER ORDERED** that Cobb County's Objections to the R&R [88] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Owens's Objections to the R&R [89] are **SUSTAINED**.

**IT IS FURTHER ORDERED** that Defendants' First Motion for Partial Summary Judgment [59] is **GRANTED** on Plaintiffs' claims under Section 1981 and the Equal Protection Clause.

**IT IS FURTHER ORDERED** that Defendants' Second Motion for Partial Summary Judgment [61] is **DENIED** on Owens's claims for USERRA discrimination and USERRA retaliation.

**SO ORDERED** this 4th day of September 2015.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE